## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| JOSEPH LLOYD THOMPSON<br>ANSUMANA JAMMEH<br>KAREN LOPEZ<br>SARAI HERNANDEZ<br>NILSON FERNANDO BARAHONA MARRIAGA<br>SHELLEY DINGUS<br>Irwin County Detention Center<br>132 Cotton Drive<br>Ocilla, GA 31774<br><br>and<br><br>JENNER BENAVIDES<br>DAVID FERNANDEZ<br>GERARDO ARRIAGA<br>Folkston ICE Processing Center<br>P.O. Box 248<br>Folkston, GA 31537<br><br>and<br><br>ARISTOTELES SANCHEZ MARTINEZ<br>MICHAEL ROBINSON<br>TOMAS HERNANDEZ<br>PETER OWUSU<br>Stewart County Detention Center<br>146 CCA Road<br>Lumpkin, GA 31815<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>JOHN TSOUKARIS<br>Interim Field Office Director U.S. Immigration and<br>Customs Enforcement | **HEARING REQUESTED**<br><br><br><br>Case No.: |

Atlanta Field Office,
180 Ted Turner Drive, SW, Suite 522
Atlanta, GA 30303;

and

MATTHEW T. ALBENCE
Deputy Director and Senior Official Performing the
Duties of the Director
U.S. Immigration and Customs Enforcement
500 12th Street, SW
Washington, D.C. 20536;

and

CHAD WOLF
Acting Secretary
Department of Homeland Security,
3801 Nebraska Avenue, NW
Washington, D.C. 20016;

and

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT
500 12th Street, SW
Washington, D.C. 20536;

Respondents/Defendants.

**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C.
§ 2241 AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   PARTIES ................................................................................................3

III.  JURISDICTION AND VENUE.........................................................10

IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES ..............11

V.   STATEMENT OF FACTS .................................................................11

  A.   COVID-19 Is a Global Pandemic that Poses a Significant Risk of Death or Serious Illness to Petitioners.................................................................11

     i.    Transmission of COVID-19.................................................16

     ii.   Symptoms of COVID-19, Underlying Risks Factors, and Long-Term Effects ...............................................................18

     iii.  Prevention of COVID-19 Transmission ................................19

  B.   COVID-19 Will Likely Ravage Jails, Prisons, and Detention Centers ......21

  C.   Stewart, Folkston, and Irwin Are Primed for COVID-19 Exposure and Severe Outbreaks .............................................................................30

     i.    Existing Conditions at the Georgia Detention Centers Will Further Enable COVID-19 Transmission..................................................30

     ii.   The Georgia Detention Centers Have a Dismal Medical Care Track Record and Are Currently Ignoring Reported Flu-like Symptoms Among the Detained Population...................................................34

     iii.  It Is Only a Matter of Time Before COVID-19 Reaches All Three Facilities.............................................................................40

  D.   The Lack of Hospital Resources Near the Georgia Detention Centers Will Put Petitioners at Even Greater Risk ...................................................46

  E.   ICE's Actions to Address the Pandemic Thus Far Have Been Woefully Inadequate, and Release is the Only Adequate Response to Protect Petitioners .49

  F.   Petitioners Are Particularly Vulnerable to Serious Illness or Death if Infected by COVID-19 and Should Be Released from Detention. ....................53

VI.   LEGAL FRAMEWORK ................................................................67

A.   Petitioners Have a Constitutional Right to Reasonable Safety in Custody 67

B.   This Court Has Authority to Order Petitioners' Release to Vindicate Their Fifth Amendment Rights, and Such Relief Is Necessary Here. ..........................71

C.   Habeas Is a Broad, Flexible Remedy That Authorizes Courts to Order Release from Unlawful Detention Conditions as Law and Equity Requires. ......73

VII.  CLAIM FOR RELIEF ................................................................75

A.   Violation of Fifth Amendment Right to Substantive Due Process (Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement)..75

VIII. PRAYER FOR RELIEF ................................................................77

## I.   INTRODUCTION

1.  The COVID-19 pandemic is wreaking havoc throughout the world. The United States has now surpassed the rest of the world in the number of confirmed cases. Over 6,000 Americans have died. Experts estimate that, after the pandemic runs its course, the coronavirus will have infected between 160 and 214 million people and taken the lives of up to 1.7 million people in the United States alone.

2.  There is no vaccine against COVID-19 and no known cure. Currently, the only recognized strategies to reduce the risk of exposure to COVID-19 are social distancing and improved hygiene, which have led to unprecedented public health measures around the world.

3.  Given this reality, the President has declared a national emergency; forty-eight U.S. states—including Georgia—have declared states of emergency; and numerous states and localities—including Georgia and many of its cities and counties—have issued "shelter-in-place" orders requiring residents to stay in their homes. These measures all seek to reduce the spread of the virus and, ultimately, save lives.

4.  Unfortunately, U.S. Immigration and Customs Enforcement (ICE), which has authority over the detention of immigrants who may be subject to removal from the United States, has not followed suit. Despite warnings from thousands of

medical and public health professionals that releasing detained immigrants is the

only viable option to avert an imminent public health threat, the agency has

generally refused to do so in the absence of court intervention.

5.   Federal judges across the country have ordered the urgent release of

numerous immigrants, explaining the pressing health risks created by ICE

detention and other types of imprisonment.[1]

6.   In immigration detention facilities—including Stewart Detention Center

("Stewart") in Lumpkin, Georgia; Folkston ICE Processing Center ("Folkston") in

Folkston, Georgia; and Irwin County Detention Center ("Irwin") in Ocilla,

Georgia, where Plaintiffs-Petitioners ("Petitioners") are imprisoned—social

---

[1] *See, e.g.*, *Xochihua-Jaimes v. Barr*, 2020 WL 1429877 (9th Cir. Mar. 24, 2020); *Martin Munoz v. Wolf*, Case No. 20-cv-00625-TJH-SHK (C.D. Cal. Apr. 2, 2020), ECF No. 14; *Robles Rodriguez v. Wolf*, 20-cv-00627-TJH-GJS (C.D. Cal. Apr. 2, 2020), ECF No. 37; *Hernandez v. Wolf*, CV 20-60017-TJH (KSx)(C.D. Cal. Apr. 1, 2020), ECF No. 17; *Arana v. Barr*, 2020 WL 1502039 (S.D.N.Y. Mar. 27, 2020); *Xuyue Zhang v. Barr*, 2020 WL 1502607 (C.D. Cal. March 27, 2020); *Basank v. Decker*, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Castillo v. Barr*, 2020 WL 1502864 (C.D. Cal. March 27, 2020); *Thakker v. Doll*, No. 1:20-cv-00480-JEJ (M.D. Pa. Mar. 31, 2020), ECF No. 47; *Coronel v. Decker*, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Fraihat v. Wolf*, No. ED CV 20-00590 TJH (KSx) (C.D. Cal. Mar. 30, 2020); *Calderon Jimenez v. Wolf*, No. 18 Civ. 10225 (D. Mass. Mar. 26, 2020), ECF No. 507; *United States v. Stephens*, 2020 WL 1295155, at *2 (S.D. N.Y. Mar. 19, 2020); *Matter of Extradition of Toledo Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020).

distancing is virtually impossible. In these congregate environments, hundreds or thousands of people live, eat, and sleep together in close quarters, and contact with other detainees and ICE personnel is a fact of life. ICE detention facilities are also notorious for their unsanitary conditions and meager provision of hygiene products. Under these circumstances, an outbreak of COVID-19 will "spread like wildfire," according to a former high-level ICE official.

7. Due to their medical conditions or underlying diseases, Petitioners are particularly vulnerable to serious cases of COVID-19. If they contract the virus, there is a high risk they will require critical care—largely unavailable in southern Georgia where the facilities are located—and face serious illness and death.

8. Petitioners bring this action to remedy ICE's violation of their constitutional rights and protect themselves—as well as others detained or employed at Stewart, Folkston or Irwin, or living in the surrounding communities—from the imminent harm that will result from their continued detention.

## II.    PARTIES

9. Petitioner Joseph Lloyd Thompson is a citizen of Jamaica and Legal Permanent Resident of the United States who is detained by ICE at Irwin. He has been in ICE custody since approximately January 2018. He suffers from diabetes, hypertension, depression, and a severe aortic aneurysm that requires surgery that

3

ICE has repeatedly refused to facilitate. He has a history of hospitalization for pneumonia and his heart problems. As a consequence of his health conditions, he is at high risk for severe illness or death if he contracts COVID-19.

10.     Petitioner Ansumana Jammeh is a citizen of Gambia who has been detained at Irwin since March 2019. He suffers from diabetes and severe hemorrhoids that have required surgery and caused him extreme pain. He was also hospitalized in December 2019 for inflammation in his intestine. As a consequence of his health conditions, he is at high risk for severe illness or death if he contracts COVID-19.

11.     Petitioner Karen Lopez[2] is a citizen of Honduras who has been detained by ICE at Irwin since March 2020. She has a pacemaker due to a heart condition that also caused her to suffer a stroke. She also suffers from multiple sclerosis, which causes severe chronic pain along with problems with her vision, balance, muscle

---

[2] Petitioners Karen Lopez, Jenner Benavides, David Fernandez, Sarai Hernandez, Tomas Hernandez, Gerardo Arriaga, Michael Robinson, and Peter Owusu are seeking to proceed anonymously in this action due to their reasonable fear that revealing their identities could cause them or their families to suffer serious harm, including adverse immigration consequences, harassment, and violence, and due to their need to protect their highly sensitive and personal information, including information relating to their immigration status and physical and mental health. A Motion for Leave to Proceed Under Pseudonyms is being filed contemporaneously herewith.

control, and other bodily functions. As a consequence of her health conditions, she is at high risk for severe illness or death if she contracts COVID-19.

12.     Petitioner Sarai Hernandez is a citizen of Honduras who has been detained at Irwin since March 2020. She is the sister, legal guardian, and primary caretaker of Petitioner Tomas Hernandez. She has suffered from severe asthma her entire life, which gives her respiratory distress requiring hospitalization and weakens her immune system. She has not been able to get access to an inhaler from ICE. As a consequence of her health condition, she is at high risk for severe illness or death if she contracts COVID-19.

13.     Petitioner Nilson Fernando Barahona Marriaga is a citizen of Honduras who has been detained by ICE at Irwin since October 2019. He suffers from diabetes and hypertension, both of which he has struggled to manage while in detention. His condition has deteriorated since he has been detained, and many of his requests for medical services have been ignored. As a consequence of his health condition, he is at high risk for severe illness or death if he contracts COVID-19.

14.     Petitioner Shelley Dingus is a citizen of England, who is detained by ICE at Irwin. She has been in ICE custody since January 2020. She suffers from asthma, chronic obstructive pulmonary disease, severe migraines, depression, anxiety, and eczema that causes severe skin allergies and open wounds that are easily

infected. As a consequence of her health conditions, she is at high risk for severe illness or death if she contracts COVID-19.

15.     Petitioner Jenner Benavides is a transgender woman and citizen of Mexico who has been detained by ICE at Folkston since May 2019. She is HIV positive and suffers from bipolar disorder and severe depression and anxiety. As a consequence of her health condition, she is at high risk for severe illness or death if she contracts COVID-19.

16.     Petitioner David Fernandez is a citizen of Mexico who has been detained by ICE at Folkston since December 2019. He suffers from diabetes and has a history of tuberculosis. ICE has not consistently provided him with his necessary insulin injections, so his health has deteriorated while in detention. As a consequence of his health conditions, he is at high risk for severe illness or death if he contracts COVID-19.

17.     Petitioner Gerardo Arriaga is a citizen of Peru, who is detained at Folkston. He has been detained by ICE since March 2020. He suffers from Lupus, an autoimmune disease that causes him to be immunocompromised and causes inflammation and damage to his joints, skin, kidneys, blood, heart, and lungs. As a consequence of his health conditions, he is at high risk for severe illness or death if he contracts COVID-19.

