# **EXHIBIT 1**

## DECLARATION OF ROBERT B. GREIFINGER, MD

I, Robert B. Greifinger, M.D., hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am a physician who has worked in health care for prisoners for more than 30 years. I have managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system. I have authored more than 80 scholarly publications, many of which are about public health and communicable disease. I am the editor of *Public Health Behind Bars: from Prisons to Communities,* a book published by Springer (a second edition is due to be published in early 2021); and co-author of a scholarly paper on outbreak control in correctional facilities.[1]

2. I have been an independent consultant on prison and jail health care since 1995. My clients have included the U.S. Department of Justice, Division of Civil Rights (for 23 years) and the U.S. Department of Homeland Security, Section for Civil Rights and Civil Liberties (for six years). I am familiar with immigration detention centers, having toured and evaluated the medical care in approximately 20 immigration detention centers, out of the several hundred correctional facilities I have visited during my career. I currently monitor the medical care in three large county jails for Federal Courts. My resume is attached as Exhibit A.

**COVID-19 Background**

3. COVID-19 is a coronavirus disease that has reached pandemic status. As of today, according to the World Health Organization, more than 850,000 people have been diagnosed with COVID-19 around the world and 42,000 have died.[2] In the United States, about 214,000 people have been diagnosed and 4,800 people have died thus far.[3] These numbers are likely an underestimate, due to the lack of availability of testing, especially in the United States.

---

[1] Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.

[2] See https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd, accessed April 2, 2020.

[3] See https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?searchResultPosition=1, accessed April 2, 2020.

4. There is emerging evidence, from researchers in Singapore, that the virus that causes COVID-19 is transmissible from an asymptomatic person for one to two days before the person develops symptoms.[4]

5. COVID-19 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. In the absence of a vaccine, the only way to mitigate the spread of COVID-19 is scrupulous hand hygiene and social distancing.

6. People in the high-risk category for COVID-19, i.e., the elderly or those with underlying disease, are likely to suffer serious illness and death when they are infected. According to preliminary data from China, 20% of people in high risk categories who contract COVID-19 have died.

7. Those who do not die have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that are in very short supply.

8. The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

9. Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19. For that reason, public health officials have recommended extraordinary measures to combat the spread of COVID-19. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of risk mitigation strategy.

**Risk of Outbreak of COVID-19 in Detention Centers**

10. The conditions of immigration detention facilities pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions. ICE will not be able to stop the spread of COVID-19 within its

---

[4] https://www.cdc.gov/mmwr/volumes/69/wr/mm6914e1.htm?s_cid=mm6914e1_w, accessed April 2, 2020.

facilities.  ICE has already reported the presence of detainees with confirmed COVID-19 in multiple detention facilities.[5]

11. One of the few means of preventing a COVID-19 infection is through social distancing—that is maintaining a distance of at least six feet between individuals so as not to unintentionally spread the virus to others. This is nearly impossible in a detention center, where crowding of individuals is commonplace. Immigration detention facilities are enclosed environments, much like the cruise ships that have been sites of large concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of virus transmission because of crowding, the proportion of vulnerable people detained, the ingress and egress of staff, and often scant medical care resources.

    Take the sally-port or control port, for example. This is a series of two locked gates that bring all staff and detained persons past a guard in a window control room. These areas often become severely crowded, especially during shift changes for staff or leading up to count for the detained people. In this context, close contact is unavoidable; it creates a breeding ground for COVID-19 infection.

    These sally-ports are also a focal point for staff to transfer keys, radios, and other equipment through a hand to hand transaction, intensifying the risk of transmitting infection from a staff member to others.

12. In a detention center, people live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection.  Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

13. Many immigration detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention. As examples, immigration detention facilities often use practical nurses who practice beyond the scope of their licenses; have part-time physicians who have limited availability to be on-site; and facilities with no formal linkages with local health departments or hospitals.

---

[5] https://www.ice.gov/coronavirus, accessed April 2, 2020.

14. It is difficult to capture the full extent of the problem because testing materials have been in very short supply and the fact that people who are infected with COVID-19, as far as we know, can be asymptomatic for up to two days before showing the symptoms associated with the disease.

