## **EXHIBIT 4**

# DECLARATION OF JAQUELINNE MURILLO FIGUEROA, ESQ.

I, Jaquelinne Murillo Figueroa, Esq., hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am an Associate Attorney with Polanco Law, PC, a law office based in North Carolina. I represent individuals in removal proceedings before the Executive Office for Immigration Review (EOIR), including individuals detained at Stewart Detention Center in Lumpkin, GA. I generally spend at least one week per month in our Lumpkin, GA, office.

3. I have been in Lumpkin since March 22, 2020. I go to the detention center almost every day to meet with clients, prepare them for their hearings, or appear with them in court. I had hearings scheduled on March 25 and March 27, 2020.

4. At Stewart, the court and visitation area are in the same building but are accessed through separate entrances to the building. Both visitors and staff enter the building by walking through a system of two remotely operated gates. After the first gate, you must enter a small holding area and wait for the first gate to close before the second gate will open. Directly ahead of the gates is the entrance

to the detention center lobby, which is used for visitation and for staff entering and exiting. The entrance to the court is to the left of the entrance to the detention center lobby; the sidewalk outside branches off to lead to the door.

5. I have noticed that Stewart has changed some things in response to COVID-19. Early in the week of March 23, when I entered the lobby, I had to respond in writing to a printed list of questions about risk factors for COVID-19. The questionnaire, which appears to be used for both visitors and staff, asks for name and date; whether the individual is experiencing any symptoms (cough, fever, shortness of breath, respiratory issues); whether the individual has traveled to certain listed locations where COVID-19 is known to be prevalent; and where the individual has traveled recently. I have repeatedly indicated that I traveled to Mexico from March 12-18. No staff member has asked for any additional information about my travel.

6. On March 24, the detention center erected a tent inside the gates where the sidewalk branches off to lead either to the lobby or to the court. Now, staff and visitors must fill out the questionnaire at the tent and have their temperature taken prior to entering. The staff member who takes people's temperatures uses a thermometer that passes over the forehead without touching it. During the week of March 30, the guards at the entrance to the detention center began wearing gloves

and masks while they take people's temperature.  Temperature checks are required for entrance into the detention center and the court.

7.  The detention center has also put hand sanitizer in the lobby and in the three legal visitation rooms.  There is also hand sanitizer near the metal detector that visitors to the court must pass through, on the respondent's table in the courtroom, on the government's table in the courtroom, and on the judge's bench. There is no requirement to use the hand sanitizer.

8.  Despite these changes, I am concerned about the risk of contracting COVID-19 at the detention center.

9.  On Monday, March 23, I appeared in court for a hearing.  The courtroom was fairly full: there were 5-6 detainees, the court clerk, the judge, two guards, an interpreter, the government attorney, and me.  As the interpreter approached the immigration judge's bench to swear in, the judge told her that she should wipe everything down because the prior interpreter – a Bangladeshi interpreter – had come from the New York court where there was a suspected case of COVID-19. The interpreter used Clorox wipes to wipe down the desk and chair, but during the time I was in the court, the staff were instructed to do so for any surfaces in the court between uses.

10. After my hearing, I went directly from court to the visitation entrance to follow up with my client. I asked a guard in the lobby whether I needed gloves or a mask to meet with my client. The guard replied that nothing was required; that if nothing had "happened" in court, nothing would "happen" in visitation.

11. The visitation lobby requires me to touch several items that I did not see cleaned. First, all items must pass through an x-ray machine in plastic bins. The bins looked dirty, and I did not see anyone cleaning them after use; they just went back into the stack. Visitors must put all belongings in a locker and take a visitor ID badge. I did not see lockers, locker keys, or badges being cleaned. The plastic chairs in the lobby are all very close together. I saw a detainee bring a vacuum cleaner into the lobby, but he did not clean the plastic chairs or any other surface. He had gloves, but no mask.

12. When I went to visit clients on March 24, I brought gloves with me into legal visitation. It is not clear to me when or how the legal visitation rooms are being cleaned. A sign on the entrance to the detention center says that legal visitors can bring their own Clorox wipes. The legal visitation rooms consist of a plexiglass window separating the attorney from the detainee, a tabletop on each side, and plastic chairs. The plexiglass has a small slot and each side has a phone. I no longer use the phones out of concern over their cleanliness because I

previously contracted ringworm on my face from the surface of the phone in the detention center. In order to prepare a client and have him sign documents, I must pass papers and pens back and forth through the slot. Detainees do not have gloves, masks, or hand sanitizer in the visitation room.

13. On March 24, I completed my visit as shift change was happening. As I exited the visitation room into the hallway leading to the lobby, I observed a group of staff waiting for the gate to the lobby to open. There were about 15-20 staff in the small hallway, all crowded within several inches of each other.

14. Of all the staff I saw at Stewart, none had any gloves, masks, or other personal protective equipment (PPE) aside from the guards taking temperatures.

15. On March 25, I appeared at the Stewart court for a hearing. The officer at the court entrance was coughing continually and mentioned that she wanted lemon tea for her cough. That officer did not have a mask or any other protective gear.

16. On April 1, 2020, I went to the Stewart court to file documents in a case. I wore gloves and a mask, but was not required to do so. I am aware that there has now been a confirmed case of COVID-19 at Stewart.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _3_ day in April, 2020 in Lumpkin, GA.

_____
Jaquelinne Murillo Figueroa