# **EXHIBIT 8**

# DECLARATION OF JOSEPH LLOYD THOMPSON

I, Joseph Lloyd Thompson, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am at least 18 years of age and am competent to sign this declaration. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am 49 years old. I am a citizen of Jamaica and a long-term resident of Georgia. I got my green card in 1987.

3. I have a 5-year-old son and 22-year-old son who I love very much. Before being detained, I had been working at a country club as a sous-chef. I quit that job so I could move closer to my youngest son, who is in Chatsworth, Georgia. I call my youngest son whenever I can afford it. I haven't been in touch with my oldest son for three years because his contact information changed, and I don't think he knows where I am. I really want to find him as soon as I am released. The last time I spoke to him he was in North Carolina.

4. I miss cooking very much. I am very passionate about cooking and even had my own catering business at one point with two thousand followers on Facebook. I dream of having my own brand of seasoning and writing my own cookbooks. I really want to write cookbooks for children where I can show

that super foods are healthy and good. My youngest son used to help me in the kitchen from when he was just two years old. Cooking is like an art to me, bringing together different techniques and ingredients to create something unique with love.

5. I am currently detained at the Irwin County Detention Center (ICDC) in Ocilla, Georgia. I have been in ICE custody since approximately January 2018. I have been transferred to multiple detention centers because of my serious medical conditions and hospitalized approximately ten times while in ICE custody. I am applying for Cancellation of Removal. I am working with my immigration attorneys right now on collecting the evidence for my application.

6. My current medical problems include an aneurysm on my heart that is now also in my stomach, diabetes, hypertension, and depression. I also have chronic back pain and nerve damage in my right hand. Before being detained, I was hospitalized for pneumonia three times. I have also been hospitalized many times for chest pain because of my heart problems. My immigration lawyers submitted two parole requests with details about my medical problems, but ICE denied both parole requests.

7. At ICDC, I sleep in a small cell with one other person. I've even completed a drawing of my cell that I am attaching to my declaration. There are two bunk

beds in our cell. The mattress is extremely thin. It feels like you're sleeping on metal. It really aggravates my back pain. You can't get a second mattress to layer on top of the first one unless you make a lot of grievances about it. You can file complaints on tablets they provide in the detention center or by paper, but nothing happens unless you cause a scene and get the warden involved. There is also a shower, toilet, and sink in the cell. Everything is very dirty and cramped. If you're ever locked in your cell and have a medical emergency, you have to push the button to call for help. The officers don't respond right away, if they respond at all.

8. The cell opens up into an open dorm space where there are four long, rectangular tables. There's only one microwave for everyone to use. There are two TVs. We're responsible for cleaning up the dorm ourselves. There are about 32 people who share this common space. There isn't much space so there's no way for all of us to be at least six feet apart from each other.

9. The food we're served is never hot. It's always cold or room temperature. The water is nasty. It doesn't taste filtered. It tastes like chemicals. It tastes bad even after boiling. There's a station where we can get ice and drinking water, but it's kept in the "law library." They don't refill the water at the station often enough so we're constantly dehydrated. The ice isn't hygienic at all. People reach into it without even washing their hands. I always make sure to drink

only tea because I hope the water is safer after boiling, even if it still tastes bad. I never touch the ice.

10. The law library isn't really a library. It's more like a janitorial closet with two computers and the ice and water station. There are always buckets and mops stored in there too. It's very dirty. I spend a lot of time in there because it is important to me to learn about the law and how it applies to my life.

11. Anything that needs to be cleaned is left to us, the people who are detained. Some people are good about trying to keep things clean, but a lot of people are not. I do my best to keep things clean because I have to take care of my health. They don't give us real cleaning supplies. Sometimes they give us very watery cleaning solution. I have seen the original containers with the cleaning solution and the cleaning solution is a very strong green color, like seaweed. But the cleaning solution we have is so diluted that it's basically clear. I don't think it really cleans or disinfects at all. Sometimes they give us small soft brushes to use to scrub. Usually, the only thing we have for cleaning are rags we have to make ourselves from towels ICDC is about to throw away. They never give us gloves to protect ourselves while cleaning.

