**<u>EXHIBIT 14</u>**

## DECLARATION OF JENNER BENAVIDES

I, Jenner Benavides, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am at least 18 years of age and am competent to sign this declaration. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am a 27-year-old transgender woman. I am originally from Mexico.

3. I am currently detained at Folkston ICE Processing Center ("Folkston") in Folkston, Georgia. I have been in ICE custody since approximately May 2019.

4. I first came to the United States in 2002 with my siblings when I was about ten years old. My mother was already residing in the United States at that time, and we came to live with her. Since then, I have lived in the United States with my family, mostly in Nashville, Tennessee.

5. In 2014, my mother passed away from stomach cancer, and I got full custody of four of my siblings, all of whom were under 18 years old at the time. Before I was detained, I still had custody of my two youngest siblings, who are now five years old and eight years old. I am planning to formally adopt them once I am able to. All my siblings still live in Nashville now.

6. In 2015, I became a DACA recipient and maintained that status until 2018.

1

That same year, I was also diagnosed with HIV. This new diagnosis, combined with my mother's recent death, took a toll on my mental health, and I turned to alcohol to cope with the stress and pain at the time. I was convicted of a DUI with associated charges in 2016 and another in 2018. In 2018, I stopped drinking alcohol altogether, and I greatly regret the decisions I made that led to these convictions.

7. Last year, I was detained by ICE after I was pulled over for speeding.

8. In detention, I applied for relief under Form I-589 because I am afraid to return to Mexico. At that time, I had not come out as transgender yet, so my application was initially based on the continuous sexual assault and abuse I endured as a child at the hands of a family member in Mexico, as well as on my status as a feminine gay man. During my individual hearing which took place on February 6, 2020, I further testified that I am transgender and that I fear being removed to Mexico based, in part, on my gender identity.

9. My applications for relief under Form I-589 were denied, and I filed a notice of appeal with the Board of Immigration Appeals (BIA). I am waiting for a briefing schedule to be issued, but once it is, an attorney at Asian Americans Advancing Justice-Atlanta will be representing me before the BIA and assisting me with submitting my appellate brief. The same attorney submitted a parole request to the Department of Homeland Security (DHS) on my behalf

on April 2, 2020.

10. Attorneys at the Tennessee Immigrant and Refugee Rights Coalition are also helping me apply for a U-visa. I am applying based on an incident that occurred in December 2018, when a man broke into my house and physically injured me when I tried to stop him. I testified against him in court.

11. Along with HIV, I was also diagnosed with bipolar disorder and severe depression and anxiety in 2015. Around August 2019, while in detention, I was diagnosed with high cholesterol. I occasionally have high blood pressure as well, and a physician at Folkston asked that I get it checked once a week to monitor it. The nurse at Folkston only began doing this for me recently. Before, I would only get my blood pressure checked every month when I went for my regular check-up with the medical services team at the detention center.

12. I need to take medications every day for my medical conditions and symptoms from these conditions, like insomnia. When I was not in detention, I took four medications for my HIV, bipolar disorder, depression, and anxiety. At Folkston, I receive nine different kinds of medication for all my conditions. Prior to detention, I took one medication for my HIV. But at Folkston, I believe they give me four different kinds that I have to take. I believe they are antiretrovirals, including Isentress, Tenofovir, and Lamivudine. When I first

entered ICE custody and began taking them, I experienced vomiting and diarrhea for about three weeks in response to the change. I got blood drawn at this time, but I was never told the results of any analysis done on it.

13. There are certain medications, including my HIV and anxiety medications, that need to be taken at the same time every day to be the most effective. While Folkston does provide the medications to me every day, there are often problems with the communication between the medical services team and ICE officers that cause them to be provided at inconsistent times. Additionally, it is recommended that my HIV medication be taken before or after a meal, and sometimes it is provided at a time that does not allow me to take it with food.

14. While in detention, I have been going to outside appointments with a healthcare provider for my HIV. During the appointments, the provider does a physical exam, draws my blood for lab work, and makes sure my medications are working. I typically go about every three months, but it has been over three months since my last appointment. I have also been receiving mental health treatment from a psychiatrist who provides the prescriptions for my bipolar medications. I see this psychiatrist over video call once a month.

15. There have been instances when I have requested to be seen by the medical services team at Folkston and received very delayed responses. For example, over a week ago, I sent a request to be seen for severe pain in my ear and

mouth, and although I initially got confirmation that I had an appointment scheduled, I was never called for it and never received the appointment. I have requested the appointment again but am still waiting.

16. Since I have been in detention, my bipolar disorder, depression, and anxiety have gotten much worse. As recently as last week, I was still housed with the general male population, and they constantly bullied and harassed me. I felt very unsafe in my unit. I often had suicidal thoughts and could not sleep.