6

18.     Petitioner Aristoteles Sanchez Martinez is a citizen of Venezuela, who is detained by ICE at Stewart. He has been in ICE custody since approximately September 2018. He suffers from Type II diabetes, hypertension, neuropathy, avascular necrosis, non-palpable pulses in the lower extremities, and venous insufficiency, among other conditions. He is currently in a wheelchair due to his conditions. He is also currently recovering from a hernia repair surgery after which he was brought back to the ICE facility within a day instead of remaining in intensive care. As a consequence of his health conditions, he is at high risk for severe illness or death if he contracts COVID-19.

19.     Petitioner Michael Robinson is a citizen of Jamaica, who has been detained by ICE at Stewart since around February 2020. He suffers from hypertension, asthma, cardiac murmur, high blood pressure, and benign prostatic hyperplasia. As a consequence of his health conditions, he is at high risk for severe illness or death if he contracts COVID-19.

20.     Petitioner Tomas Hernandez is a citizen of Honduras who has been detained at Stewart since March 2020.[3] He has an intellectual disability, suffers from

_____

[3] Tomas Hernandez's last known location was the Stewart Detention Center in Lumpkin, Georgia. As of April 3, 2020, Petitioners' counsel has reason to believe

asthma and ADHD, and has a history of seizures. Petitioner Sarai Hernandez is his sister, legal guardian, and primary caretaker, and she is detained at Irwin. Being detained by ICE is the first time the two have been separated. Mr. Hernandez is particularly vulnerable as he is unable to communicate his needs to others due to his intellectual disability, speech impediment, and deafness in one ear; his sister believes he it is likely that he is not getting the medical care he needs. As a consequence of his health conditions, he is at high risk for severe illness or death if he contracts COVID-19.

21.     Petitioner Peter Owusu is a citizen of Ghana and has been detained at Stewart since January 2020. He has difficulty breathing due to a stab wound he suffered prior to fleeing from Ghana. At a previous detention center, he received a breathing machine, but he has not been able to access it at Stewart. The wound he sustained also led to other complications, including improperly healed stitches, ongoing stomach pain, digestion issues, dizziness, headaches, and heart issues. As a consequence of his health conditions, he is at high risk for severe illness or death if he contracts COVID-19.

---

that he may have been transferred or moved and is not able to confirm his current location.

8

22.     Respondent-Defendant (hereinafter Respondent) John Tsoukaris is the Interim Field Office Director for the ICE Atlanta Field Office. The ICE Atlanta Field Office has complete control over the admission and release of noncitizens detained at Stewart, Irwin, and Folkston. Respondent Tsoukaris is a legal custodian of Petitioners. He is sued in his official capacity.

23.     Respondent Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Respondent Albence is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. He is sued in his official capacity.

24.     Respondent Chad Wolf is the Acting Secretary of the United States Department of Homeland Security (DHS). In this capacity, he is responsible for the implementation and enforcement of immigration laws and oversees ICE. He is sued in his official capacity.

25.     Respondent ICE is a federal law enforcement agency within the Department of Homeland Security. ICE is responsible for the criminal and civil enforcement of the immigration laws, including the detention and removal of immigrants.

## III.  JURISDICTION AND VENUE

26.  This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2241 (habeas jurisdiction), 28 U.S.C. § 1651 (All Writs Act), Article I, Section 9, clause 2 of the U.S. Constitution (the Suspension Clause), and the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

27.  The district courts have jurisdiction to hear habeas corpus claims by noncitizens challenging the lawfulness of their detention. *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018); *Demore v. Kim*, 538 U.S. 510, 516-17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

28.  Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 2243 because this is the District Court with territorial jurisdiction over the place where the immediate custodian is located.  *See, e.g.*, *Masingene v. Martin*, No. 19-CV-24693, 2020 WL 465587 (S.D. Fla. Jan. 27, 2020).  Venue in this District is further proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District, as well as under 28 U.S.C. § 1391(e) because the Respondents in this action are officers or employees of the United States. The decisions by the Atlanta ICE Field Office Director to continue to detain Petitioners have occurred and are occurring in this District.

## IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

29.    Petitioners have no administrative remedies to exhaust because no administrative process exists to raise a constitutional challenge to their detention. "[A] petitioner need not exhaust his administrative remedies where the administrative remedy will not provide relief commensurate with the claim." *Boz v. United States*, 248 F.3d 1299, 1300 (11th Cir. 2001). Thus, "[b]ecause the BIA does not have the power to decide constitutional claims—like the validity of a federal statute—[certain constitutional] need not be administratively exhausted." *Warsame v. U.S. Attorney Gen.*, 796 Fed. Appx. 993, 1006 (11th Cir. 2020). *See also Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1561 (11th Cir. 1989), *aff'd sub nom. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) (exhaustion had "no bearing" where petitioner sought to make a constitutional challenge to procedures adopted by the INS).

## V.    STATEMENT OF FACTS

### A. COVID-19 Is a Global Pandemic that Poses a Significant Risk of Death or Serious Illness to Petitioners

30.    Coronavirus disease 2019 ("COVID-19") is a highly contagious respiratory disease caused by a newly discovered coronavirus. Since the first case was reported in December 2019, the transmission of COVID-19 has been growing exponentially. The number of reported cases climbed from 1 to 100,000 in 67

11

days; from 100,000 to 200,000 in only 11 days; and from 200,000 to 300,000 in just 4 days.[4]

31.　On March 11, 2020, the World Health Organization ("WHO") declared the outbreak a global pandemic,[5] and COVID-19 has now touched nearly every country on the planet.[6] As of April 3, 2020, the number of confirmed cases worldwide has surpassed one million, including over 245,373 people in the United

---

[4] Berkeley Lovelace Jr., et al., CNBC, *Coronavirus pandemic is accelerating as cases eclipse 350,000, WHO says* (last updated Mar. 23, 2020), https://www.cnbc.com/2020/03/23/coronavirus-pandemic-is-accelerating-as-cases-eclipse-350000-who-says.html

[5] Tedros Adhanom Ghebreyesus, *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

[6] *Coronavirus disease 2019 (COVID-19) Situation Report – 73*, World Health Organization (April 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_4https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200330-sitrep-70-covid-19.pdf?sfvrsn=7e0fe3f8_2

States. Over 53,238 people have died as a result of COVID-19 worldwide, including at least 6,095 in the United States.[7]

32.    Nationally, projections by the Centers for Disease Control and Prevention ("CDC") indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the pandemic without effective public health intervention, with as many as 1.7 million deaths in the most severe projections.[8] On March 23, 2020, the WHO warned that the United States could become the next epicenter of the pandemic.[9] And indeed on March 26, 2020, the

---

[7] Worldometer: Coronavirus, https://www.worldometers.info/coronavirus/#countries (last accessed Apr. 3, 2020).

[8] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths,* The New York Times (last updated Mar. 18, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html

[9] Sarah Boseley, *US may become next centre of coronavirus pandemic, says WHO,* The Guardian (Mar. 24, 2020), https://www.theguardian.com/world/2020/mar/24/us-may-become-centre-of-coronavirus-pandemic-who-says

United States surpassed every other country in the world in number of confirmed COVID-19 cases.[10]

33.     In the state of Georgia, transmission of COVID-19 has also been rampant. On March 14, 2020, Governor Brian Kemp declared a public health state of emergency, describing the spread of COVID-19 as an "unprecedented public health threat."[11] At the time, there were 64 diagnosed COVID-19 cases spread across 15 counties.[12] As of April 3, 2020, less than 30 days later, the number of reported cases had jumped to 5,831 with 143 counties now affected.[13] The number of reported deaths from COVID-19 is 184, making Georgia the state with the eleventh highest

---

[10] *U.S. Now Leads the World in Confirmed Cases*, The New York Times (last updated Apr. 1, 2020), https://www.nytimes.com/2020/03/26/world/coronavirus-news.htmlhttps://www.nytimes.com/2020/03/26/world/coronavirus-news.html

[11] Governor Brian P. Kemp, *Kemp Declares Public Health State of Emergency*, Office of the Governor (Mar. 16, 2020), https://gov.georgia.gov/press-releases/2020-03-16/kemp-declares-public-health-state-emergency

[12] Id.

[13] *Georgia Department of Public Health COVID-19 Daily Status Report* (Apr. 2, 2020), https://dph.georgia.gov/covid-19-daily-status-report

number of COVID-19-related deaths in the United States.[14] Governor Kemp has now issued a shelter in place order for the state of Georgia beginning on April 3, 2020.[15]

34.    The risk of serious illness or death from COVID-19 is greater in Georgia than in other parts of the United States because the population is overall much less healthy. Georgia has among the highest incidence of diabetes, hypertension, obesity and strokes in the country, particularly in areas with high poverty rates.[16]

35.    Due to the lack of widespread testing available in most countries, including the United States, the number of confirmed cases is likely but a fraction of the true number of COVID-19 cases worldwide. As of April 3, 2020, approximately 1,288,013 tests have been administered in the entire United States; in Georgia, only

---

[14] Listing of United States Total Coronavirus Cases (last updated Apr. 2, 2020), https://www.worldometers.info/coronavirus/country/us/

[15] Governor Brian P. Kemp, *Governor Kemp Issues Shelter in Place Order*, Office of the Governor (Apr. 2, 2020), https://gov.georgia.gov/press-releases/2020-04-02/governor-kemp-issues-shelter-place-order

[16] Alan Judd, *In hard-hit Georgia, virus expected to linger*, The Atlanta Journal-Constitution (Mar. 26, 2020), https://www.ajc.com/news/hard-hit-georgia-virus-expected-linger/AYMvVN9SIq8A0RUgUzIt5O/

23,053.[17] Because of the shortage of tests in the United States—admitted to be a "failing" by top infectious disease expert Dr. Anthony Fauci[18]—the CDC currently recommends prioritizing testing for symptomatic healthcare providers and hospitalized patients[19]—which means that the number of diagnosed COVID-19 cases may be only the tip of a very large iceberg.[20]

          i.    Transmission of COVID-19

36.    COVID-19 easily spreads through respiratory droplets that an infected person expels when they cough, sneeze, speak, or breathe. Transmission can occur if those virus-carrying droplets land directly on a nearby person's nose or mouth, or

---

[17] The COVID Tracking Project, Our most up-to date data and annotations (last updated Apr. 2, 2020), https://covidtracking.com/data/

[18] Elizabeth Chuck, *'It is a failing. Let's admit,' Fauci says of coronavirus testing capacity* NBC News (Mar. 12, 2020), https://www.nbcnews.com/health/health-news/it-failing-let-s-admit-it-fauci-says-coronavirus-testing-n1157036

[19] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19)* (last updated Mar. 24, 2020), https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html

[20] George Citroner, *How Many People in the United States Actually Have COVID-19?*, Healthline (Mar. 18, 2020), https://www.healthline.com/health-news/how-many-coronavirus-cases-are-there

when a person inhales these droplets or touches a contaminated surfaced and then touches their mouth, nose, or eyes.[21] The coronavirus can survive up to three hours in the air, four hours on copper, 24 hours on cardboard, and two to three days on plastic and stainless steel.[22]

37.     Many people who carry COVID-19 remain completely asymptomatic and may never even realize that they are infected, yet they can still spread the disease. Likewise, infected people who may eventually develop symptoms are contagious even when they are in the pre-symptomatic phase and may account for 50% of transmissions. Interventions that isolate or quarantine only symptomatic individuals, therefore, cannot effectively contain transmission.

---

[21] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *How Coronavirus Spreads* (last reviewed Mar. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html

[22] Harvard Health Publishing, *As coronavirus spreads, many questions and some answers* Harvard Medical School, Coronavirus Resource Center (last updated Apr. 1, 2020), https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center

ii.   Symptoms of COVID-19, Underlying Risks Factors, and Long-Term Effects

38.    In some people, COVID-19 causes only mild symptoms or no symptoms at all. But for others, COVID-19 can result in more serious injury, including respiratory failure, kidney failure, and death.

39.    Older individuals and those with certain medical conditions are at particularly high risk for serious illness or death from COVID-19.

40.    Medical conditions that increase the risk of severe illness or death from COVID-19 for individuals of any age include blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological, neurologic, and neurodevelopmental conditions, and current or recent pregnancy.