15. ICE is not set up to be able to contain the disease once it is inside of its facilities or the facilities of its contractors. This is because of the realities of an infectious disease within the tight confines of a detention center and the history of inadequate health care that ICE has provided to detainees, directly or through its contractors. The CDC has warned detention centers to plan for staffing shortages due to the impact of COVID-19 on detention center staff.[6] The COVID-19 crisis only exacerbates ICE's longstanding struggle to maintain adequately staffed facilities.

16. Moreover, the Georgia detention centers have well-documented problems in the provision of adequate medical care.[7]  Extended wait times for detained individuals who are ill to see a medical professional, compounds the risk of transmission.  Densely congregated living areas and food preparation practices fail to comply with the standards that would prevent the spread of COVID-19.

17. The only viable public health strategy available is risk mitigation. Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of vulnerable individuals is a key part of a risk mitigation strategy.

**ICE'S Ameliorative Measures Will Not Be Effective**

18. There are no changes in procedure that can alleviate these concerns. Approaches like solitary confinement or keeping individuals locked into their cells more hours of the day will make the problem worse. These approaches are psychologically damaging to detained people and may lead to a spike in severe depression, attempted and completed suicides, and medical emergencies. In the context of an outbreak in the facility, when

---

[6] 3 https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#social_distancing, accessed April 2, 2020

[7] https://www.oig.dhs.gov/sites/default/files/assets/FOIA/OIG_FOIA_Stewart-Detention-Center-Work-Papers.pdf; https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.  Accessed April 2, 2020.

onsite medical staff are operating at or over capacity, the problems can accelerate.

19. In addition to social distancing, another key measure to prevent the spread of COVID-19 is frequent and thorough hand washing. Handwashing stations are often few and far between in detention centers; soap is often in short supply. Many facilities do not have handwashing stations that allow water to be turned on and remain on.  Instead, the faucets automatically shut off after a period of time, making it nearly impossible to wash one's hands for the recommended twenty seconds.

20. In addition to these challenges, ICE has failed to adequately respond to the COVID-19 pandemic. Both the March 6, 2020 interim guidance sheet[8] produced by ICE Health Services Corps, the body that oversees ICE detention facilities' medical care, ICE's guidance on its website,[9] and the ICE internal guidance dated March 27, 2020 are wholly insufficient to adequately face the crisis at hand. They fail in these ways:

    a. The protocol focuses on travel contacts, instead of community spread. Questions focus on detainee's recent travel history. This misses the mark. At this point in the course of the pandemic, nearly everyone who is not practicing social distancing is in contact with someone who has the virus. The correct focus is monitoring active symptoms, including fever and interaction with sick individuals upon entry into the ICE facility, including sick detained people and staff. Staff is an especially important vector in this outbreak. Since they go back and forth between the detention centers and the communities where they live, the detention centers will be hit by COVID-19 at the same time as the surrounding communities, staff and their families included.

    b. The ICE protocol does not follow the measures in the CDC guidelines for long term care facilities. Specifically, it does not ensure access to hand sanitizer or provide masks for individuals with a cough. Although the March 27, 2020 guidance recommends access to hand sanitizer inside the detention centers, it does so only for ICE-operated facilities, not contract detention centers like those in Georgia.  It also fails to specify the alcohol content of the hand sanitizer, leading to the risk of low-content hand sanitizers that are not effective.

---

[8] https://www.aila.org/infonet/ice-interim-reference-sheet-coronavirus, accessed April 2, 2020.
[9] https://www.ice.gov/covid19, accessed April 2, 2020.

c. The ICE protocol does not provide guidance on how to deal with surge capacity, which will almost certainly be necessary as the number of cases in the detention facility increases and the number of healthy staff who can treat detained people decreases. The March 27, 2020, guidance merely recommends that detention centers continue to hire staff, which is not a meaningful suggestion where individuals are instructed to shelter in place and socially distance.

d. There is no guidance on when to test detained people. ICE Health Service Corps leadership should provide daily updates to medical staff disseminating criteria for testing in this rapidly changing environment. Epidemiologists working in conjunction with local and federal COVID-19 responders must be part of the decision-making process guiding this daily protocol. The March 27, 2020, guidance to simply follow CDC guidelines with regard to testing is insufficient and will lead to inconsistent testing.

e. The protocol does require close contacts of people with suspected COVID-19 to be monitored for 14 days for symptoms. However, many people who arrive at the detention facility, including both staff and detained persons, will have had contact with someone with COVID-19. The detention facility's medical unit simply cannot handle the volume of patients that would need this level of monitoring. There needs to be significantly more facilities and staffing to meet these needs, but, to my knowledge, ICE has not made the appropriate changes to accommodate such a level.