12. The air vents at ICDC are really dirty. We all share the same air vents. I don't think they have ever been cleaned. There's this red lint that comes out of the air vents. You can see a bit of red around the vents and on the walls. You can

4

also tell that there is a lot of dust built up. I've reported the problem and asked that the air vents be cleaned because sometimes I have trouble breathing. They have never cleaned them though.

13. Since the coronavirus started, the guards haven't done much to help us. They haven't come around to tell us anything about what's happening on the outside. The only information we have access to is from the news. We have limited access to soap and no access to hand sanitizer. There was only one day in the past week that I saw some of the guards wearing gloves and masks. Also, beginning about one week ago, some guards started coming around with Lysol in backpack containers with a spray nozzle and just spraying the showers and toilets in our cells very quickly. There's no scrubbing or cleaning of anything else to try to make us safer. None of the walls or doors are ever cleaned. Also, about one week ago, they began serving food on disposable plates. Sometimes the people who are serving food have masks, sometimes they don't. They may be wearing gloves, but they touch everything with the same gloves—the trash, food, everything.

14. I was first detained at ICDC beginning approximately January 22, 2018. In approximately March 2018, I remember having severe chest pains while in my cell. I pressed the buzzer to request assistance, but nobody came. I was on the top bunk and I fell to the ground. My cellmate had to bang on the door of

the cell for attention.

15. After someone finally came, I was sent to the hospital in Tifton, Georgia, for two weeks. I remember that my CK level was over 10,000. I almost died. They gave me six or seven bags of IV fluids. I was handcuffed and shackled throughout my hospital stay. It was so difficult to use the bathroom. They only removed the shackles for me to shower. I was told that I needed surgery, but that they could only stabilize me at Tifton, and not operate. I was supposed to have a follow up appointment after this incident, but that never happened.

16. While at ICDC, I was hospitalized in Tifton, Georgia, approximately eight times. Each occasion of hospitalization was similar. Each time it began with chest pains. Each time, ICE was always very delayed in getting me medical attention. I'm always shackled when I'm taken to the hospital. There's no follow up to my hospitalizations. I'm just hospitalized again when I have chest pains.

17. Additionally, while I was still in ICDC custody, I was transferred to the Folkston Processing Center (Folkston) in approximately August 2018 for about one month. While at Folkston, I was also rushed to the hospital because my medical condition had deteriorated so badly. I was told that I needed to go to a hospital in Jacksonville because I required special treatment. At the hospital in Jacksonville, I received medication to stabilize my symptoms, but

they did not operate.

18. Just one day after my release from the hospital in Jacksonville, I was taken back to ICDC. I also recall during this time that two ICE officers or detention center guards told me directly that they didn't want to spend the money for surgery and that they would rather I just be deported.

19. In or about October 2018, I was transferred to the Stewart Detention Center (Stewart). While I was at Stewart, I was hospitalized for chest pains three or four times. I was usually hospitalized for a few days at a time. I was still not operated on and was only medicated for my symptoms.

20. Additionally, while I was still in Stewart custody, I was transferred to Alamance County Jail in North Carolina for about six days in approximately February 2019. I was transferred along with ten other detained individuals. It was never clear why we were transferred. It was a nine-hour ride to Alamance County, and I did not receive any medication on my way up there.

21. While I was detained in North Carolina, I was assaulted by ICE and detention officers. I was beaten so badly that I couldn't swallow. I went four days without food. I still have nerve damage in my right hand from being handcuffed violently, and I am in constant pain. My hand has not been treated even though I've reported the pain and asked for treatment. A nurse looked at my hand and said that since I could move it and that the skin didn't break on

my hand, that I was fine. I wasn't given any other treatment for my hand. I tried to file a report by calling the Inspector General's office. I never received any follow up from this. I was then returned to Stewart.