17. Because I felt so unsafe, about a month ago I asked for protective custody. But this meant I was shut in a small cell by myself, which made my anxiety much worse. I became so anxious and depressed that I asked to be moved back to the general housing, where I continued to deal with regular heckling and name-calling from other detainees.

18. In the last week or so before this declaration was drafted, I was sexually assaulted by men in my pod unit more than once. On March 27, 2020, I reported the incidents to the captain, who did not respond to my report. The next day, I reported them to the shift officer, and I was brought to a medical unit for the rest of the weekend and placed on suicide watch. I am now in protective custody again, which means I am back in a small cell by myself.

19. I will remain in protective custody until I am released from detention. While I feel safer here because I am not around the men who assaulted me and other

men who bully and harass me, being shut in a small space like this exacerbates my anxiety and depression. I only interact with ICE officers and other Folkston staff each day, like when they bring me my meals and medications, and come to do inspections. I am also required to be escorted by a lieutenant or captain every time I need to go shower, and they sometimes handcuff me for this process. A nurse recently began checking my blood pressure more regularly as well, and they handcuff me during this as well.

20. I would like my information filed under a pseudonym because I want to keep my HIV status and other medical information private. I am afraid of being embarrassed or harmed if this information is made public, due to harassment and violence that I have experienced related to my identity. I would also like to protect my asylum case information from being disclosed to the public.

21. At Folkston, the general population is housed in pod units of about 36 people each. We typically sleep in dorm rooms in pairs. When I was with the general population, I had many different roommates during the time I have been detained. On average, I received a new roommate approximately every two to three weeks before I was moved to protective custody this week.

22. The dorms have sinks and toilets in them, but we shower in communal bathrooms. There are two shower rooms that I have access to, and each has four shower stalls, but not all of them work properly. All the detained people

6

in my pod unit use these same showers and they are not cleaned between uses. To my knowledge, they are only cleaned in the mornings.

23. At Folkston, detained immigrants are often crowded into the dining hall and other communal spaces. During mealtimes, we sit very close to each other in the dining hall, and usually multiple pod units eat at one time. We also spend a lot of time in the communal space in our pod units that provide our only access to TV and games. We sometimes eat in that space as well, and people often crowd around the televisions. There is one Spanish TV and one English TV; so, everyone who speaks Spanish sits together close to the Spanish TV, and everyone else sits together near the English TV. Most of the time, the pod unit I am in is full to capacity with 36 people, but it does fluctuate as people are released or deported and brought in.

24. The only soap provided to us for washing our hands and showering is liquid soap that comes in single use packages that ICE periodically passes out. There is no soap available in the shower rooms or in our pod units. The officers are supposed to bring soap, along with other toiletries, like tissues and toothpaste, at least every other day. However, they are very inconsistent, and I sometimes have to ask them or they won't provide it. In general, the soap is provided two or three times a week, but the last three weeks I only received it once a week. Each time they pass it out, each detained person gets about four squares of

single use soap. It is impossible to save any of the soap in the packet after opening it, by pouring it into another container, because it would be confiscated as unauthorized material when officers inspect our dorms and belongings. Therefore, for the last three weeks, I had four squares of soap each week to use both for hand washing and showering. If I have funds in my commissary, I can sometimes order more soap and toiletries there. But I know there are many people who do not have the money to do this.

25. There is also no hand sanitizer available to us whatsoever, including in the commissary. There is non-alcohol based, foaming hand sanitizer available in the front office of the detention center that ICE officers can use, but it is not available to detained people.

26. At Folkston, detained people serve the food and clean the common areas of the center, particularly in the pod units and hallways. I often volunteer to help with the cleaning. It involves cleaning the tables and mopping the floors. We are given gloves to wear while cleaning, but no face masks or other personal protective equipment. The main cleaning solution we are given is a spray bottle of mostly odorless liquid. While the ICE officers say it is a "disinfectant," it smells like water to me. I know it is not bleach or alcohol-based, because we are not permitted to have those substances in the detention center. We are sometimes provided with soap for cleaning but are often

8

instructed to just use the spray, including when mopping the floors.

27. In my opinion, the cleaning methods are not adequate to disinfect the spaces, and I have also not been trained on hygiene measures in order to limit the spread of infectious disease while cleaning. I have not been instructed to clean the doors, including the doorknobs, at the front entrance of the detention center or that go to the medical office or dining hall. I have not noticed any other detained people cleaning the doors either.

28. In general, I rarely notice any ICE officers or other staff in the detention center wearing gloves, face masks, or other personal protective equipment. I have noticed one ICE officer who wears a face mask, but beyond that, I have not observed the use of protective gear. I also have not observed ICE officers and other detention center staff washing their hands regularly.