41.    Infected individuals can face prolonged treatment and recovery periods, requiring highly attentive hospital care and ventilators that are in increasingly short supply. Those who do not die can face serious damage to the lungs, heart, liver, or other organs.[23]

---

[23] Lisa Maragakis, M.D., M.P.H., *I've been diagnosed with the new coronavirus disease, COVID-19. What should I expect?* Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/diagnosed-with-covid-19-what-to-expect

42.     Complications from COVID-19 can manifest at an alarming pace. Patients can go from being medically stable with no need for supplemental oxygen to requiring intubation and ventilator-assisted breathing within 24 hours. Various studies estimate that the average length of time from onset of symptoms to hospitalization or the development of severe symptoms is only 7-9 days.

### iii.     Prevention of COVID-19 Transmission

43.     There is currently no vaccine against COVID-19. Nor are there any known prophylactic medications that will prevent or reduce the risk of a COVID-19 infection. Therefore, the only effective way to protect people against the risk of serious illness or death from COVID-19 is to limit their exposure to the virus through social distancing—i.e., physical separation of at least six feet from other people, especially individuals who are or may be infected—and vigilant hygiene, including frequent and thorough handwashing with soap and water.[24]

44.     The high incidence of asymptomatic transmission, alongside the nationwide dearth of diagnostic tests to identify and isolate infected individuals, necessitate strict social distancing measures to interrupt transmission.

---

[24] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *How to Protect Yourself* (last reviewed Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

45.   Social distancing reduces the average number of contacts between people, which lowers every individual's risk both for acquiring COVID-19 and transmitting it to another person.

46.   Strict social distancing measures have shown effectiveness in reducing the transmission of COVID019. On January 23, 2020, the Chinese government instituted a complete lockdown of Wuhan, China, where the COVID-19 outbreak began, to attempt to fight the spread of the virus. They shut down all schools, offices, and factories and banned private vehicles from city streets. This lockdown expanded to other cities in Hubei province in the next several days, extending to 60 million people in China.[25] Following the lockdown, Wuhan saw a sustained decrease in transmission of COVID-19, and two months later, the daily number of reported cases dropped to zero.[26]

47.   Throughout the world, other countries have also implemented drastic social distancing measures in an effort to control the COVID-19 pandemic and protect people's health and lives. France, for example, imposed a strict nationwide

---

[25] Amy Gunia, *China's Draconian Lockdown Is Getting Credit for Slowing Coronavirus. Would It Work Anywhere Else?*, Time Magazine (Mar. 13, 2020), https://time.com/5796425/china-coronavirus-lockdown/

[26] *Id.*

lockdown, prohibiting gatherings of any size and ordering all residents to stay at home.[27] Overall, countries encompassing an estimated one third of the world's population have enacted similar restrictions.[28] Across the United States, cities and states are imposing increasingly stringent measures to effectuate social distancing. As of April 2, 2020, at least 38 states, 48 counties, and 14 cities, and had ordered their residents to "shelter in place" or stay at home.[29]

### B. COVID-19 Will Likely Ravage Jails, Prisons, and Detention Centers

48.     Imprisoned populations, including those in ICE detention facilities, are at higher risk for infectious disease, as compared to the general population. Factors that heighten their risk include poor sanitation, high population density, and "a

---

[27] Bryan Pietsch, *'We are at war': France's president just announced a 15-day lockdown, banning public gatherings and walks outdoors*, Business Insider (Mar. 16, 2020), https://www.businessinsider.com/coronavirus-france-president-macron-announces-15-day-lockdown-2020-3

[28] Andrea Salcedo & Gina Cherelus, *Coronavirus Travel Restrictions, Across the Globe*, The New York Times (Apr. 1, 2020) https://www.nytimes.com/article/coronavirus-travel-restrictions.html

[29] Juliana Kaplan, Lauren Frias, & Morgan McFall-Johnson, *A Third of the Global Population Is On Coronavirus Lockdown*, Business Insider (last updated Apr. 2, 2020) https://www.businessinsider.com/countries-on-lockdown-coronavirus-italy-2020-3

higher prevalence of infectious and chronic diseases and . . . poorer health than the general population, even at younger ages."[30]

49.    Dr. Scott Allen and Dr. Josiah Rich—experts in the fields of detention health, infectious disease, and public health who advise DHS's Office of Civil Rights and Civil Liberties have urged Congress to take immediate actions to slow the spread of COVID-19 in ICE detention centers, including releasing immigrants to facilitate maximum social distancing—an "oxymoron" in congregate settings.[31]

50.    In March 2020, over 3,000 medical professionals across the United States urged ICE to release individuals and families from detention "to prevent the spread of COVID-19 and mitigate the harm of an outbreak" to detained individuals, as well as to facility staff.[32] They warned that social distancing measures

---

[30] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (last reviewed Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[31] Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH Letter to Congress (Mar. 19, 2020) https://assets.documentcloud.org/documents/6816336/032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.pdf

[32] Janus Rose, *Thousands of Doctors Deman ICE Release Detainees to Stop a COVID-19 Disaster*, Vice.com (Mar. 18, 2020),

recommended by the CDC are nearly impossible in immigration detention and that large-scale quarantines may be unfeasible at ICE facilities that are already at maximum capacity. They also expressed concern that "isolation may be misused and place individuals at higher risk of neglect and death."

51.     Like these and other experts, [33] Drs. Allen and Rich also warned of the dire consequences that a COVID-19 outbreak within an ICE detention facility would have on the community outside the facility. They describe a "tinderbox" scenario where a rapid outbreak inside a facility would result in the hospitalization of multiple detained people in a short period of time, which would spread the virus to the surrounding community and create a demand for ventilators far exceeding the supply.

52.     Once a disease is introduced into a jail, prison, or detention facility, it spreads faster than under most other circumstances due to overcrowding, poor

---

https://www.vice.com/en_us/article/4agp4w/thousands-of-doctors-demand-ice-release-detainees-to-stop-a-covid-19-disaster

[33] See, e.g., Rich Schapiro, *Coronavirus could 'wreak havoc' on U.S. jails, experts warn*, NBC News (Mar. 12, 2020), https://www.nbcnews.com/news/us-news/coronavirus-could-wreak-havoc-u-s-jails-experts-warn-n1156586 ("An outbreak of the deadly virus inside the walls of a U.S. prison or jail is now a question of when, not if, according to health experts.").

sanitation and hygiene, and lack of access to adequate medical services. For these same reasons, the outbreak is harder to control.[34] The severe outbreaks of COVID-19 in congregate environments, such as cruise ships and nursing homes, illustrate how rapidly and widely COVID-19 would rip through an ICE detention facility. On the Diamond Princess cruise ship, for example, approximately 700 passengers and crew on board were infected over the course of three weeks despite the initiation of quarantine protocols.

53.   ICE detention facilities also deprive detained individuals of the ability to maintain good hygiene, which is also critical to reducing the risk of exposure to COVID-19, and are notorious for their unsanitary conditions and meager provision of hygiene and cleaning products.

54.   Despite the global pandemic and shelter-in-place orders across the country, ICE continues to bring new people into detention centers and to transfer previously detained people between facilities.[35] Some detained people have staged

---

[34] Christina Potter, *Outbreaks in Migrant Detention Facilities*, Outbreak Observatory (Jul. 11, 2019), https://www.outbreakobservatory.org/outbreakthursday-1/7/11/2019/outbreaks-in-migrant-detention-facilities

[35] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19* (last reviewed/updated Apr. 2, 2020),

public protests, including initiating hunger strikes and threatening suicide, to express their outrage at being housed with newly arriving individuals who may have been exposed to COVID-19.[36]

55.     Correctional staff is also an especially dangerous vector for a COVID-19 outbreak within a detention center since they regularly travel back and forth between the outside world and the detention facilities where they work.

56.     ICE's past handling of infectious disease outbreaks in detention centers has been inept—foreshadowing the impact once COVID-19 reaches these facilities.

_____

https://www.ice.gov/covid19 (" . . . our law enforcement officers and agents continue daily enforcement operations to make criminal and civil arrests."); *see* Richard Hall, Coronavirus: ICE Crackdown Stokes Fears for Safety of Undocumented Immigrants During Pandemic, Independent (Mar. 15, 2020) (noting that "[i]n New York, immigration advocates have noted a marked increase in ICE activity in recent months, which has not slowed as the coronavirus outbreak has worsened."). On March 18, 2020, ICE announced it would "temporarily adjust" its enforcement practices during the COVID-19 outbreak, but declined to say it would stop arresting people altogether. *See* Rebecca Klar, *ICE Pausing Most Enforcement During Coronavirus Crisis*, The Hill (Mar. 18, 2020), https://thehill.com/latino/488362-ice-pausing-most-immigration-enforcement-during-coronavirus-crisis

[36] *Ice detainees threaten suicide, stage protests over coronavirus fears*, The Washington Post (Mar. 25, 2020) https://www.washingtonpost.com/video/national/ice-detainees-threaten-suicide-stage-protests-over-coronavirus-fears/2020/03/25/8232738e-0b1e-4fdb-8538-456e269a8eb7_video.html

In 2019, a mumps outbreak across 57 immigration detention facilities throughout the country—including Stewart—led to almost 900 cases of mumps overwhelmingly contracted inside the facilities[37] before the outbreak spread to surrounding communities.[38] ICE and CBP facilities have been sites of other outbreaks in just the past couple years,[39] in addition to outbreaks in other prisons and jails.[40]

---

[37] Leung J, Elson D, Sanders K, et al. *Notes from the Field: Mumps in Detention Facilities that House Detained Migrants—United States, September 2018–August 2019*, MMWR Morb Mortal Wkly, 749–50 (Aug. 30, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6834a4-H.pdf; Roxanne Scott, *Stewart Detention Center Watches For New Cases Of Mumps*, WABE (Mar. 8, 2019), https://www.wabe.org/stewart-detention-center-watches-for-new-cases-of-mumps/

[38]  *See* Terrence McDonald, *Bergen County Won't Say if Mumps Outbreak Affects Only Immigrant Detainees*, Northjersey.com (Jun. 13, 2019), https://www.northjersey.com/story/news/bergen/2019/06/13/bergen-county-nj-wont-say-if-jail-mumps-outbreak-hit-only-ice-inmates/1448708001. In addition, in 2019, thousands of individuals in 39 immigration detention centers across the country were exposed to chickenpox. *See* Emma Ockerman, *Migrant Detention Centers Are Getting Slammed with Mumps and Chickenpox*, Vice News (Jun. 14, 2020), https://www.vice.com/en_us/article/mb8k5q/migrant-detention-centers-are-getting-slammed-with-mumps-and-chicken-pox.

[39] Christina Potter, Outbreak Observatory *supra* n. 34, (describing outbreaks of acute respiratory illnesses like influenza, and other diseases like scabies and chickenpox).

[40] J. O'Grady, et al., *Tuberculosis in prisons: anatomy of global neglect*, European Respiratory Journal (2011), https://erj.ersjournals.com/content/38/4/752.short

57.    COVID-19 has indeed already started to spread inside U.S. prisons and jails across the United States, including other carceral systems in Georgia [41] and New York City.[42]

58.    ICE has publicly reported six cases of COVID-19 among its detained population as of April 2, 2020, and identified 49 additional cases among its personnel, including five employees who work at an ICE detention facility.[43] In addition, according to a leaked internal report, ICE has placed at least nine detainees in medical isolation and is monitoring 24 more in ten different detention facilities— all likely due to suspicion of COVID-19.[44]

---

(stating that tuberculosis prevalence among prisoners worldwide can be up to 50 times higher than national averages).