f. There is no guidance in the protocol to identify the highest risk patients or steps to protect them from contracting COVID-19. The plan needs to include an improved intake process, cohorted housing areas for high-risk patients, increased infection control measures, and increased medical surveillance, including daily checks for signs and symptoms. And these measures will mean nothing if social distancing is not followed. Social distancing of six feet, as recommended by the CDC, will be impossible in all ICE facilities, especially in light of practices such as double celling.

g. There are no clear criteria for hospital transfer. As clinical staff have no experience with this disease, ICE should develop rational clinical criteria for transfer to an acute care hospital.

21. The ICE response envisions using isolation rooms to monitor individuals with COVID-19 symptoms. However, most facilities only have one to four of these rooms. There will be many more than one to four people with COVID-19 in the detention center. Instead, ICE must create entire housing units reserved for people with COVID-19 symptoms, so that symptomatic patients can live separately from those who are asymptomatic or at risk.

22. Isolation is not a proper solution for people without symptoms or confirmed disease. Detainees who are isolated are monitored less frequently. If they develop COVID-19 symptoms, or their symptoms escalate, they may not be able to get the medical attention they desperately need in a timely fashion. It also makes it more likely that these detained people will attempt suicide or self-harm, giving rise to more medical problems in the midst of a pandemic. Isolation also increases the amount of physical contact between staff and detained people—in the form of increased handcuffing, escorting individuals to and from the showers, and increased use of force due to the increased psychological stress of isolation. My expert opinion is that the use of isolation or lockdown is not a medically appropriate method for abating the substantial risks of COVID-19.

23. Transferring individuals between facilities, a common ICE practice, is medically inappropriate during the outbreak. ICE does not have the staffing needed to monitor the transferred patients for the appropriate 14-day period to check for symptoms. However, ICE has not provided guidance to halt or limit transfers.

**Release is the Most Effective Public Health Measure to Curb Morbidity and Mortality**

24. In my opinion, the public health recommendation is to release vulnerable people from detention, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage. To the extent that vulnerable detainees have had exposure to known cases with laboratory-confirmed infection with the virus that causes COVID-19, they should be tested immediately in concert with the local health department.  Those who test negative should be released.

25. Releasing the most vulnerable patients reduces the burden on local health care resources, as it reduces the risk of transmission of the disease to a large number of people living in close proximity for an extended period of time.

26. This release cohort can be separated into two groups. Group 1 could be released to home quarantine for 14 days, assuming they can be picked up from detention centers by their families or sponsors. Group 2 comprises those who cannot be easily transported to their homes by their families or sponsors. Group 2 could be released to a housing venue for 14 days, determined in concert with the Georgia Department of Health.

27. ICE must release all people with risk factors who pose no danger to society. This will prevent serious illness including death. ICE's response has made abundantly clear that they do not plan to establish special protections for high-risk patients, instead waiting for them to become infected, symptomatic, and in danger. The lack of special protections will lead to unnecessary illness and death for the people most vulnerable to this disease. ICE is walking willingly into a preventable disaster by keeping high-risk and vulnerable patients in detention facilities during the rapid spread of COVID-19.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _2nd_ day in April 2020 in New York City, New York.

Robert B. Greifinger, M.D.

# **EXHIBIT A**

# ROBERT B. GREIFINGER, M.D.

380 Riverside Drive, Apt 4F                                                                (646) 559-5279
New York, New York 10025                                                          bob@rgreifinger.com

Physician consultant with extensive experience in development and management of complex community and institutional health care programs. Demonstrated strength in leadership, program development, negotiation, communication, operations and the bridging of clinical and public policy interests. Teacher of health and criminal justice.


## SUMMARY OF EXPERIENCE

MEDICAL MANAGEMENT AND QUALITY IMPROVEMENT SERVICES        1995-Present

Consultant on the design, management, operations, quality improvement, and utilization management for correctional health care systems.

- Recent clients include (among others) the U.S. Department of Justice Civil Rights Division, monitoring multiple correctional systems and the U.S. Department of Homeland Security Office of Civil Rights and Civil Liberties. Federal court monitor for the Metropolitan Detention Center, Albuquerque, New Mexico, Orleans Parish Sheriff's Office, New Orleans, Louisiana, and Miami-Dade Corrections and Rehabilitation Department.