22. In approximately May 2019, I was transferred to Folkston, where I continued to have chest pains but did not receive adequate care. Dr. Copeland with ICE advocated for me to be sent to Stewart because no one in Folkston or Jacksonville wanted to operate on my aneurysm because of its size and placement. My aneurysm is in a very delicate position and it requires a skilled, expert surgeon.

23. In approximately September 2019, I was transferred to Stewart again for about two weeks so that I could see a specialist at Piedmont Hospital in Atlanta. I thought I was going to have surgery this time based on what the doctor was recommending, but they did not operate.

24. In approximately December 2019, I was transferred to ICDC. I had heard that someone recently suffered a burst aneurysm while detained at Folkston, and I think that might have motivated my transfer to ICDC.

25. During all this time, doctors have recommended surgery, but the only treatment approved by ICE was medication to stabilize my symptoms. Over time, the dosage of my medication has kept increasing because I grow tolerant of it. I grow tolerant of the medications because my symptoms continue to get

worse and because my body gets used to the medication. The most recent measurement of my aneurysm was 5.2 cm. Doctors have told me that surgery is recommended when an aneurysm gets to 4.7 cm. Doctors have also told me that I'm a walking time bomb and that anything could cause stress on my aneurysm. I was told that if it bursts, I will only have 15 seconds to live.

26. Despite my very serious conditions, I have not received any special treatment, medical evaluations, or information regarding the coronavirus. In fact, even with this increased risk, they didn't give me any of my medication from about March 4, 2020 to March 26, 2020. This was really upsetting and stressful because my medication is crucial for controlling my symptoms so that my heart doesn't become overworked and stressed. My medications are also designated as "keep on property," meaning that I'm supposed to have them on my person at all times in case there is an emergency.

27. While I do have a criminal record, it is short and old. I have three nonviolent charges of theft from 2001 and 2002 and a single charge of walking-while-intoxicated in 2018. To my knowledge, I was not convicted of any of these charges. In 2012, I was involved in a domestic incident with my wife, and I immediately took responsibility for that incident and pled guilty against the advice of my attorney. I have not been involved in any other type of criminal activity and have worked hard to better myself while detained. I visit the law

library regularly, was recently baptized, and attend as many support groups as I can.

28. If I am released from detention, I will live with my sister, who is a U.S. citizen and federal employee residing in Snellville, Georgia. I will self-quarantine in my sister's home in order to protect myself and others from coronavirus.

29. I will comply with any applicable conditions of release including attending check-ins and immigration court hearings.

30. I have authorized my attorney to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 2, 2020 at Stone Mountain, Georgia.

_____

Lorilei Williams, Esq., on behalf of Joseph Lloyd Thompson

# ATTORNEY DECLARATION

I, Lorilei Williams, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. My name is Lorilei Williams. I am a licensed attorney in good standing in the state of New York. I am an inactive attorney in good standing in the state of Texas. I am an attorney of record in this litigation.

2. I represent the declarant, Joseph Lloyd Thompson. Out of necessity in light of the COVID-19 pandemic, I signed Joseph Lloyd Thompson's declaration on his behalf and with his express consent.

3. ICE is oftentimes requiring legal visitors to provide and wear personal protective equipment, including disposable vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized to hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Center for Disease Control and Protection (CDC) issued statements warning that individuals are at a higher risk of infection when traveling. I have Hashimoto's Thyroiditis, an autoimmune

disease, and asthma, which put me at a higher risk for COVID-10 complications.

5. In light of the above, to protect public health, I am not able to travel to Ocilla, Georgia, to obtain my client's signature.

6. I spoke with Joseph Lloyd Thompson via video-teleconferencing and read the declaration to him and confirmed the accuracy of the information therein. Joseph Lloyd Thompson has confirmed that I can sign on his behalf, as reflected in his declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 2, 2020 at Stone Mountain, Georgia.

_____

Lorilei Williams, Esq.,

Attorney for Plaintiffs

Southern Poverty Law Center

T. 404.858.2567

lorilei.williams@splcenter.org