29. ICE officers who supervise our pod unit enter our unit multiple times a day to ensure that the pod is secure and running smoothly. These officers usually have more than one pod that they are required to supervise each day, so they move in between the pods frequently. When they are in our pod, they interact closely with us and do not maintain six feet distance away. They sometimes wear gloves while they do this, but not face masks.

30. ICE officers also enter our individual dorms to check for unauthorized items three times a day. During these checks, they interact closely with us and do

9

not maintain six feet distance. They also touch our personal items. They usually wear gloves during this process, but not face masks.

31. I became aware of the COVID-19 outbreak a few weeks ago from watching the news. I also received a memorandum notifying me that family visitations are cancelled until further notice due to the outbreak but that attorney visitation is still permitted. I happened to see a couple posters on a communal bulletin board that discussed COVID-19. They are printed on 8.5" x 11" sheets of paper, and the text and photos printed on them are relatively small. They provide information from the CDC about COVID-19, including recommendations about hand hygiene and covering your cough. They do not discuss social distancing or avoiding groups, or which groups of people are at higher risk. They refer us to the CDC website for further information, but we do not have access to the Internet. The only reason I noticed these posters was because I like to stay up to date on what is posted on the bulletin board. No ICE officers directed us to look at the posters or otherwise drew our attention to them. These are the only notices about COVID-19 that I have seen.

32. I have not received any formal memorandums, announcements, or in-person education from ICE about COVID-19, aside from the memorandum about family visitation. Typically, if there's an important change, we receive an official memorandum. No ICE officers have talked to me about the outbreak

10

and how to prevent exposure or spread, such as the importance of proper hand hygiene or staying six feet apart from other detained people. I have not observed any increase in provision of soap or other cleaning supplies.

33. In the last few weeks, I have not observed any increases in medical staffing or medical screenings being done for COVID-19. On the contrary, when I visited the medical office about a week ago, I noticed that the medical staff did not have face masks and was told by a nurse that ICE had not informed them about how to prevent the spread of COVID-19 or address cases if they were to arise. I also have not observed any people being put in quarantine or other isolation due to COVID-19.

34. I have, however, observed new immigrants being brought into the detention center in the last few weeks. There have been new immigrants brought into my pod unit during this time. From my conversations with nurses and officers at the facility, I learned that there were people brought in directly from the community as transferred from other ICE detention centers.

35. I have seen advertisements from the CDC on the television during the COVID-19 outbreak, and I learned that because I am HIV positive, I am particularly vulnerable to COVID-19 and at higher risk of falling seriously ill or dying if I contract the disease. Despite these vulnerabilities, no member of the medical staff at the detention center has evaluated my conditions or

11

wellbeing to determine whether any additional precautionary measures are necessary to protect me from the illness. I am fearful for my life.

36. Prior to being placed in protective custody due to the recent incidents of sexual assault, I was not placed in a separate unit with other particularly vulnerable people who are at higher risk due to existing health conditions.

37. A friend who lives in Nashville, Tennessee has agreed to receive me if I am released from detention. She is a U.S. Citizen and has agreed to be my sponsor for parole and bond purposes. If I am released, I will comply with any applicable conditions of release including attending check-ins and immigration court hearings.

38. I will also practice appropriate social distancing, isolation, and hand hygiene as recommended by public health experts. I am particularly concerned about adhering to these kinds of recommendations because of my HIV status. I am truly afraid of what might happen to me if I am exposed to COVID-19.

39. I have worked closely with my attorneys to prepare this declaration. I have authorized my attorney to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

12

Executed on April 3, 2020 at Decatur, Georgia.

_____

Hillary Li, on behalf of Jenner Benavides

## ATTORNEY DECLARATION

I, Hillary Li, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. My name is Hillary Li. I am a licensed attorney in good standing in the state of Georgia. I am an attorney of record in this litigation.

2. I represent the declarant, Jenner Benavides. Out of necessity in light of the COVID-19 pandemic, I signed Jenner Benavides's declaration on her behalf with her express consent.

3. ICE is oftentimes requiring legal visitors to provide and wear personal protective equipment, including disposable vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized to hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Center for Disease Control and Protection (CDC) issued statements warning that individuals are at a higher risk of infection when traveling.

5. In light of the above, to protect the public health, I am not able to travel to Folkston, Georgia, to obtain my clients' signature.

14

6. I spoke with Jenner Benavides over the phone and read the above declaration to her and confirmed the accuracy of the information therein. Jenner Benavides has confirmed that I can sign on her behalf, as reflected in her declaration.

I declare under penalty of perjury that the things described above are true and correct to the best of my knowledge.

Executed on April 3, 2020 at Decatur, Georgia.

_____

Hillary Li

Attorney for Plaintiffs

Asian Americans Advancing Justice-Atlanta

T: 404-585-8446

hli@advancingjustice-atlanta.org

15