[41] Joshua Sharpe and Christian Boone, *Ga. Inmate dies from COVID-19 as virus hits more prisons*, The Atlanta Journal-Constitution (Mar. 27, 2020), https://www.ajc.com/news/local/breaking-inmate-dies-from-covid-outbreak-worsens-prison/TzQZL4uXfK4GzH9ebSFNQN/

[42] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in jails and Prisons*, wired.com (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/

[43] *ICE Guidance on COVID-19*, *supra* n. 35

[44] Ken Klippenstein, *Exclusive: ICE Detainees Are Being Quarantined, A leaked document about the Department of Homeland Security's Covid-19 response suggests that the crisis has made its way to border detention facilities*, The Nation

59.     Nationally and internationally, governments and jail and prison staff have already recognized the threat posed by COVID-19 and released detainees. Iran,[45] Ethiopia,[46] and Texas[47] and have all begun to release people to mitigate the harm that the impending spread of COVID-19 will cause. As of March 23, 2020, Fulton County Jail in Atlanta, Georgia had already released 30 people from its custody, and Hall County Jail in Gainesville, Georgia had released 300.[48] Dougherty

---

(Mar. 24, 2020), https://www.thenation.com/article/society/corona-covid-immigration-detention/

[45] Babk Dehghanpisheh and Stephanie Nebehay, *Iran Temporarily Releases 70,000 Prisoners as Coronavirus Cases Surge*, Reuters (Mar. 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5

[46] Bukola Adebayo, *Ethiopia pardons more than 4,000 prisoners to help prevent coronavirus spread*, CNN (Mar. 26, 2020), https://www.cnn.com/2020/03/26/africa/ethiopia-pardons-4000-prisoners-over-coronavirus/index.html

[47] Dillon Collier, *Bexar County jail population down more than 500 inmates after release of nonviolent offenders*, KSAT.com (last updated Mar. 25, 2020), https://www.ksat.com/news/local/2020/03/25/bexar-county-jail-population-down-more-than-500-inmates-after-release-of-nonviolent-offenders/

[48] Christian Boone, *Hall, Fulton counties releasing nonviolent offenders early as virus looms*, The Atlanta Journal-Constitution (Mar. 23, 2020), https://www.ajc.com/news/crime--law/hall-fulton-counties-releasing-nonviolent-offenders-early-virus-looms/lOZTaZ9lVSwoy38Cp6XJIP/;

County Detention Center, which is about a mile from Phoebe Putney Memorial Hospital in Albany, Georgia, has also taken steps to reduce its incarcerated population in light of the severe outbreak devastating the surrounding community.[49] On March 26, 2020, the Federal Bureau of Prisons instructed prison directors to prioritize releasing federal inmates to home confinement, taking into consideration factors including "[t]he age and vulnerability of the inmate to COVID-19, in accordance with the [CDC] guidelines."[50]

60.    Still, ICE continues to detain even the most medically vulnerable noncitizens despite the grave risk of serious illness or death.

---

[49] Stanley Dunlap, *Georgia jailers cope with COVID-19; release inmates, quarantine arrivals*, Georgia Recorder (Mar. 30, 2020), https://georgiarecorder.com/2020/03/30/georgia-jailers-cope-with-covid-19-release-inmates-quarantine-arrivals/

[50] Office of the Attorney General, Washington, DC, Memorandum for Director of Bureau Prisons, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000

### C. Stewart, Folkston, and Irwin Are Primed for COVID-19 Exposure and Severe Outbreaks

i. <u>Existing Conditions at the Georgia Detention Centers Will Further Enable COVID-19 Transmission</u>

61.    The ICE Atlanta Field Office currently detains an estimated 4,000 noncitizens at Stewart, Folkston, and Irwin.

62.    The existing conditions at Stewart, Folkston, and Irwin pose a heightened public health risk for the spread of COVID-19. These conditions are too extensive to remedy in time to adequately respond to the urgent COVID-19 crisis.

63.    Private contractors operate Stewart, Folkston, and Irwin. The DHS Office of Inspector General has repeatedly concluded that ICE fails to hold detention facility contractors accountable for meeting performance standards required to ensure humane conditions.[51]

---

[51] *See* U.S. Department of Homeland Security, Office of the Inspector General, OIG-19-18, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, 1 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf; U.S. Department of Homeland Security, Office of the Inspector General, OIG-18-67, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, 1 (Jun. 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/20//18-06/OIG-18-67-Jun18.pdf; *see also* U.S. Department of Homeland Security, Office of Inspector General, Office of Inspections & Evaluations, Adult Detention Oversight, 16-047-ISP-ICE (Feb. 2017),

64.     All three facilities house people in very close quarters, making social distancing and the recommended hygiene measures effectively impossible. Most people sleep in bunk rooms housing dozens of immigrants, where beds are feet apart from each other, and use shared toilets and showers; the facilities also have some smaller cells housing 2-4 people with shared bathrooms. People detained at Stewart, Folkston, and Irwin eat together in shared cafeterias and regularly congregate in common areas of their housing units [52] A man detained at Stewart reported to advocates on March 26, 2020, that detained people had asked a staff person about social distancing and were told that "doesn't apply" because they "are in detention."

65.     The bathrooms in these facilities can often be unsanitary and in poor condition or lack hot or cold water. For example, detained people at Irwin have

---

https://www.oig.dhs.gov/sites/default/files/assets/FOIA/OIG_FOIA_Stewart-Detention-Center-Work-Papers.pdf [hereinafter OIG Stewart Work Papers]

[52] Project South, Center for Immigrants' Rights Clinic, *Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers* (May 2017), *available at* https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf at 31, 43 [hereinafter Imprisoned Justice]; Keith Gardner, dvids.net, Folkston Processing Center B-Roll (Apr. 4, 2017), https://www.dvidshub.net/video/529423/folkston-processing-center-b-roll

reported that water from the showers is so hot that it caused hair to fall out after washing, and that the "moldy infection-riddled bathrooms" are "consistently dirty."[53]

66.    Access to items necessary for personal hygiene, such as soap, clean clothing, and cleaning supplies, is insufficient at all three facilities. [54] In a pending class-action lawsuit, people detained at Stewart allege that they are forced to work in the facility for cents an hour in order to buy additional hygiene supplies, such as soap and toilet paper, at the commissary.[55] Detained people in Irwin have reported that bleach is only used "on special occasions" and that detained people are required to wear the same pair of shoes in the moldy showers as they do around the rest of their housing unit.[56]

---

[53] U.S. Department of Homeland Security, Office of Inspector General, OIG-18-32, *Concerns about ICE Detainee Treatment and Care at Detention Facilities* (Dec. 11, 2017), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf at 7 [hereinafter *Concerns about ICE Detainee Treatment*]; Imprisoned Justice at 31, 43-44

[54] Imprisoned Justice at 30, 33, 42-45; OIG Stewart Work Papers; *Concerns about ICE Detainee Treatment* at 7.

[55] *Wilhen Hill Barrientos, et al. v. Corecivic, Inc.*, No. 18-cv-00070-CDL (M.D. Ga. Apr. 17, 2018) Dkt. 1 Complaint for Declaratory and Injunctive Relief and Damages *available at* https://projectsouth.org/wp-content/uploads/2018/04/Complaint-Barrientos-v.-Core-Civic.pdf

[56] Imprisoned Justice at 32, 45

67.   Detained immigrants in Stewart have also reported shockingly poor water quality—some reported boiling water in their cells before drinking it; developing rashes after showers; the water turning their white clothes green; and getting headaches or long bouts of diarrhea after drinking the water. One attorney visiting Stewart reported to an advocacy group that a sympathetic guard urged the attorney not to drink water out of the drinking fountain.[57]

68.   At all three facilities, food preparation and service are communal with little opportunity for surface disinfection. Detained people, overseen by food service contractors, staff the kitchens. People detained in these facilities have for years reported food being served that is undercooked, rotten, or rancid and that contains hair and foreign objects such as rocks, insects, mice, plastic, a tooth, and a nail.[58]

---

[57] Imprisoned Justice at 32; Southern Poverty Law Center, *Shadow Prisons: Immigrant Detention in the South* (Nov. 21, 2016), https://www.splcenter.org/20161121/shadow-prisons-immigrant-detention-south [hereinafter Shadow Prisons] at 16, 42

[58] Imprisoned Justice at 30, 44, 47; Shadow Prisons at 16, 26, 42; OIG Stewart Work Papers

ii.   The Georgia Detention Centers Have a Dismal Medical Care
Track Record and Are Currently Ignoring Reported Flu-like
Symptoms Among the Detained Population

69.   Respondents have consistently failed to provide minimally adequate medical care in Stewart, Folkston, and Irwin.[59] This failure is so severe that it cannot be remedied quickly to respond to COVID-19, especially in a time when healthcare resources are in high demand.

70.   At all three detention centers, critical medical care is routinely delayed—sometimes for months—or denied outright.

71.   Detained people have reported to advocates at Folkston that medical staff dismiss detained people's medical concerns or ridicule them as "dramatic." On one occasion, other detained individuals had to stage a protest to demand a response to a person exhibiting signs of severe medical distress. In another case, Folkston staff ignored a man and his attorney's repeated requests to go to the emergency room due to excruciating abdominal pain. His appendix later ruptured.

---

[59] U.S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, Compliance Inspection, Enforcement and Removal Operations, ERO Atlanta Field Office, Stewart County Detention Center, Lumpkin, Georgia (Aug. 21-23, 2012), *available at* https://www.ice.gov/doclib/foia/odo-compliance-inspections/2012stewart_detntn_cntr_lumpkin_GA_aug21-23-2012.pdf; *Concerns about ICE Detainee Treatment*; Shadow Prisons at14-15, 17, 23-25, 40-41; Imprisoned Justice at 46-49

72.     At Irwin, requests for medical attention may be met with punishment, such as being placed in solitary confinement. One man detained at Irwin reported that a guard told him "medical staff would only take [him] to the hospital if they see [him] dying." Detained people at Irwin reported that the facility lacks a medical alert system to notify guards of an emergency, leaving detained people helpless in the event of a medical emergency in the living area. An inspection at Irwin in 2017 found that its medical unit cells were so dirty that "floors needed to be mopped, walls wiped down, toilets cleaned, and trash and refuse removed."[60]

73.     Accessing medical care at Stewart is incredibly difficult. In 2018, there was not even a way to request medical attention in writing at Stewart. During a stakeholder tour of Stewart in 2018, a detained man in the waiting room of the medical unit said to the tour participants, "nos están tratando mal," or *they're mistreating us.*

---

[60] U.S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, Compliance Inspection, Enforcement and Removal Operations, ERO Atlanta Field Office, Irwin County Detention Center, Ocilla, Georgia (Mar. 7-9, 2017), *available at* https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf at 6

74.     When detained people at these facilities do get the attention of a medical provider, they are often given the wrong diagnostic tests, medication, or dosage, or prescribed only painkillers, regardless of the source of their complaints.[61]

75.     The facilities also face consistent understaffing, including "chronic shortages of almost all medical staff positions."[62]

76.     People in these facilities with diabetes—a condition that the CDC considers a risk factor for severe COVID-19 "particularly if not well controlled"[63]— have reported diets that are inadequate given their medical needs, consisting largely

---

[61] Imprisoned Justice at 35-36; Shadow Prisons at 40; DHS Office for Civil Rights and Civil Liberties, *Formal Complaint – Stewart Detention Center, Lumpkin, GA* (Oct. 11, 2019), *available at* https://www.detentionwatchnetwork.org/sites/default/files/CRCL%20complaint%20-%20SDC%20-%20Oct%2011%20-%20translation_Redacted.pdf; Project South, Institute for the Elimination of Poverty & Genocide, *Letter to Members of the Georgia Delegation to the 116th United States Congress Re: Requesting an Investigation of the Stewart Detention Center* (Oct. 17, 2019) *available at* https://projectsouth.org/wp-content/uploads/2019/10/10.17.2019-Letter-to-Georgia-Congressional-Delegates-.pdf; *Concerns about ICE Detainee Treatment* at 7

[62] Imprisoned Justice at 35; OIG Stewart Work Papers

[63] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *People who are at higher risk for severe illness* (last reviewed Mar. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html

of potatoes, white rice, and bread.[64] Petitioner David Fernandez has received as few as three out of the fourteen insulin injections per week he requires to manage his diabetes, which has left him so weak and tired that he could not stand up.

77.     Failing to provide for detained people's medical needs has had deadly consequences in Georgia. Four people detained at Stewart have died since spring 2017.[65] One died from complications of pneumonia, despite being a healthy 33-year-old before entering detention.[66] According to ICE's own records, facility staff failed to properly monitor his documented symptoms of hypertension (a condition that increases the risk of a serious case of COVID-19), failed to immediately authorize emergency medical services after a provider ordered them to do so, and failed to suspend his food service work duties after observing symptoms that could "potentially transmit[ ] contagious illnesses."[67]

---

[64] Imprisoned Justice at 22-23, 32; Shadow Prisons at 17, 42.