- National Commission on Correctional Health Care. Principal Investigator for an NIJ funded project to make recommendations to Congress on identifying public health opportunities in soon-to-be-released inmates.

- Associate Editor, Puisis M (ed), Clinical Practice in Correctional Medicine, Second Edition, St. Louis. Mosby 2006.

- Editor, Greifinger, RB (ed), Public Health Behind Bars: From Prisons to Communities, New York. Springer 2007.

- John Jay College of Criminal Justice. Professor (adjunct) of Health and Criminal Justice and Distinguished Research Fellow 2005 – 2016.

- Co-Editor, International Journal of Prison Health 2010 – 2016.


NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES        1989 - 1995

Operating budget of $1.4 Billion. Responsible for inmate safety, program, and security. Sixty-nine facilities housing over 68,000 inmates with 30,000 employees.

Deputy Commissioner/Chief Medical Officer, 1989 - 1995

- Operating budget of $140 million; health services staff of 1,100. Accountable for inmate health services and public health. Directed major initiatives in policy and program development, quality and utilization management.

- Developed and implemented comprehensive program for HIV prevention, surveillance, education, and treatment in nation's largest AIDS medical practice.

- Managed the rapid implementation of an infection control program responding to a major outbreak of multidrug-resistant tuberculosis. Helped bring the nation's tuberculosis epidemic to public attention.

- Developed $360 million five-year capital plan for inmate health services. Opened the first of five regional medical units for multispecialty ambulatory and long-term care.

- Implemented a centralized and regional pharmacy system, improving quality, service and cost management.

# ROBERT B. GREIFINGER, M.D.

MONTEFIORE MEDICAL CENTER, Bronx, NY                              1985 - 1989

A major academic medical center with 8,000 employees and annual revenue of $500 million.

Vice President, Health Care Systems, 1986 - 1989

Director, Alternative Delivery Systems, 1985 - 1986

Operating budget of $60 million with 1,100 employees.  Managed a multi-specialty group, a home health agency, and prison health programs.

- Negotiated contracts, including bundled service, risk capitation, fee-for-service arrangements, and major service contracts.  Developed a high technology home care joint venture.

- Taught epidemiology and health care organization at Albert Einstein College of Medicine.  Lectured nationally on health care delivery and managed care.

- Conceived and collaborated in development of a consortium of six academic medical centers, leading to a metropolitan area-wide, joint venture HMO.  Organized a network of physicians to contract with HMO's preparing for cost-containment.


WESTCHESTER COMMUNITY HEALTH PLAN, White Plains, NY          1980 - 1985

Independent, not-for-profit, staff-model HMO, acquired by Kaiser-Permanente in 1985.   Operating revenue $17 million with 200 employees and 27,000 members.

Vice President and Medical Director

Chief medical officer and COO.  Managed the delivery of comprehensive medical services.  Accountable to the Board of Directors for quality assurance and utilization management. Practiced pediatrics.

- Accomplished turnaround with automated utilization management, improved service, sound personnel management principles, and quality management programs.

- Implemented performance based compensation program.

COMMUNITY HEALTH PLAN OF SUFFOLK, INC.                        1977 - 1980

Community based, not-for-profit, staff model HMO, with enrollment of 18,000.

Medical Director

- Developed and operated clinical services.  Accountable for quality of care.  Practiced clinical pediatrics, and taught community health and medical ethics at SUNY Stony Brook School of Medicine.

MONTEFIORE MEDICAL CENTER, Bronx, NY                          1976 - 1977

Residency Program in Social Medicine, Deputy Director, 1976-1977

Unique clinical training program focused on community health and change agentry.  Developed curriculum and supervised 40 residents in internal medicine, pediatrics and family medicine.

UNITED STATES PUBLIC HEALTH SERVICE                          1972 - 1974

Commissioned officer in the National Health Service Corps.  Functioned as medical director and family physician in a federally funded neighborhood health center in Rock Island, Illinois.  Honorable Discharge.