[65] José Olivares, *How Solitary Confinement Kills: Torture and Stunning Neglect End in Suicide at Privately Run ICE Prison*, The Intercept (Aug. 29, 2019), https://theintercept.com/2019/08/29/ice-solitary-mental-health-corecivic/

[66] Jeremy Redmon, *Brother: Cuban was healthy before dying of pneumonia in ICE custody*, The Atlanta Journal-Constitution (Feb. 20, 2018), https://www.ajc.com/news/state--regional-govt--politics/brother-cuban-was-healthy-before-dying-pneumonia-ice-custody/9TNpiI95CYQPyiGPoSyzmJ/

[67] U.S. Department of Homeland Security, Immigration and Customs Enforcement, Report of Investigation, Case No. 201803734, Castro-Garrido, Yulio/non-

78.     A whistleblower within the ICE Health Service Corps (IHSC) alleged in 2018 that medical staff at Stewart delayed a critically ill man's care after receiving a lab report that should have resulted in immediate intervention. After it was determined that the treatment the staff had prescribed "may have caused harm that could have resulted in fatality," IHSC leadership "failed to take appropriate action."[68]

79.     In the context of the COVID-19 pandemic, early reports indicate that ICE is using the same playbook—ignoring pleas for help, threatening those who seek medical care with punishment, and waiting until it may be too late.

80.     On March 19, 2020, a man detained at Folkston reported that he was afraid of contracting COVID-19 because he feared Folkston would not provide

---

employee/0109 Detainee/Alien – Death (Known Cause – Terminal Illness)/Jacksonville, Duval, FL (Jan. 31, 2018), *available at* https://projectsouth.org/wp-content/uploads/2019/06/OPR-Release-of-2019-ICLI-00033.pdf at 12.

[68] U.S. Department of Homeland Security, Office for Civil Right and Civil Liberties, Memorandum for Ronald Vitiello, Deputy Director and Senior Official (ICE), From Cameron P. Quinn, Officer for Civil Rights and Civil Liberties and Marc Pachon, Attorney Advisor – Legal Division, Office of General Counsel, *Subject: ICE Health Service Corps (IHSC) Medical/Mental Care and Oversight* (Mar. 20, 2019), *available at* https://www.documentcloud.org/documents/6575024-ICE-Whistleblower-Report.html

proper medical treatment. Another man at Folkston reported that there was at least one person in his housing unit who was experiencing coughing, fever, and shortness of breath but had not been moved to another location. The same day, a detained man at Irwin reported to advocates that a person inside his housing unit had a worsening cough but had not been moved to another location.

81.    On March 23, 2020, a man detained at Stewart reported to advocates that people detained there are afraid to report their symptoms for fear of being placed in segregation—in a 6-by-9-foot cell—where a number of detained people have died by suicide.

82.    On March 26, 2020, a man detained at Stewart reported to advocates that sick people at Stewart might not ask for a medical appointment because they do not believe they will be treated appropriately. Another man detained at Stewart reported to advocates that he was experiencing a sore throat with dizziness and diarrhea, and that he had observed other people with a cough go to a medical appointment at Stewart, after which they were just returned to the general population rather than isolated. The same day, a detained person at Folkston reported to advocates that he was having flu-like symptoms and had waited for more than a day since requesting a medical appointment.

83.    Preliminary data suggests that a person with COVID-19 is most infectious during the early stage of the disease.[69] Early, proactive action is necessary to prevent the virus's spread. The well-documented failure to provide adequate and timely medical care at Stewart, Folkston, and Irwin is the mark of a system that cannot possibly cope with spread of COVID-19.

iii.    It Is Only a Matter of Time Before COVID-19 Reaches All Three Facilities

84.    It is highly likely that COVID-19 will reach or already has reached Stewart, Folkston, and Irwin. Detained people at Stewart and Irwin have reported to advocates that there are confirmed cases of COVID-19 within their facilities.[70] In addition, news recently broke that a guard at Stewart tested positive for COVID-19—the first reported case in Stewart County.

---

[69] Helen Branswell, *People 'shed' high levels of coronavirus, study finds, but most are likely not infectious after recovery begins*, statnews.com (Mar. 9, 2020), https://www.statnews.com/2020/03/09/people-shed-high-levels-of-coronavirus-study-finds-but-most-are-likely-not-infectious-after-recovery-begins/

[70] Jeremy Redmon, *Georgia immigration detention employee tests positive for coronavirus*, The Atlanta Journal-Constitution (Mar. 31, 2020) https://www.ajc.com/news/breaking-news/georgia-immigration-detention-employee-tests-positive-for-coronavirus/scDYEmROtOSowK2ULLPt5K/

85.     Many counties surrounding Stewart County also have confirmed cases of COVID-19.[71] Lumpkin is about 50 miles from Albany, Georgia—a community in Dougherty County that has been hard hit by the pandemic. Albany is home to Phoebe Putney Memorial Hospital, Georgia's most "severely impacted" hospital thus far in the pandemic.[72] On March 25, 2020, Phoebe Putney reported that all three of its ICUs were filled with critically ill COVID-19 patients, after having opened a fourth ICU for patients not infected with COVID-19.[73] As of March 26, 2020, Albany had the fourth highest rate of confirmed COVID-19 per capita in the

---

[71] *Georgia Department of Public Health COVID-19 Daily Status Report* (Apr. 2, 2020), https://dph.georgia.gov/covid-19-daily-status-report – specifically Randolph County, plus (not directly bordering) Muscogee County, Terrell County, Sumter County. As well as Russell County, GA: *COVID-19 map of Alabama: latest coronavirus cases by county*, wvtm13.com (last updated Apr. 1, 2020), https://www.wvtm13.com/article/coronavirus-map-alabama/31919956#

[72] Christina Maxouris and Angela Barajas, *Georgia's hardest-hit hospital says its intensive care units are filled with 'critically ill' coronavirus patients*, CNN (last updated Mar. 26, 2020), https://www.cnn.com/2020/03/26/us/southwest-georgia-icu-units-full/index.html

[73] Christina Maxouris and Angela Barajas, *Georgia's hardest-hit hospital says its intensive care units are filled with 'critically ill' coronavirus patients*, CNN (last updated Mar. 26, 2020), https://www.cnn.com/2020/03/26/us/southwest-georgia-icu-units-full/index.html

world and the third-highest number of COVID-19 deaths per capita.[74] As of April 2, 2020, Dougherty County had the second highest number of reported COVID-19 diagnoses—521—and COVID-19-related deaths—30—among all 159 counties in Georgia.[75] Lumpkin is also about 50 miles from Lee County, Alabama, which is also a COVID-19 "hot spot" in Alabama, with 91 confirmed cases as of April 2, 2020.[76]

86.     There were five confirmed cases of COVID-19 in Irwin County as of April 2, 2020, with confirmed cases in all bordering counties as well.[77] Ocilla is

---

[74] Nate Cohn, et al., *Some U.S. Cities Could Have Coronavirus Outbreaks Worse Than Wuhan's*, The New York Times (Mar. 27, 2020), https://www.nytimes.com/interactive/2020/03/27/upshot/coronavirus-new-york-comparison.html

[75] *Georgia Department of Public Health COVID-19 Daily Status Report* (Apr. 2, 2020), https://dph.georgia.gov/covid-19-daily-status-report

[76] *COVID-19 map of Alabama: latest coronavirus cases by county*, wvtm13.com (last updated Apr. 1, 2020), https://www.wvtm13.com/article/coronavirus-map-alabama/31919956#; Paul Gattis, *Alabama's new coronavirus 'hot spot': Auburn area*, al.com (Mar. 25, 2020), https://www.al.com/news/2020/03/alabamas-new-coronavirus-hotspot-lee-county.html; Alabama Department of Public Health, Division of Infectious Diseases & Outbreaks, Alabama's COVID-19 Data and Surveillance Dashboard (last updated Apr. 2, 2020) https://alpublichealth.maps.arcgis.com/apps/opsdashboard/index.html#/6d2771faa9da4a2786a509d82c8cf0f7

[77] *Georgia Department of Public Health COVID-19 Daily Status Report* (Apr. 2, 2020), https://dph.georgia.gov/covid-19-daily-status-report

also only 60 miles from Albany, Georgia, where there is sustained community spread of the virus.

87.     In Charlton County, where Folkston is located, there was one confirmed case of COVID-19 as of April 2, 2020[78]—a woman who lives in Folkston with two family members who work in the local public schools and came into contact with students.[79] Duval County, Florida, includes the city of Jacksonville, which is the closest metro area to Folkston—about 45 miles away. Duval County had 286 confirmed cases as of April 2, 2020.[80]

88.     There is great risk that people traveling in and out of the Georgia detention centers could carry COVID-19 with them and expose Petitioners.

89.     Staff at Stewart, Folkston, and Irwin arrive and leave on a shift basis, and there is limited ability to adequately screen incoming staff for new,

---

[78] *Georgia Department of Public Health COVID-19 Daily Status Report* (Apr. 2, 2020), https://dph.georgia.gov/covid-19-daily-status-report

[79] Gordon Jackson, *Folkston coronavirus case confirmed*, The Brunswick News (Mar. 17, 2020), https://thebrunswicknews.com/news/local_news/folkston-coronavirus-case-confirmed/article_79dd9c5d-f2dc-554b-8993-1ae66bcd127f.html

[80] Florida Department of Health, Division of Disease Control and Health Protection, Florida's COVID-19 data and Surveillance Dashboard, (last updated Apr. 2, 2020) https://experience.arcgis.com/experience/96dd742462124fa0b38ddedb9b25e429

asymptomatic infection. Staff generally live in the communities near these facilities—areas where there are confirmed cases of COVID-19.

90.     Staff often need to crowd into small spaces to enter and exit detention centers. On March 24, 2020, an immigration attorney visiting Stewart observed a shift change in which a group of 15-20 staff was waiting in a small hallway for a gate to open, all crowded within several inches of each other. Over the course of multiple visits during the same week, she did not see any staff at Stewart wearing gloves, masks, or other personal protective equipment (PPE); one officer at the entrance to the Stewart immigration court without any PPE was "coughing continually." Similarly, an attorney visiting Irwin on March 22, 2020, observed no use of PPE by facility staff, other than a guard who put on gloves before taking her temperature, and took them off right afterwards.

91.     Attorneys continue to visit their detained clients in Stewart, Folkston, and Irwin because immigration court hearings for detained immigrants are proceeding in most cases, and deadlines for filings in individual cases are still on the books. Since the pandemic began, ICE has permitted attorneys to enter these facilities without taking adequate precautions to limit exposure in the event that a visiting attorney is a COVID-19 carrier. At all three facilities, attorneys were permitted to enter for legal visits in late March without wearing any PPE. They

merely had to submit to temperature checks and answer a brief set of questions about whether they had traveled recently or had contact with a confirmed case of COVID-19.

92.     On March 25, an attorney visiting Folkston observed 50-60 detained people in the same room, sitting inches away from each other, waiting for their court hearings to be conducted by video teleconferencing (VTC). She attended two hearings with clients that day in small VTC rooms that provide just enough space for two people to sit next to each other facing the VTC camera.

93.     As recently as March 23, 2020, Stewart—which houses an immigration court—was holding hearings with more than ten people inside a court room. At least one such hearing included a live interpreter who, according to the judge, had traveled from the New York court where a judge had a presumed positive case of COVID-19. After the hearing, the attorney went to visit her client and was permitted to enter the visitation lobby at Stewart without any PPE. When she visited her client in the legal visitation rooms at Stewart, the client did not have gloves, a mask, or hand sanitizer.

94.     There are myriad ways in which COVID-19 is likely to enter or has already entered Stewart, Folkston, and Irwin; none of which Respondents can

meaningfully address without blanket testing of every individual who enters. However, testing shortages make such a measure impossible.

95.     Once the virus appears in these facilities, it will be effectively impossible for Petitioners to protect themselves from infection through social distancing and vigilant hygiene—the only known mitigation measures. If they do contract COVID-19, Petitioners—who are already at particularly high risk of serious illness and death—are unlikely to receive the medical care they need.

### D. The Lack of Hospital Resources Near the Georgia Detention Centers Will Put Petitioners at Even Greater Risk

96.     The local and regional hospitals near Stewart, Folkston, and Irwin are ill-equipped to handle COVID-19 outbreaks within these facilities, heightening the risks for Petitioners.