# ROBERT B. GREIFINGER, M.D.

## FACULTY APPOINTMENTS

1976 - 2002
  Assistant Professor of Epidemiology and Social Medicine, Albert Einstein College of Medicine

2005 - 2016
  Professor (adjunct) of Health and Criminal Justice and Distinguished Research Fellow, John Jay College of Criminal Justice

## NATIONAL COMMITTEE FOR QUALITY ASSURANCE

Worked with NCQA since its inception in 1980. Began training surveyors in 1989, and continued as faculty for NCQA sponsored educational sessions. Served for six years as a charter member of the Review Oversight (accreditation) Committee. Served on the Reconsideration (appeals) Committee for six years. Surveyed dozens of managed care organizations, and reviewed several hundred quality management programs.

## OTHER PROFESSIONAL ACTIVITIES

2012 – present   Member, Board of Directors, Prison Legal Services, New York

2012 – present   Member, Board of Directors, National Health Law Program

2011 – 2015   Member, Board of Directors, Academic Consortium of Criminal Justice Health

2010 - 2016   Co-editor, International Journal of Prisoner Health

2009   Recipient, B. Jaye Anno Award for Lifetime Achievement in Communication

2007-2015   Member, National Advisory Group on Academic Correctional Health Care

2007   Recipient, Armond Start Award, Society of Correctional Physicians

2005 - 2011   Member, Advisory Board to the Prisoner Reentry Institute, John Jay College

2002 - present   Member, Editorial Board, Journal of Correctional Health Care

2002 - present   Peer reviewer for multiple journals, including Journal of Correctional Health Care, International Journal of Prison Health, Journal of Urban Health, Journal of Public Health Policy, Annals of Internal Medicine, American Journal of Public Health, Health Affairs, and American Journal of Drug and Alcohol Abuse.

2001 - 2003   Member, Advisory Board to CDC on Prevention of Viral Hepatitis in Correctional Facilities

1999 - 2003   Member, Advisory Board to CDC on Prevention and Control of Tuberculosis in Jails

1997 - 2003   Member, Reconsideration Committee, NCQA

1997 - 2001   Moderator, Optimal Management of HIV in Correctional Systems, World Health Communications

1997 - 2000   Member, Reproductive Health Guidelines Task Force, CDC

1993 - 1995   Co-chair, AIDS Clinical Trial Community Advisory Board, Albany Medical Center

1992 - Present   Society of Correctional Physicians

1991 - 1997   Member, Review Oversight (accreditation) Committee, NCQA

ROBERT B. GREIFINGER, M.D.

1983 - 1985     Executive Committee, Medical Directors' Division, Group Health Association of
                America (Secretary, 1984-1985)

EDUCATION

University of Pennsylvania, College of Arts and Sciences, Philadelphia; B.A., 1967 (Amer. Civilization)

University of Maryland, School of Medicine, Baltimore; M.D., 1971

Residency Program in Social Medicine (Pediatrics), Montefiore Medical Center, Bronx, NY; 1971-1972,
1974-1976, Chief Resident 1975-1976

CERTIFICATION

Diplomate, National Board of Medical Examiners, 1971

Diplomate, American Board of Pediatrics, 1976

Fellow, American Academy of Pediatrics, 1977

Fellow, American College of Physician Executives, 1983

Fellow, American College of Correctional Physicians (formerly Society of Correctional Physicians), 2000

License:  New York, Pennsylvania (inactive)

ROBERT B. GREIFINGER, M.D.

Updated February 2018

PUBLICATIONS

Greifinger RB, A Summer Program in Life Sciences.  Journal of Medical Education 1970; 45: 620-622.

Greifinger RB, Sidel VW, American Medicine - Charity Begins at Home.  Environment 1977; 18(4): 7-18.

Greifinger RB, An Encounter With the System.  The New Physician 1977; 26(9): 36-37.

Greifinger RB, Sidel VW, Career Opportunities in Medicine.  In Tice's(eds) Practice of Medicine. Hagerstown: Harper & Row 1977; 1(12): 1-49.

Greifinger RB, Grossman RL, Toward a Language of Health.  Health Values 1977; 1(5): 207-209.

Grossman RL, Greifinger RB, Encouraging Continued Growth in the Elderly.  In Carnevali DL & Patrick M (eds), Nursing Management for the Elderly. Philadelphia: Lippincott 1979: 543-552.

Greifinger RB, Jonas S, Ambulatory Care.  In Jonas S (ed), Health Care Delivery in the United States (second edition). New York: Springer 1980: 126-168.