97.     An outbreak of COVID-19 in ICE detention centers will expose the thousands of ICE officers, medical personnel, contract workers, and many others who work in these facilities to the virus, diverting crucial and limited medical resources.

98.     Patients who are hospitalized for COVID-19 commonly require intensive care and a ventilator to assist breathing. Even some younger and healthier

individuals who contract COVID-19 may require supportive care.[81] And those who develop serious complications will need advanced support, including highly specialized equipment that is in limited supply and an entire team of care providers. This level of support is especially difficult to provide to detained individuals because ICE detention facilities lack adequate medical care infrastructure.

99.     Stewart, Folkston, and Irwin are geographically isolated from appropriate levels of medical care to treat COVID-19. The disease requires an intensive care unit with appropriate medical equipment and staff. The closest hospitals to these facilities are either critical access hospitals without such facilities or regional hospitals serving many counties that either are already or will quickly become overwhelmed if there are outbreaks in these detention centers.

100.    Critical access hospitals are generally located in rural areas where the access to nearby hospitals is extremely limited. They have fewer than 25 beds and are designed to care for patients who will require fewer than 96 hours of care; importantly, even if some have ICU-type beds, they do not provide capacity for the

---

[81] Fei Zhou, MD, et al., *Clinical course and risk factors for mortality of adults in patients with COVID-19 in Wuhan, china: a retrospective cohort study,* The Lancet, vol. 395, issue 10229 (Mar. 11, 2020), *available at* https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext

type of long-term treatment required for COVID-19 patients. Critical access hospitals are not designed to care for critically ill patients; they are designed to stabilize and transfer critically ill patients. Regional hospitals in rural areas provide services to populations spread over a large area, often many counties.

101.   Stewart is at least one hour away from two facilities where the necessary level of care could be provided, one of which—Phoebe Putney in Albany, Georgia—is already completely overwhelmed with COVID-19 patients. A hospital closer to Stewart—Southwest Georgia Regional Medical Center in Cuthbert, Georgia—has no long-term ICU beds.

102.   The nearest hospital to Irwin with ICU capabilities is Tift Regional Medical Center, approximately 18 miles away. Tift Medical Center has 181 hospital beds, including 20 ICU beds. As a regional hospital, it serves 12 counties. A coronavirus outbreak in any of these counties would overwhelm the hospital and its ICU beds.

103.   The nearest hospital to Folkston detention center with ICU capabilities is Southeast Georgia Health System in Camden with only 40 beds, including 5 ICU beds, approximately 26 miles away. Patients would likely require initial transport or transfer to Southeast Georgia Health System – Brunswick with 300 beds, including 24 ICU beds, which is about 45 miles away.

104.   With the increasing shortage of PPE, providers, hospital capacity, and ICU resources like ventilators, it is impossible to know when specific hospitals in Georgia will run out of any of these necessary resources. However, predictions in Georgia suggest all hospital resources will be used by April 22, 2020, and that the state currently has an ICU bed shortage of 755 beds and 1,075 ventilators.

### E.  ICE's Actions to Address the Pandemic Thus Far Have Been Woefully Inadequate, and Release is the Only Adequate Response to Protect Petitioners

105.   ICE's failure to recognize the inevitability of outbreaks at Stewart, Folkston, and Irwin, and take adequate precautions, including releasing people, demonstrates a total disregard for the rights, well-being, and humanity of detained immigrant, including Petitioners.

106.   Instead of releasing Petitioners and other vulnerable people, ICE has issued guidance reflecting certain changes to its operations. These changes fail to adequately protect those in ICE's custody, especially Petitioners, who are particularly vulnerable to infection and illness; in fact, there are no conditions of confinement that would adequately protect Petitioners given the realities of detention.

107.   Many of the changes ICE claims to have implemented are either contradicted by reports from individuals with first-hand experience in the detention centers or are ineffective.

108.   Reports by Petitioners and other detained immigrants belie ICE's assertions that it has implemented "[c]omprehensive protocols" for the protection of staff and patients, including the appropriate use of [PPE]." As stated above, detained immigrants and visiting attorneys have not observed ICE staff routinely using PPE, even during close interactions, or regularly washing their hands since the start of the COVID-19 outbreak. Due to national shortages, some of the top trauma centers and hospitals in the state of Georgia have had difficulty obtaining sufficient PPE and other medical supplies, and ICE is presumably dealing with the same issues.

109.   Several Petitioners and other detained immigrants at all three facilities have indicated that ICE personnel never informed them about COVID-19 or advised on recommended hygiene or social distancing practices. A few detained people reported seeing notices about COVID-19 posted on a bulletin board, but indicated that they did not receive any additional information. One detained woman at Folkston reported that when detained people asked for explanations and information around COVID-19, guards and staff responded by threatening to take away their possessions and put them in solitary confinement. Petitioner Nilson Fernando

Barahona Marriaga reported that the only precaution he and other kitchen workers were instructed to take was to replace plastic ware with disposable plates.

110.   Detained immigrants also report a severe lack of access to hygiene supplies. Petitioner Jenner Benavides described only receiving four single-use squares of liquid soap a week, which she needed to use for both hand washing and showers. This would be an unacceptable hygiene practice even before the COVID-19 pandemic; now, it is egregious.[82]

111.   Other measures ICE claims to have taken, including temporarily suspending social visitation in detention and screening new detained immigrants and arriving visitors for certain symptoms of COVID-19, are insufficient to curb the risk of infection within the detention centers. Moreover, ICE's screening procedures for visitors, which are limited to temperature checks and a questionnaire, will likely exclude many individuals who have COVID-19. Not all COVID-19 patients present with fever or respiratory symptoms. Many may be asymptomatic but still contagious, or have mild or less common symptoms. As symptoms of COVID-19 can present

---

[82]   Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *Interim Guidance on management of Coronavirus Disease 2019 (COVID-19) in correctional and Detention Facilities* (Mar. 23, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (about providing soap supply)

anywhere from 2 to 14 days after exposure, individuals who pass ICE's screenings can expose other detained individuals, as well as detention center staff.

112.   The options available to ICE to mitigate risk, like the solitary confinement of all medically vulnerable people, are problematic and unsafe. Placing an individual with significant medical needs in solitary confinement not only exacerbates underlying medical conditions, including mental health conditions, but also creates additional risks. This is particularly true given the rapid and severe progression of COVID-19 in affected individuals and the need for responsive medical observation. The Georgia detention centers do not have the space or staff to safely care for patients for this period of time.

113.   Locking any detained person, with or without underlying medical conditions, in a jail cell for extended periods of time, is psychologically damaging and could lead to a spike in severe depression, suicides, and other medical emergencies. In the context of an infectious disease outbreak, where onsite medical staff are operating at or over capacity, these problems will only accelerate. Isolation also increases the amount of physical contact between detention center staff and detained people due to increased handcuffing, escorting individuals to and from the showers, and increased use of force due to the increased psychological stress of isolation.

114. Experts believe release from custody is both the most effective public health measure to curb increased transmission of COVID-19 and the most practical strategy to protect medically vulnerable people like Petitioners from further harm. ICE's response to COVID-19 has made abundantly clear that they do not plan to establish special protections for high-risk patients, instead waiting for them to become symptomatic. This puts not only Petitioners but ICE's own personnel and the larger community at risk of a preventable disaster.

**F. Petitioners Are Particularly Vulnerable to Serious Illness or Death if Infected by COVID-19 and Should Be Released from Detention.**

115. Petitioners in this case are particularly vulnerable to serious illness or death if infected by COVID-19 and are currently detained within the jurisdiction of the ICE Atlanta Field Office.

116. **Joseph Lloyd Thompson.** Mr. Thompson is a 49-year-old citizen of Jamaica, Lawful Permanent Resident of the United States, and long-term resident of Georgia. He has two sons who are 5 and 22 years old. He is extremely passionate about cooking; before he was detained, he worked at a country club as a sous chef.

117. Mr. Thompson is currently detained by ICE at Irwin, and has been in ICE custody since approximately January 2018. He is working with his immigration attorneys to apply for Cancellation of Removal.

118.   Mr. Thompson has diabetes, hypertension, depression, and a severe heart aneurysm that requires surgery that ICE has repeatedly refused to facilitate. He has been hospitalized three times for pneumonia, and many times for his heart problems. During his time in ICE custody, Mr. Thompson has been hospitalized on at least ten occasions. His attorneys have submitted two parole requests with details about his medical problems, but ICE denied both.

119.   While in ICE custody, including at Irwin, Mr. Thompson has consistently been denied adequate medical care. While detained in North Carolina, he was assaulted by ICE and detention officers, to the point that he could not swallow and that he still has nerve damage in his right hand from being handcuffed so violently. He did not receive any treatment for his hand. While detained at Folkston, he did not receive adequate care for chest pain from his aneurysm. He was transferred to several other facilities, but instead of approving necessary operations to address his aneurysm, ICE continues to only medicate his symptoms. At Irwin, ICE has repeatedly delayed Mr. Thompson's care as well, including not even providing him with his required medications for nearly two weeks in March 2020. He is also forced to live in unsanitary conditions and drink unhygienic water.

120.   Mr. Thompson is critically vulnerable to COVID-19 because of his significant health problems. Upon his release he will self-quarantine at his U.S. Citizen sister's home in Snellville, Georgia.

121.   **Ansumana Jammeh**. Mr. Jammeh is a 43-year-old citizen of Gambia. He has been detained by ICE at Irwin since March 2019. His Board of Immigration Appeals (BIA) appeal of his removal order is currently pending.

122.   Mr. Jammeh suffers from diabetes for which he requires insulin pills and blood sugar checks, as well as a special diabetic diet that he is not provided at Irwin. He also has severe hemorrhoids that developed while in ICE custody, cause him extreme pain, and recently required surgery in March 2020. He was prescribed antibiotics after the surgery but has not received them, instead receiving only prescription pain medication and Ibuprofen, which have not managed his pain. He will likely require a second surgery to treat other hemorrhoids. In December 2019, he was taken to the emergency room for severe abdominal pain caused by inflammation in his intestines. When he returned to Irwin, ICE similarly failed to provide most of the medications prescribed by the doctor.

123.   At Irwin, in addition to repeatedly struggling to obtain the medications and medical services that he requires, Mr. Jammeh is also not provided with enough

hygiene products each week, including soap, and was told by staff that he had to clean his own room while he was bedridden from the hemorrhoids surgery.

124.  Due to his significant health problems, Mr. Jammeh is critically vulnerable to COVID-19. Upon his release he plans to self-quarantine at the home of a close friend in Atlanta, Georgia. He also has two cousins in Marietta, Georgia who are willing to take him in as well.

125.  **Karen Lopez.** Ms. Lopez is a 42-year-old citizen of Honduras. She has a partner and five children, ages 13 to 27 years old; prior to detention they all lived together in Atlanta, Georgia.

126.  Ms. Lopez has been detained by ICE at Irwin since March 2020. She is pursuing deferral of removal under the Convention Against Torture, and is also eligible for U-visa.

127.  Ms. Lopez has a pacemaker due to a heart condition that also caused her to suffer a stroke about six years ago. Her heart condition makes it difficult for her to even climb in and out of a top bunk bed. She also suffers from multiple sclerosis (MS), which causes her severe chronic pain along with problems with her vision, balance, muscle control, and other bodily functions. Three weeks ago, ICE forced her to have a mammogram against her wishes, which, because of her pacemaker, made her feel very sick and weak for several days only to be taken to

the emergency room before stabilizing. Ms. Lopez also may have a stomach ulcer. Despite all of her serious medical conditions, ICE has not provided her with the medications and medical services she needs. She has only been given Ibuprofen and aspirin for her pain, and not a specialized medication or diet for her MS.

128.   Ms. Lopez is critically vulnerable to COVID-19 because of her significant health problems. Upon her release she plans to return home and self-quarantine with her partner and children in Atlanta, Georgia, who eagerly await her return.