Greifinger RB, Toward a New Direction in Health Screening.  In Health Promotion: Who Needs It? Washington: Medical Directors Division, Group Health Association of America 1981: 61-67.

Greifinger RB, Sidel VW, American Medicine.  In Lee, Brown & Red (eds), The Nation's Health.  San Francisco: Boyd & Fraser 1981: 122-134.

Greifinger RB, Bluestone MS, Building Physician Alliances for Cost-Containment.  Health Care Management Review 1986: 63-72.

Greifinger RB, An Ethical Model for Improving the Patient-Physician Relationship.  Chicago: Inquiry 1988: 25(4): 467-468.

Glaser J, DeCorato DR, Greifinger RB, Measles Antibody Status of HIV-Infected Prison Inmates. Journal of Acquired Immunodeficiency Syndrome 1991; 4(5): 540-541.

Ryan C, Levy ME, Greifinger RB, et al, HIV Prevention in the U.S. Correctional System, 1991.  MMWR 1992; 41(22): 389-397.

Greifinger RB, Keefus C, Grabau J, et al, Transmission of Multidrug- resistant Tuberculosis Among Immunocompromised Persons in a Correctional System.  MMWR 1992; 41(26): 509-511.

Greifinger RB, Tuberculosis Behind Bars, in Bruce C Vladeck ed, The Tuberculosis Revival:  Individual Rights and Societal Obligations In a Time of AIDS.  New York: United Hospital Fund 1992: 59-65.

Bastadjian S, Greifinger RB, Glaser JB. Clinical characteristics of male homosexual/bisexual HIV-infected inmates. J AIDS 1992;5:744-5.

Glaser JB, Greifinger R. Measles antibodies in HIV-infected adults. J Infect Dis. 1992 Mar;165(3):589.

Glaser J, Greifinger RB, Correctional Health Care:  A Public Health Opportunity.  Annals of Internal Medicine 1993; 118(2): 139-145.

Greifinger RB, Glaser JG and Heywood NJ, Tuberculosis In Prison:  Balancing Justice and Public Health, Journal of Law, Medicine and Ethics 1993; 21 (3-4):332-341.

ROBERT B. GREIFINGER, M.D.

Valway SE, Greifinger RB, Papania M et al, Multidrug Resistant Tuberculosis in the New York State Prison System, 1990-1991, Journal of Infectious Disease 1994; 170(1):151-156.

Wolfe P, Greifinger RB, Prisoners in Service of Public Health: Focus New York State.  New York Health Sciences Journal 1994 1(1):35-43.

Valway SE, Richards S, Kovacovich J, Greifinger RB et al, Outbreak of Multidrug-Resistant Tuberculosis in a New York State Prison, 1991.  American Journal of Epidemiology 1994 July 15; 140(2):113-22.

Smith HE, Smith LD, Menon A and Greifinger RB, Management of HIV/AIDS in Forensic Settings, in Cournos F(ed), AIDS and People with Severe Mental Illness: A Handbook for Mental Health Professionals. New Haven: Yale Press 1996.

Greifinger RB, La Plus Ca Change . . ., Public Health Reports 1996 July/August; 111(4):328-9.

Greifinger RB, TB and HIV, Health and Hygiene 1997;18,20-22.

Greifinger RB, Horn M, "Quality Improvement Through Care Management," chapter in Puisis M (ed), Clinical Practice in Correctional Medicine, St. Louis: Mosby 1998.

Greifinger RB, Glaser JM, "Desmoteric Medicine and the Public's Health," chapter in Puisis M (ed), Clinical Practice in Correctional Medicine, St. Louis: Mosby 1998.

Greifinger RB, Commentary: Is It Politic to Limit Our Compassion? Journal of Law, Medicine & Ethics, 27(1999):213-16.

Greifinger RB, Glaser JG and Heywood NJ, "Tuberculosis In Prison:  Balancing Justice and Public Health," chapter in Stern V (ed), Sentenced to die? The problem of TB in prisons in Eastern Europe and Central Asia, London: International Centre for Prison Studies, 1999.

Greifinger RB (Principal Investigator).  National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress.  August 2002.  http://www.ncchc.org/pubs_stbr.html.

Kraut JR, Haddix AC, Carande-Kulis V and Greifinger RB, Cost-effectiveness of Routine Screening for Sexually Transmitted Diseases among inmates in United States Prisons and Jails. National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress.  August 2002. http://www.ncchc.org/stbr/Volume2/Report5_Kraut.pdf.