129.   **Sarai Hernandez.** Ms. Hernandez is a 37-year-old citizen of Honduras. She and her younger brother, Petitioner Tomas Hernandez, fled to the United States seeking asylum in June 2019. They were released from custody at that point to live with their sister in Atlanta. On March 4, 2020, they attended their scheduled court date, only to be told the hearing had been moved to February 12, 2020. Although they hadn't been notified of the change, the judge ordered them deported. Ms. Hernandez and her brother were both detained by ICE that day. Ms. Hernandez is currently detained at Irwin, while her brother is detained at Stewart.

130.   Ms. Hernandez has suffered from asthma her entire life, which has given her respiratory distress and weakens her immune system. She also has a history of hospitalization from asthma attacks. The conditions of her detention have

exacerbated her asthma greatly, and she has not been able to get a necessary inhaler from ICE. While detained, she also had a painful ovarian cyst, and needed to be taken to the hospital.

131.   Ms. Hernandez is critically vulnerable to COVID-19 because of her asthma, and greatly concerned not only about her own health but her brother's health. Upon their release she looks forward to being reunited with him, and they will self-quarantine at their U.S. citizen aunt's home in Port Richey, Florida.

132.   **Nilson Barahona Marriaga.** Mr. Barahona Marriaga is a 38-year-old citizen of Honduras. He has lived in the U.S. for more than ten years, and been married to a U.S. citizen for over six years. They have a six-year-old son. Mr. Barahona Marriaga also has a U.S. Citizen father, a mother who is a Legal Permanent Resident, and two U.S. Citizen sisters.

133.   Mr. Barahona Marriaga has been detained by ICE at Irwin since approximately October 2019. He is eligible for adjustment of status through a pending I-130, Petition for Alien Relative. He has also applied for Non-LPR Cancellation of Removal, and may be eligible for a U-Visa based on a kidnapping in 2011. An attorney helped him apply for parole and bond, but they were denied.

134.   Mr. Barahona Marriaga has diabetes and hypertension, both of which he struggles to manage while in detention. ICE does not provide the necessary diet

and access to exercise that he needs to manage his diabetes, so his condition has deteriorated and many of his requests for medical services have been ignored. He is also forced to remain in very crowded, unsanitary quarters, and is fearful of COVID-19 because he knows there are detained people in quarantine at Irwin.

135.    Mr. Barahona Marriaga is critically vulnerable to COVID-19 because of his significant health problems. Upon his release, he would self-quarantine in his home in Lawrenceville, Georgia, where his wife and child eagerly await his return.

136.    **Shelley Dingus.** Ms. Dingus is a 52-year-old citizen of England. She has lived in the U.S. for over nine years, and has been married for 21 years to a U.S. citizen who is a U.S. Air Force veteran. She has five children, ages 17 to 28 years old. Prior to detention, she lived in Norton, Virginia and worked as a senior healthcare specialist.

137.    Ms. Dingus is currently detained by ICE at Irwin, and has been in ICE custody since January 2020. She suffers from asthma, chronic obstructive pulmonary disease, severe migraines, depression, anxiety, and eczema that causes severe skin allergies and open wounds that are easily infected. She requires an inhaler and other medicines for her asthma every day. She also requires lotion and cream for her skin condition, medication for her migraines, anti-depressants, and hormone replacement tablets due to a full hysterectomy. ICE does not consistently provide her with her

medications, or provides her with improper medications. Her requests for medical care are also often ignored or delayed, and she is not provided enough hygiene products.

138.   Ms. Dingus is critically vulnerable to COVID-19 because of her age and her significant health problems. Her husband and two younger sons await her return; upon her release she plans self-quarantine at their home in Virginia.

139.   **Jenner Benavides.** Jenner Benavides is a 27-year-old transgender woman and citizen of Mexico. She entered the U.S. at the age of 10 and later became a DACA recipient. In 2014 her mother died from stomach cancer, leaving Ms. Benavides as the sole caretaker and custodian of her four minor siblings in Nashville, Tennessee.

140.   Ms. Benavides has been in ICE custody since May 2019 and is currently detained at Folkston. She applied for asylum based on continuous sexual assault and abuse she endured as a child in Mexico, and her gender and sexual identity. She is currently appealing the denial of this relief to the BIA and applying for a U-visa. An immigration attorney submitted a parole request on her behalf on April 2, 2020.

141.   Ms. Benavides is living with HIV and bipolar disorder. She also suffers from depression, anxiety and suicidal ideation exacerbated by her conditions of confinement. At Folkston, she is constantly bullied and harassed by other

immigrants detained there. She was recently sexually assaulted more than once by men in her pod unit. When she reported the assault, she was put on suicide watch, and then moved to protective custody, which further worsens her anxiety and depression. She has also experienced delays and inconsistencies in medical services at Folkston, and she is not provided enough soap or toiletries to keep herself clean and protected from illness.

142.   Ms. Benavides is critically vulnerable to COVID-19 because of her autoimmune disease and other health problems. Her U.S. citizen friend is waiting to care for her in Nashville once she is released, where her two youngest siblings also eagerly await her return.

143.   **David Fernandez.** Mr. Fernandez is a 45-year-old citizen of Mexico. He has lived in the United States for nearly 18 years, and has worked consistently in labor jobs, including farming, construction, and roofing.

144.   Mr. Fernandez has been detained at Folkston since December 2019. He is seeking asylum in the United States.

145.   Mr. Fernandez has diabetes and has suffered from tuberculosis in the past. A doctor has told him that if he does not manage his blood sugar levels, he is at risk of suffering a heart attack. Prior to his detention by ICE, he had his sugar levels under control, and he felt well. However, maintenance of his diabetes requires

fourteen injections of insulin per week, and he has not consistently received all of these necessary injections. Some weeks he receives as few as three. His health has deteriorated, and he sometimes cannot stand up from fatigue. Mr. Fernandez is now suffering flu-like symptoms in a facility where he cannot practice social distancing, he is not provided sufficient soap, testing for COVID-19 is unavailable, and staff are not taking precautions to protect him from infection.

146.   Mr. Fernandez is critically vulnerable to COVID-19 because of his significant health problems. Upon his release he plans to self-quarantine in South Carolina, where friends eagerly wait to welcome him home.

147.   **Gerardo Arriaga.** Mr. Arriaga is a 24-year-old citizen of Peru. He is married to a U.S. Citizen and lived in Atlanta, Georgia before being detained. He is eligible for adjustment of status.

148.   Mr. Arriaga is currently detained at Folkston. He has Lupus, an autoimmune disease that causes him to be immunocompromised and causes inflammation and damage to his joints, skin, kidneys, blood, heart, and lungs. Because of his condition, he is predisposed to infections, and needs medications and topical creams to manage the symptoms. While he has been at Folkston, he has not received these necessary medications. He has also requested medical attention that

has been ignored, and staff are not taking precautions to protect him from COVID-19. He has also not been provided any soap by ICE since he has been detained.

149.   Mr. Arriaga is critically vulnerable to COVID-19 because of his significant health problems. Upon his release he plans to self-quarantine with his wife in Atlanta, Georgia.

150.   **Aristoteles Sanchez Martinez.** Mr. Sanchez Martinez is a 47-year-old citizen of Venezuela. His family lives in Queens, New York.

151.   Mr. Sanchez Martinez is detained by ICE at Stewart, and has been in ICE custody since approximately September 2018. Before Stewart, he was detained at the Houston Contract Detention Facility in Houston, Texas, and at Folkston. Mr. Sanchez Martinez's BIA appeal of his removal order was denied in November 2019, but it is unlikely that he will be removed to Venezuela.

152.   Mr. Sanchez Martinez has Type II diabetes, hypertension, neuropathy, avascular necrosis, non-palpable pulses in the lower extremities, and venous insufficiency, among other conditions. His sugar levels have at times been dangerously high while in ICE custody. He is currently in a wheelchair due to his conditions. He is also currently recovering from a hernia repair surgery after which he was brought back to Stewart within a day instead of remaining in intensive care. He still experiences pain, weakness, and inflammation from the surgery. ICE has

neglected to care for Mr. Sanchez Martinez's health—he has only received Tylenol to treat his severe pain and ICE often fails to check his sugar levels.

153.   Mr. Sanchez Martinez is critically vulnerable to COVID-19 because of his significant health problems. Upon his release he plans to self-quarantine with his family in Queens with the support of a Lutheran Church in Brooklyn, New York.

154.   **Michael Robinson.** Mr. Robinson is a 54-year-old citizen of Jamaica. He has six U.S. citizen children, and has family in both Florida and New York.

155.   Mr. Robinson has been detained by ICE at Stewart since February 2020. He is seeking asylum, Withholding of Removal, and protection under the Convention Against Torture, based on persecution he experienced as a bisexual man.

156.   Mr. Robinson suffers from hypertension, asthma, cardiac murmur, high blood pressure, and benign prostatic hyperplasia. He was recently told by a doctor that the "left side of [his] heart is swollen." He also recently experienced an incident during which he was exposed to pepper spray, which made him cough blood. His medical condition has been deteriorating since being detained. New medication in detention has led to severe side effects including constant headaches, numbness in his mouth, and uncontrollable shaking. The medical staff at Stewart have not responded to his requests for his medical records. At Stewart, he lives in very close

quarters, is not provided enough soap, and is fearful of the confirmed case of COVID-19 at the facility.

157.   Mr. Robinson is critically vulnerable to COVID-19 because of his age and his significant health problems. Upon his release he plans to self-quarantine with either his family in Florida, sister in Long Island, New York, or mother in Brooklyn, New York.

158.   **Tomas Hernandez.** Mr. Hernandez is an 18-year-old citizen of Honduras. He fled with his older sister, Petitioner Sarai Hernandez, to seek asylum in the United States in June 2019. As noted, they were released from custody then to live with their sister in Atlanta, but re-detained on March 4, 2020 when they attended a scheduled court date only to learn the hearing had been moved to a month earlier. Although they hadn't been notified of the change, the judge ordered them deported, and Mr. Hernandez and his sister were both detained that day. Mr. Hernandez is currently detained at Stewart, while his sister is detained at Irwin.

159.   Mr. Hernandez has an intellectual disability that makes it nearly impossible for him to communicate with people and understand people. He also has a speech impediment and is deaf in one ear. His sister is his legal guardian and primary caretaker, and their current detention by ICE is the first time the two have been separated.

160.   Mr. Hernandez has also suffered from asthma his entire life, has ADHD, and has a history of seizures. As he is unable to communicate his needs to others, his sister believes he it is likely that he is not getting the medical care he needs.

161.   Mr. Hernandez is critically vulnerable to COVID-19 because of his significant health problems as well as his intellectual disability and inability to communicate clearly with staff at the detention center without the help of his sister. Upon their release he and his sister Sarai will self-quarantine at their U.S. citizen aunt's home in Port Richey, Florida.

162.   **Peter Owusu.** Mr. Owusu is a 40-year-old citizen of Ghana. He is seeking asylum, Withholding of Removal, and protection under the Convention Against Torture based on persecution he experienced in Ghana.

163.   Mr. Owusu has been detained at Stewart since January 2020. Before he fled Ghana, he suffered a stab wound that causes him difficulty breathing. At a previous detention center, he received a breathing machine, but he has not been able to access it at Stewart. He has trouble breathing without the machine, particularly at night and when it is cold. Without the machine, he cannot sleep well. The wound he sustained also led to other complications, including improperly healed stitches, ongoing stomach pain, digestion issues, dizziness, headaches, and heart issues. Mr.

Owusu requested to see a doctor, but ICE has not taken him to see one, and instead told him to take a painkiller.

164.   Mr. Owusu is critically vulnerable to COVID-19 because of his significant health problems. Upon his release he plans to self-quarantine with his uncle in Houston, Texas.

165.   As discussed above, public health experts with experience in immigration detention and correctional settings have unequivocally concluded that vulnerable people, like Petitioners, will be safer if they are released from custody.

166.   ICE has a longstanding practice of exercising its authority to release from custody particularly vulnerable immigrants with significant medical or humanitarian needs, including on bond, parole, or under other conditions including highly effective alternatives to detention ("ATD") such as GPS monitoring and telephone check-ins. *See, e.g.,* 8 C.F.R. § 212.5(b)(1); 8 U.S.C. § 1182(d)(5)(a); 8 C.F.R. § 235.3(b)(1)(iii); 8 C.F.R. § 235.3(b)(4)(ii); 8 C.F.R. § 241.4.