Hornung CA, Greifinger RB, and Gadre S, A Projection Model of the Prevalence of Selected Chronic Diseases in the Inmate Population. National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress. August 2002. http://www.ncchc.org/stbr/Volume2/Report3_Hornung.pdf.

Hornung CA, Anno BJ, Greifinger RB, and Gadre S, Health Care for Soon-to-be-Released Inmates: A Survey of State Prison Systems," National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress. August 2002. http://www.ncchc.org/stbr/Volume2/Report1_Hornung.pdf.

Patterson RF & Greifinger RB, Insiders as Outsiders:  Race, Gender and Cultural Considerations Affecting Health Outcome After Release to the Community, Journal of Correctional Health Care 10:3 2003; 399-436.

Howell E & Greifinger RB, What is Known about the Cost-Effectiveness of Health Services for Returning Inmates? Journal of Correctional Health Care 10:3 2003; 437-455.

Kraut JR, Haddix AC, Carande-Kulis V and Greifinger RB, Cost-effectiveness of Routine Screening for Sexually Transmitted Diseases among inmates in United States Prisons and Jails, J Urban Health:

ROBERT B. GREIFINGER, M.D.

Bulletin of the New York Academy of Medicine 2004: 81(3):453-471. (Finalist, Charles C. Shepard Science Award)

Greifinger RB. Health Status in U.S. and Russian Prisons:  More in Common, Less in Contrast. Journal of Public Health Policy 2005 26:60-68.  http://www.palgrave-journals.com/cgi-taf/DynaPage.taf?file=/jphp/journal/v26/n1/full/3200003a.html&filetype=pdf

Greifinger RB. Health Care Quality Through Care Management, M. Puisis (ed). Clinical Practice in Correctional Medicine, Second Edition. St. Louis. Mosby 2006: pp. 510-519.

Greifinger RB. Pocket Guide Series on tuberculosis, HIV, MRSA, sexually transmitted disease, viral hepatitis and management of outbreaks.  See http://www.achsa.org/displaycommon.cfm?an=1&subarticlenbr=23

Greifinger RB. Inmates are Public Health Sentinels.  Washington University Journal of Law and Policy. Volume 22 (2006) 253-64.

Greifinger RB. Disabled Prisoners and "Reasonable Accommodation." Journal of Criminal Justice Ethics. Winter Spring 2006: 2, 53-55.

Mellow J, Greifinger RB. Successful Reentry: The Perspective of Private Health Care Providers. Journal of Urban Health.  November 2006 doi:10.1007/s11524-006-9131-9.

Mellow J, Greifinger RB. The Evolving Standard of Decency: Post-Release Planning? Journal of Correctional Health Care January 2008 14(1):21-30.

Williams B, Greifinger RB.  Elder Care in Jails and Prisons: Are We Prepared? Journal of Correctional Health Care January 2008 14(1):4-5.

Greifinger RB (editor). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

Greifinger RB. Thirty Years Since Estelle v. Gamble: Looking Forward Not Wayward. Greifinger, RB (ed). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

Patterson RF, Greifinger RB. Treatment of Mental Illness in Correctional Settings.  Greifinger, RB (ed). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

MacDonald M, Greifinger RB. and Kane D. Use of electro-muscular disruption devices behind bars: Progress or regress. Editorial',International Journal of Prisoner Health,4:4,169 — 171. 2009.

Hoge SK, Greifinger RB, Lundquist T, Mellow J.  Mental Health Performance Measurement in Corrections. International Journal of Offender Therapy and Criminology, 53:6 634-47, 2009. Abstract accessed January 12, 2010 at http://www.ncjrs.gov/App/Publications/abstract.aspx?ID=251100.

Williams BA, Lindquist K . . . Greifinger RB et al. Caregiving Behind Bars: Correctional Officer Reports of Disability in Geriatric Prisoners.  J Am Geriatr Soc 57:1286–1292, 2009.

Baillargeon J, Williams B . . . Greifinger RB, et al. Parole Revocation among Prison Inmates with Psychiatric and Substance Use Disorders.  Psychiatric Services 60:11: 1516-21, 2009.

Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.