## VI.   LEGAL FRAMEWORK

### A. Petitioners Have a Constitutional Right to Reasonable Safety in Custody

167.   All noncitizens who are in ICE, even those with prior criminal convictions, are civil detainees held pursuant to civil immigration laws. *Zadvydas,*

533 U.S. at 690. Their constitutional protections while in civil custody are thus derived from the due process clause of the Fifth Amendment. *Id.*

168. The Fifth Amendment Due Process Clause, which mirrors the Fourteenth Amendment, prohibits punishment of people in civil custody. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004); *Hamm v. Dekalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985) (citing *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977)). (1989).

169. Civilly detained people "are generally 'entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Marsh v. Fla. Dep't of Corrections*, 330 F. App'x 179 (11th Cir. 2009) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)); *accord Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 n.5 (4th Cir. 2017).

170. To establish that a particular condition or restriction of detention constitutes impermissible punishment, a petitioner must show either (1) an expressed intent to punish; or (2) lack of a reasonable relationship to a legitimate governmental purpose, from which an intent to punish may be inferred. *See Wolfish*, 441 U.S. at 538. Absent an explicit intention to punish, a court must apply a two-part test: "First, a court must ask whether any 'legitimate goal' was served by the prison conditions.

Second, it must ask whether the conditions are 'reasonably related' to that goal." *Jacoby v. Baldwin County*, 835 F.3d 1338, 1345 (11th Cir. 2016). "[I]f conditions are so extreme that less harsh alternatives are easily available, those conditions constitute 'punishment.'" *Telfair v. Gilberg*, 868 F. Supp. 1396, 1412 (S.D. Ga. 1994) (citing *Wolfish*, 441 U.S. at 538-39 n.20).

171.   "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). The government must provide detained individuals with basic necessities, such as adequate medical care, food, clothing, and shelter; the failure to provide these necessities violates due process. *Hamm*, 774 F.2d at 1573; *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1115 (11th Cir. 2005).

172.   At a minimum, the Fifth Amendment Due Process Clause prohibits Respondents' deliberate indifference to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation in the post-conviction criminal context. *Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, (1983) ("[T]he due process rights of a [detainee] are at least as great as the Eighth Amendment protections

available to a convicted prisoner."); *see also Hale v. Tallapoosa County*, 50 F. 3d 1579, 1582 n.4 (11th Cir. 1995).

173.   In order to show that Respondents are acting with deliberate indifference, Petitioners must show exposure to a substantial risk of serious harm of which Respondents are aware and have disregarded. *Farmer v. Brennan*, 511 U.S. 825, 834, 837-38 (1994); *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019); *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).

174.   The government may violate the Eighth Amendment when it "ignore[s] a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33; *see also id.* at 34 (citing with approval *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974), which held that prisoners were entitled to relief under the Eighth Amendment when they showed, *inter alia*, the mingling of "inmates with serious contagious diseases" with other prison inmates).

175.   Thus, the harm that Petitioners fear—i.e., that their confinement will result in a COVID-19 infection that will seriously injure and possibly kill them— need not become a reality to establish a violation of their constitutional rights. Courts

do not require a plaintiff to "await a tragic event" before seeking relief from a condition of confinement that unconstitutionally endangers them. *See Helling*, 509 U.S. at 33 (holding prisoner's Eight Amendment claim could be based upon possible future harm to health, as well as present harm).

176.   "Nor does it matter that some inmates may not be affected by the condition, and that the harm is thus, in a sense, only potential harm. The Court has found an Eighth Amendment violation 'even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed.'"   *Tittle v. Jefferson Cty. Comm'n*, 10 F.3d 1535, 1543 (11th Cir. 1994) (quoting *Helling*, 509 U.S. at 33).

### B. This Court Has Authority to Order Petitioners' Release to Vindicate Their Fifth Amendment Rights, and Such Relief Is Necessary Here.

177.   Courts have broad power to fashion equitable remedies to address constitutional violations in prisons, *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978), and "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see also Stone v. City & County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992) ("Federal courts possess whatever powers are necessary to

remedy constitutional violations because they are charged with protecting these rights.")

178.   This authority extends to "placing limits on a prison's population" when necessary to ensure compliance with the Constitution. *Brown*, 563 U.S. at 511; *see also Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap).

179.   The same principle applies here. As the constitutional principles and public health experts make clear, releasing Petitioners is the only viable remedy to ensure their safety from the threat to their health that COVID-19 poses. Petitioners are older adults and/or people with medical conditions who are at particularly grave risk of severe illness or death if they contract COVID-19.

180.   In the face of this great threat, social distancing and hygiene measures are Petitioners' only defense against COVID-19. Those protective measures are impossible in the environment of an immigration detention center, where Petitioners sleep in close quarters; share toilets, sinks, and showers; eat in communal spaces, and are regularly in close contact with the many other detained people and officers around them. These conditions pose a particularly high risk of exposure to COVID-

19, and as a result, Petitioners face unreasonable harm from continued detention and should be released immediately.

### C. Habeas Is a Broad, Flexible Remedy That Authorizes Courts to Order Release from Unlawful Detention Conditions as Law and Equity Requires.

181.    Petitioner also seek relief under the federal habeas statute, 28 U.S.C. § 2241, which is itself infused with long-standing common law equitable principles. See 28 U.S.C.§ 2241(c)(3) (the writ extends to those prisoners "in custody in violation of the Constitution or laws or treaties of the United States"). "Habeas is at its core a remedy for unlawful executive detention." *Munaf v. Geren*, 553 U.S. 674, 693 (2008).

182.    Habeas invests in federal courts broad, equitable authority to "dispose of the matter as law and justice require," 28 U.S.C. § 2243, as the "very nature of the writ demands that it be administered with the initiative and flexibility." *Harris v. Nelson*, 394 U.S. 286, 291 (1969); *see Boumediene v. Bush*, 553 U.S. 723, 780 (2008) ("Habeas is not 'a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose.'") (quoting *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).

183.    Accordingly, the illegality of custody under the "Constitution or laws . . . of the United States" may stem from the fact of detention and the duration of

detention—what is often referred to as the historical core of habeas—and for unlawful placement or conditions of detention. *See Wilwording v. Swenson*, 404 U.S. 249, 251 (1971) (habeas challenging "living conditions and disciplinary measures" is "cognizable in federal habeas corpus"); *Johnson v. Avery*, 393 U.S. 483 (1969) (permitting federal habeas challenge to legality of prison regulation prohibiting provision of legal assistance to other prisoners). *See also Aamer v. Obama*, 742 F.3d 1023, 1031-38 (D.C. Cir. 2014) (surveying history, purpose and Supreme Court jurisprudence and "the weight of the reasoned precedent in the federal Courts of Appeal" relating to habeas and concluding "habeas corpus tests not only the fact but also the form of detention" (citation omitted)).

184.   A court is fully empowered to remediate the particular illegality here—an outbreak of lethal and unavoidable virus that threatens Petitioners and violates their constitutional rights to be free from arbitrary and punitive detention—by ordering their release. Habeas corpus is, "above all, an adaptable remedy," *Boumediene*, 553 U.S. at 779, and federal courts retain "broad discretion in conditioning a judgment granting habeas relief . . . 'as law and justice require.'" *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (quoting 28 U.S.C. § 2243). That authority includes an order of release, *Boumediene*, 553 U.S. at 779, so as "to insure

that miscarriages of justice within [the writ's] reach are surfaced and corrected."

*Harris*, 395 U.S. at 291.

## VII.   CLAIM FOR RELIEF

### A. Violation of Fifth Amendment Right to Substantive Due Process (Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement)

185.   The Fifth Amendment to the U.S. Constitution guarantees individuals in immigration detention the right to be free from punishment. The government violates this guarantee when conditions of confinement lack a reasonable relationship to any legitimate governmental purpose, *i.e.* when a custodian's actions are excessive in relation to their purpose.

186.   Respondents' continued detention of Petitioners during the COVID-19 pandemic is excessive in relation to any legitimate governmental purpose. Less harsh measures are available to satisfy any government interest in continuing to detain Plaintiffs, including release with conditions. Under these circumstances, Respondents' detention of Petitioners amount to impermissible punishment.

187.   Conditions of confinement for individuals in immigration detention also violate the Fifth Amendment when the government fails, with deliberate indifference, to safeguard the health and safety of those in custody. The government

acts with deliberate indifference when it knowingly exposes an individual in its custody to a substantial risk of serious harm.

188.   Respondents have subjected Petitioners to conditions of confinement that create a substantial risk of contracting a serious case of COVID-19, for which there is no known vaccine, treatment, or cure. Respondents know or should be aware of the fact that Petitioners' underlying conditions render them especially vulnerable to severe illness or even death if they contract COVID-19. Respondents are therefore knowingly subjecting Petitioners to an unreasonable risk of serious harm, in violation of constitutional due process.

189.   Respondents' continued detention of Petitioners fails to adequately protect Petitioners from the risks of contracting COVID-19.

190.   Petitioners' ongoing confinement lacks a reasonable relationship to any legitimate governmental purpose and is excessive in relation to their purpose.

191.   Respondents have exposed Petitioners to a substantial risk of serious harm.

192.   Respondents have known of or disregarded the substantial risk of harm to Petitioners' health and safety.

193.   Respondents have acted with deliberate indifference to Petitioners' health and safety.

194.   Respondents' continued detention of Petitioners violates the Due Process Clause of the Fifth Amendment.

## VIII.   PRAYER FOR RELIEF

WHEREFORE Petitioners request that the Court grant the following relief:

a.   Issue a Writ of Habeas Corpus on the ground that Respondents' continued detention of Petitioners violates the Due Process Clause and order Petitioners' immediate release, with appropriate precautionary public health measures;

b.   In the alternative, issue injunctive relief ordering Respondents to immediately release Petitioners, with appropriate precautionary public health measures, on the grounds that continued detention violates Petitioners' constitutional due process rights;

c.   Issue a declaration that Respondents' continued detention of individuals at increased risk for severe illness, including all people fifty-five and older and persons of any age with underlying medical conditions that may increase the risk of serious COVID-19, violates the Due Process Clause;

d.   Award Petitioners their costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

e.     Grant any other and further relief that this Court may deem fit and proper.

Dated:  April 3, 2020                    Respectfully submitted,

SOUTHERN POVERTY LAW CENTER          ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA

By: /s/ Gracie Willis                By:  /s/ Hillary Li
Gracie Willis (GA Bar #851021)       Hillary Li (GA Bar #898375)
Rebecca Cassler (GA Bar #487886)     Phi Nguyen (Ga Bar #578019)
Lorilei Williams*                    5680 Oakbrook Pkwy, Ste. 148
150 E. Ponce de Leon Ave., Ste. 340  Norcross, GA 30093
Decatur, GA 30030                    *Tel:* (404) 585-8466
*Tel:* (404) 521-6700                *Fax:* (404) 890-5690
*Fax:* (404) 221-5857                hli@advancingjustice-atlanta.org
gracie.willis@splcenter.org          pnguyen@advancingjustice-atlanta.org
rebecca.cassler@splcenter.org

Paul Chavez*                         KILPATRICK TOWNSEND & STOCKTON LLP
Victoria Mesa-Estrada*
2 S. Biscayne Blvd., Ste. 3200       By:  /s/ Tamara Serwer Caldas
Miami, FL 33101                      Tamara Serwer Caldas (GA Bar #617053)
*Tel:* (786) 347-2056                Kathryn E. Isted (GA Bar #908030)
paul.chavez@splcenter.org            Amanda Brouillette (GA Bar #880528)
victoria.mesa@splcenter.org          1100 Peachtree St., NE, Ste. 2800
                                     Atlanta, GA 30309
Melissa Crow*                        *Tel:* (404) 815-6006
1101 17th Street, NW, Ste. 705       *Fax:* (404) 541-4754
Washington, DC 20036                 tcaldas@kilpatricktownsend.com
*Tel:* (202) 355-4471                kisted@kilpatricktownsend.com
*Fax:* (404) 221-5857                abrouillette@kilpatricktownsend.com
melissa.crow@splcenter.org

*pro hac vice motions forthcoming*

78