Stern MF, Greifinger RB, Mellow J. Patient Safety: Moving the Bar in Prison Health Care Standards. Am J Public Health.  Nov 2010; 100: 2103 - 2110.

Blair P, Greifinger R, Stone TH, & Somers S. Increasing Access to Health Insurance Coverage for Pre-trial Detainees and Individuals Transitioning from Correctional Facilities Under the Patient

ROBERT B. GREIFINGER, M.D.

Protection and Affordable Care Act.  American Bar Association.  Accessed on March 23, 2011 at
http://www.cochs.org/files/ABA/aba_final.pdf

Williams BA, Sudore RL, Greifinger R, Morrison RS. Balancing Punishment and Compassion for
Seriously Ill Prisoners.  Ann Int Med 2011; 155:122-126.

Weilandt C, Greifinger RB , Hariga F. HIV in Prison: New Situation and Risk Assessment Toolkit. Int. J.
Prisoner Health 2011; 7(2/3):17-22.

Williams, B., Stern, M., Mellow, J., Safer, M., Greifinger, RB. Aging in correctional custody: Setting a policy
agenda for older prisoner health. Am J Public Health. Published online ahead of print June 14, 2012: e1–
e7. doi:10.2105/AJPH.2012.300704.

Greifinger, RB.  Independent review of clinical health services for prisoners. Int. J. Prisoner Health 2012;
8(3/4):141-150.

Greifinger RB. Facing the facts, Int J Prisoner Health, Vol. 8 (3/4) (editorial).

Greifinger, RB. The Acid Bath of Cynicism.  Correctional Law Reporter June/July 2013: 3, 14, 16.

Ahalt C, Trestman RL, Rich JD, Greifinger RB, Williams BA. Paying the price: the pressing need for quality, cost
and outcomes data to improve correctional healthcare for older prisoners. J Am Geriatr Soc 61:2013–
2019, 2013.

Williams BA, Ahalt C, Greifinger RB.  The older prisoner and complex medical care.  Chapter in WHO guide
Prisons and Health.  WHO Copenhagen. 2014: 165-170.

Rich JD, Chandler R . .. . Greifinger RB et al. How health care reform can transform the health of criminal
justice-involved individuals. Health Affairs 33, No. 3(2014: -

Allen SA, Greifinger RB. Asserting Control: A Cautionary Tale. International Journal of Prisoner Health 11:3,
2015.

Junod V, Wolff H, Scholten W, Novet B, Greifinger R, Dickson C & Simon O.  Methadone versus
torture: The perspective of the European Court of Human Rights. Heroin Addict Relat Clin Probl.
Heroin Addict Relat Clin Probl 2018; 20(1): 31-36.

Pont J, Enggist S, Stover H, Williams B, Greifinger R, Wolff H. Prison Health Care Governance:
Guaranteeing Clinical Independence. Published online ahead of print February 22, 2018.

ABSTRACTS & RESEARCH PRESENTATIONS

Mikl J, Kelley K, Smith P, Greifinger RB, Morse D, Survival Among New York State Prison Inmates
With AIDS.  Florence:  Seventh International Conference on AIDS 1991 (poster session).

Sherman M, Coles B, Buehler J, Greifinger RB, Smith P, The HIV Epidemic in Inmates.  Atlanta: Centers
for Disease Control. 1991

Mikl J, Kelley K, Smith P, Greifinger RB, Morse D, Survival Among New York State Prison Inmates
With AIDS, American Public Health Association. 1991 (poster session)

Mikl J, Smith P, Greifinger RB, Forte A, Foster J, Morse D, HIV Seroprevalence of Male Inmates
Entering the New York State Correctional System.  American Public Health Association. 1991
(poster session)

Valway SE, Richards S, Kovacovich J, Greifinger R, Crawford J, Dooley SW. Transmission of
Multidrug-resistant Tuberculosis in a New York State Prison, 1991. Abstract No 15-15, In: World
Congress on TB Program and Abstracts, Washington, D.C., November, 1992.

## ROBERT B. GREIFINGER, M.D.

Mikl J, Smith PF, Greifinger RB, HIV Seroprevalence Among New York State Prison Entrants.  Ninth International Conference on AIDS 1993 (Poster Session)

Hornung CA, Greifinger RB, McKinney WP. Projected Prevalence of Diabetes Mellitus in the Incarcerated Population. J Gen Int Med 14 (Supplement 2):40, April 1999.