## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

JOSEPH LLOYD THOMPSON, *et al.,*

    Petitioners/Plaintiffs,

    v.

JOHN TSOUKARIS, *et al.,*

    Respondents/Defendants.

Case No.:

**HEARING REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND EMERGENCY WRIT OF <u>HABEAS CORPUS</u>

# **TABLE OF CONTENTS**

I.   FACTUAL BACKGROUND...........................................................................1

    A.   Petitioners Are Detained Individuals in Georgia at High Risk of
         Serious Injury or Death from COVID-19 .............................................2

    B.   Because They Are Detained in South Georgia, Petitioners Are
         at High Risk of COVID-19 Exposure. ..................................................4

         1.   People Enter and Exit These Facilities on a Daily Basis............4

         2.   Hygiene and Sanitation Materials Are Lacking.........................5

         3.   Social Distancing Is Impossible.................................................6

         4.   COVID-19 Introduction to the Facilities Is Imminent ..............7

    C.   The Georgia Detention Centers and the Rural Hospital
         Infrastructure in South Georgia Are Incapable of Safely
         Handling Detention Center Outbreaks. .................................................8

    D.   Releasing Petitioners Would Reduce the Devastating Public
         Health Impact of COVID-19 on Georgia...........................................10

II.  ARGUMENT......................................................................................12

    A.   Petitioners are Likely to Succeed on the Merits of Their Due
         Process Claim. ..................................................................................14

         1.   Petitioners' Continued Detention During the COVID-19
              Pandemic Constitutes Impermissible Punishment....................14

         2.   By Continuing to Detain Petitioners During the COVID-
              19 Pandemic, Respondents Are Knowingly Subjecting
              them to a Substantial Risk of Serious Harm.............................16

              a.   Substantial Risk of Serious Harm...................................18

              b.   Knowing Disregard of the Substantial Risk ...................19

B.    Petitioners Face an Imminent and Substantial Threat of Irreparable Harm from COVID-19 ....................................................21

C.    The Balance of Equities and Public Interest Weigh Heavily in Petitioners' Favor. ...............................................................23

D.    The Court Should Not Require Petitioners to Provide Security Prior to Issuing a Temporary Restraining Order.................................25

III.    CONCLUSION...........................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Ancata v. Prison Health Servs., Inc.*,
769 F.2d 700 (11th Cir. 1985) ...........................................................18

*Basank v. Decker*,
2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ...................................22

*Bell v. Wolfish*,
441 U.S. 520 (1979) .................................................................. 14, 15

*BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*,
425 F.3d 964 (11th Cir. 2005) ...........................................................25

*Boumediene v. Bush*,
553 U.S. 723 (2008) .................................................................. 12, 13

*Brown v. Hughes*,
894 F.2d 1533 (11 Cir. 1990)..............................................................18

*Brown v. Plata*,
563 U.S. 493 (2011) ...........................................................................13

*Campos v. I.N.S.*,
70 F. Supp. 2d 1296 (S.D. Fla. 1998) ...............................................26

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*,
402 F.3d 1092 (11th Cir. 2005) .........................................................16

*Coronel v. Decker*,
2020 WL 1487274 (S.D.N.Y. March 27, 2020) ................................22

*Cunningham v. Adams*,
808 F.2d 815 (11th Cir. 1987) .................................................... 21, 23

*Darnell v. Pineiro*,
849 F.3d 17 (2d Cir. 2017)..................................................................17

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989) ...........................................................................................16

*Duran v. Elrod*,
   713 F.2d 292 (7th Cir. 1983),
   *cert. denied*, 465 U.S. 1108 (1984) ...................................................................13

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................................... 17, 19

*Farrow v. West*,
   320 F.3d 1235 (11th Cir. 2003) ..........................................................................18

*Fraihat v. Wolf*,
   (M.D. Pa. March 30, 2020) ...............................................................................22

*Friedenberg v. Sch. Bd. of Palm Beach Cty.*,
   911 F.3d 1084 (11th Cir. 2018) ..........................................................................13

*Gates v. Collier*,
   501 F.2d 1291 (5th Cir. 1974) ...........................................................................17

*Gordon v. County of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ...........................................................................17

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
   425 F.3d 158 (2d Cir. 2005)...............................................................................24

*Hale v. Tallapoosa County*,
   50 F. 3d 1579 (11th Cir. 1995) ..........................................................................17

*Hamm v. DeKalb County*,
   774 F.2d 1567 (11th Cir. 1985) ..........................................................................16

*Harris v. Nelson*,
   394 U.S. 286 (1969) ..........................................................................................12

*Helling v. McKinney*,
   509 U.S. 25 (1993) ..................................................................................... 17, 18

*Hilton v. Braunskill*,
   481 U.S. 770 (1987) ........................................................................................12

*Hutto v. Finney*,
   437 U.S. 678 (1978) ........................................................................................13

*In re Extradition of Alejandro Toledo Manrique*,
   2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ..........................................5

*J.M. v. Crittendon*,
   No. 1:18-CV-568-AT, 2018 WL 7079177 (N.D. Ga. May 21, 2018) ................21

*Jacoby v. Baldwin County*,
   835 F.3d 1338 (11th Cir. 2016) ........................................................................15

*Jennings v. Rodriguez*,
   No. 15-1204, 2016 WL 6276890 (Oct. 24, 2016) ................................................25

*Jones v. Governor of Fla.*,
   950 F.3d 795 (11th Cir. 2020) ................................................................. 23, 24

*KH Outdoor, LLC v. City of Trussville*,
   458 F.3d 1261 (11th Cir. 2006) ........................................................................24

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
   51 F.3d 982 (11th Cir. 1995)........................................................................13

*Magluta v. Samples*,
   375 F.3d 1269 (11th Cir. 2004) ........................................................................14

*Marbury v. Warden*,
   936 F.3d 1227 (11th Cir. 2019) ........................................................................17

*Marsh v. Fla. Dep't of Corrections*,
   330 F. App'x 179 (11th Cir. 2009) ....................................................................15

*McElligott v. Foley*,
   182 F.3d 1248 (11th Cir. 1999) ........................................................................18

*Munaf v. Geren*,
   553 U.S. 674 (2008) ........................................................................................12

*Nken v. Holder*,
    556 U.S. 418 (2009) .........................................................................23

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) .....................................................21

*Revere v. Mass. Gen. Hosp.*,
    463 U.S. 239 (1983) ................................................................ 16, 17

*Rodriguez v. Sec'y for Dep't of Corr.*,
    508 F.3d 611 (11th Cir. 2007) .......................................................19

*Schiavo ex rel. Schindler v. Schiavo*,
    403 F.3d 1289 (11th Cir. 2005) .....................................................14

*Schultz v. Alabama*,
    330 F. Supp. 3d 1344 (N.D. Ala. 2018) ....................................... 25, 26

*Telfair v. Gilberg*,
    868 F. Supp. 1396 (S.D. Ga. 1994).................................................15

*Thakker v. Doll*,
    No. 1:20-cv-00480-JEJ (M.D. Pa. Mar. 31, 2020) ...................... 21, 22

*Wilwording v. Swenson*,
    404 U.S. 249, 251 (1971).................................................................12

*Youngberg v. Romeo*,
    457 U.S. 307 (1982)...........................................................................15

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...........................................................................14

## Statutes

28 U.S.C. § 2243 ....................................................................................12

## Rules & Regulations

Fed. R. Civ. P.  65 ............................................................................ 12, 13

Fed. R. Civ. P. 65(c)................................................25

**Other Authorities**

Abigail Hauslohner, Nick Miroff & Matt Zapotosky,
    *Coronavirus Could Pose Serious Concern in ICE Jails, Immigration*
    *Courts*, The Washington Post (Mar. 12, 2020), https://wapo.st/2X5BxOY........20

*Are You at Higher Risk for Severe Illness?,*
    *Centers for Disease Control and Prevention* (accessed Mar. 23, 2020),
    https://bit.ly/3bPkxkk................................................20

Elizabeth Cohen,
    *Experts Tell White House Coronavirus Can Spread Through Talking or*
    *Even Just Breathing*, CNN, https://cnn.it/349RUeI................................2

Georgia Dep't of Public Health COVID-19 Daily Status Report,
    https://bit.ly/3aGfOBf (last visited Apr. 3 12:46 pm)..........................7

Jeremy Redmon,
    *Georgia Immigration Detention Employee Tests Positive for Coronavirus*,
    AJC.com (Mar. 31, 2010), https://bit.ly/2UYRYKj. ............................8

Letter from 763 non-governmental organizations to Matthew T. Albence,
    ICE Acting Director (Mar. 19, 2020), https://bit.ly/2UUKtUG ........................20

Letter from Dr. Scott Allen and Dr. Josiah Rich,
    Medical Experts for DHS, to House Comm. on Homeland Sec. (Mar. 19,
    2020), https://bit.ly/3dQxP1J. ..............................................19

Miriam Magaña Lopez & Seth M.  Holmes,
    *Ice Agents Are Still Performing Raids – And Using Precious N95 Masks*
    *to Do So*, The Guardian (Mar. 31, 2020), https://bit.ly/2UEiEkr. ........................4

Tanya Lewis,
    *Map Reveals Hidden U.S. Hotspots of Coronavirus Infection*, Scientific
    American (Apr. 2, 2020), https://bit.ly/2wZqiNp..................................8

U.S. Gov't Accountability Office,
    GAO-15-26, Alternatives to Detention: Improved Data Collection and

Analyses Needed to Better Assess Program Effectiveness 10-11 (Nov. 2014)...................................................................................................3

Petitioners are detained in ICE custody in Stewart Detention Center ("Stewart"), Folkston ICE Processing Center ("Folkston"), and Irwin County Detention Center ("Irwin"), all in rural southern Georgia. Due to their medical conditions, Petitioners are vulnerable to serious cases of COVID-19. If Petitioners contract COVID-19, there is a high risk they will require critical care—largely unavailable in southern Georgia—and face serious illness or death. In detention it is impossible for Petitioners to practice the only known methods to avoid COVID-19—social distancing and diligent hand hygiene. It is all but inevitable that they will be exposed to the virus and face serious harm, possibly including death, absent an immediate order from this court releasing them from detention. Indeed, at least one guard at Stewart has already tested positive for COVID-19.

## I.    FACTUAL BACKGROUND

As of the morning of April 3, 2020, the COVID-19 pandemic has infected over one million people and taken at least 53,238 lives globally, with 245,373 confirmed cases and 6,095 deaths in the United States, including 5444 cases and 176 deaths in Georgia.[1] Compl. ¶¶ 31, 33. COVID-19 can require hospitalization and the

---

[1]The number of cases is likely an underestimate "due to lack of availability of testing" in the United States.  Ex. 1 ¶ 3.

use of a ventilator and may result in long-term organ damage or death.[2] Ex. 1 ¶ 7; Ex. 2 ¶ 6. There is no known vaccine or cure for COVID-19. Ex. 1 ¶ 5; Ex. 2 ¶ 10. COVID-19 is highly contagious and is transmitted between people who are within about six feet of each other through respiratory droplets from coughing or sneezing.[3] Ex. 2 ¶ 7; *see also* Ex. 1 ¶ 11; Ex. 3 ¶ 11. Scrupulous hand hygiene and social distancing—staying at least six feet away from all other people—are the only known ways to avoid the illness. Ex. 1 ¶¶ 5, 9, 11; Ex. 2 ¶ 11; Ex. 3 ¶ 11.

## A. Petitioners Are Detained Individuals in Georgia at High Risk of Serious Injury or Death from COVID-19

Advanced age and certain underlying medical conditions, including compromised immune system, diabetes and other endocrine disorders, metabolic disorders, heart and lung disease, and neurological and neurodevelopmental conditions, greatly increase the likelihood of contracting a serious case of COVID-19 that requires hospitalization and support from a ventilator. Ex. 1 ¶¶ 6, 8; Ex. 2 ¶¶

---

[2]All exhibits cited in this motion are exhibits attached to the Declaration of Hillary Li, which is attached to this motion.
[3]Breaking research suggests that COVID-19 may also spread when people merely talk or breathe. *See* Elizabeth Cohen, *Experts Tell White House Coronavirus Can Spread Through Talking or Even Just Breathing*, CNN, https://cnn.it/349RUeI.
**Error! Hyperlink reference not valid.**

4-5; *see also* Ex. 3 ¶ 5. According to preliminary data from China, 20% of people in these high-risk categories who contract COVID-19 have died. Ex. 1 ¶ 6.

Petitioners are individuals detained at Stewart, Folkston and Irwin who all have underlying medical conditions that put them at high risk for COVID-19.[4] Ex. 8-18, 20.

Petitioners have safe places to live where they can practice social distancing and hand hygiene upon release. They will comply with all conditions of release including attending immigration court hearings.[5] Ex. 8 ¶¶ 28-29; Ex. 9 ¶¶ 23-24; Ex. 10 ¶¶ 22-23; Ex. 11 ¶¶ 19-20; Ex. 12 ¶¶ 17-18; Ex. 13 ¶ 22; Ex. 14 ¶¶ 36-37; Ex. 15 ¶¶ 30-31; Ex. 16 ¶¶ 18-19; Ex. 17 ¶¶ 27-28; Ex. 18 ¶¶ 18-19; Ex. 20 ¶¶ 12-13.

**B.     Because They Are Detained in South Georgia, Petitioners Are at High Risk of COVID-19 Exposure.**

    **1.     People Enter and Exit These Facilities on a Daily Basis**

---

[4] Petitioner Tomas Hernandez's last known location was the Stewart Detention Center in Lumpkin, Georgia. As of April 3, 2020, Petitioners' counsel has reason to believe that he may have been transferred or moved and is unable to confirm his current location.

[5] ICE regularly releases individuals using various alternatives to detention with documented success. For example, an evaluation of ICE's conditional supervision program, ISAP, reported a 99% attendance rate at all immigration court hearings. *See* U.S. Gov't Accountability Office, GAO-15-26, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness 10-11 (Nov. 2014).

Detention center staff, ICE officers, contractors, vendors, and legal visitors enter and exit Stewart, Folkston, and Irwin on a daily basis. *See* Ex 1. ¶ 11, 15; *see generally* Ex. 4; Ex. 5; Ex. 6 ¶ 20; Ex. 7. Stewart also houses an immigration court, requiring judges, court staff, interpreters, and witnesses to do the same. *See* Ex. 4 ¶¶ 4, 9. Neither ICE nor the corporations that manage the detention centers mandate that staff or legal visitors use personal protective equipment ("PPE"). Ex. 4 ¶¶ 7, 10, 14; Ex. 5 ¶ 3; Ex. 7 ¶¶ 7-9; Ex. 8 ¶ 13; Ex. 9 ¶¶ 14, 18; Ex. 10 ¶ 16; Ex. 11 ¶ 18; Ex. 12 ¶ 13; Ex. 13 ¶¶ 15, 17; Ex. 14 ¶¶ 27-29; Ex. 15 ¶¶ 13, 22; Ex. 17 ¶ 8; Ex. 18 ¶¶ 17-18; Ex. 20 ¶ 11. One Petitioner reported seeing ICE personnel maintaining close contact with detainees without wearing face masks or gloves. Ex. 14 ¶ 29. ICE's guidance around PPE fails to account for the ongoing nationwide shortage. Ex. 3 ¶¶ 10-11, 22. ICE continues to arrest and bring new people into detention facilities, while also moving currently detained immigrants in and out of facilities and transferring them between different facilities.[6] Ex. 9 ¶ 18; Ex. 10 ¶ 18; Ex. 11 ¶ 9; Ex. 13 ¶ 20; Ex. 14 ¶ 33; Ex. 15 ¶ 26; Ex. 17 ¶¶ 2, 11-16, 24. On April 1, 2020, Irwin staff took Petitioner Hernandez to a hospital an hour away without providing her

---

[6]Miriam Magaña Lopez & Seth M. Holmes, *Ice Agents Are Still Performing Raids – And Using Precious N95 Masks to Do So*, The Guardian (Mar. 31, 2020), https://bit.ly/2UEiEkr.

PPE, causing her to fear exposure to COVID-19. Irwin staff brought her back to the detention center the same day without quarantining her. Ex. 11 ¶ 9.

All people entering the detention centers are potential sources of COVID-19 exposure. ICE may be sporadically screening such people for symptoms or contacts with known cases, but such screening is not an effective way to avoid exposure, given the known risk of asymptomatic and pre-symptomatic carriers. Ex. 1 ¶¶ 4, 14; Ex. 2 ¶ 18; Ex. 3 ¶¶ 6, 18, 22; *see also In re Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020). The only effective screening tool to prevent transmission of COVID-19 into Georgia detention centers is a COVID-19 test; but performing such tests on every individual detained at Georgia detention centers, as well as every staff member, contractor, or legal visitor on their entry to the detention center, is impossible because of the severe shortage of testing available in the United States. Ex. 3 ¶¶18, 22.

### 2. Hygiene and Sanitation Materials Are Lacking

COVID-19 can be spread by touching a surface or object that an infected person has touched and then touching one's face. Ex. 2 ¶ 7. The Georgia detention centers have shared living, eating, and recreation spaces with poor sanitation where thorough hygiene practices are not possible. Ex. 1 ¶ 12; Ex. 2 ¶ 13; Ex. 3 ¶ 19. Individuals in detention share bathrooms, showers, and sinks with little opportunity

for adequate disinfection between uses. Ex. 1 ¶ 12, ; Ex. 8 ¶¶ 7-12; Ex. 9 ¶ 11; Ex.

10 ¶¶ 7, 9, 14-15; Ex. 11 ¶¶ 14-16; Ex. 12 ¶¶ 10-11; Ex. 13 ¶¶ 13-14; Ex. 14 ¶ 21-

22, 25-26; Ex. 16 ¶¶ 6-8, 10; Ex. 17 ¶¶ 19-20; Ex. 18 ¶¶ 10-11; Ex. 20 ¶¶ 8-10.

Petitioners report a lack of access to soap and cleaning materials, preventing

compliance with the Centers for Disease Control's recommended hand hygiene and

sanitation measures. Ex. 8 ¶¶ 11, 13; Ex. 9 ¶¶ 12-13, 15; Ex. 10 ¶¶ 13, 15; Ex. 11 ¶¶

9, 15-16; Ex. 12 ¶¶ 9-11; Ex. 14 ¶¶ 23-26; Ex. 15 ¶¶ 14-17, 20; Ex. 16 ¶ 9; Ex. 17

¶¶ 13-14, 22-23; Ex. 18 ¶¶ 13-14. Some Petitioners report receiving some cleaning

materials that exacerbate asthma, causing many detained people to cough and have

difficulty breathing. Ex. 13 ¶ 16, 19. One Petitioner described receiving only four

single-use squares of liquid soap a week for the past few weeks of the COVID-19

outbreak, which she was expected to use for both hand washing and showers. Ex. 14

¶ 23. During an infectious disease outbreak, providing soap for four uses per week

is egregious. *See* Ex. 14 ¶ 23; Ex. 2 ¶ 16; Ex. 3 ¶ 11.

### 3. Social Distancing Is Impossible

Detention centers are particularly susceptible to rapid spread due to the

congregate nature of detention centers and overcrowding. Ex. 1 ¶¶11, 12, 20f; Ex. 3

¶¶ 20, 23; Ex. 19 ¶ 5 ("The design of these facilities requires inmates to remain in

close contact with one another.").

There is no way to practice social distancing at Stewart, Folkston, and Irwin. Ex. 8 ¶¶ 7-8; Ex. 9 ¶ 10; Ex. 10 ¶ 9; Ex. 11 ¶ 14; Ex. 12 ¶¶ 8-9; Ex. 13 ¶¶ 13-14; Ex. 14 ¶ 22; Ex. 15 ¶¶ 9-11, 27; Ex. 16 ¶¶ 6, 8; Ex. 17 ¶¶ 15, 19; Ex. 18 ¶ 11, 19; Ex. 20 ¶ 8-10. At these facilities, detained people live in extremely close quarters, often in shared dorms with dozens of people sleeping feet apart from each other, or in small shared cells. *E.g.* Ex. 8 ¶¶ 7-8; Ex. 9 ¶ 10; Ex. 11 ¶ 14; Ex. 12 ¶¶ 8-9; Ex. 13 ¶¶ 13-14; Ex. 15 ¶¶ 9-10; Ex. 16 ¶¶ 6-7; Ex. 18 ¶¶ 10-11. Petitioners have observed very few if any changes within their facilities over the last several weeks in response to the pandemic. *See, e.g.*, Ex. 8 ¶ 13; Ex. 11 ¶¶ 11-12 (noting that when detained people ask for information, guards and staff threaten to take away tablets, restrict phone access, or put people in solitary confinement); Ex. 15 ¶¶ 18-20.

4. **COVID-19 Introduction to the Facilities Is Imminent**

Petitioners seek emergency relief from this Court at a time when COVID-19 has already begun to ravage Georgia. There are confirmed cases in all counties where the Georgia detention centers are located.[7] Albany, Georgia—which has some of the closest ICU beds to Stewart and Irwin—has among the highest per capita rates of

---

[7]Georgia Dep't of Public Health COVID-19 Daily Status Report, https://bit.ly/3aGfOBf (last visited Apr. 3 12:46 pm).

COVID-19 infection and death in the world.[8] Reports from detained people inside Stewart and Irwin indicate that there may already be confirmed COVID-19 cases inside the facilities. Ex. 6 ¶ 13; Ex. 10 ¶ 18; Ex. 12 ¶ 16; Ex. 13 ¶ 21; Ex. 16 ¶ 17; Ex. 17 ¶ 20; Ex. 18 ¶¶ 9, 16; Ex. 20 ¶ 8. ICE confirmed late on March 31, 2020, that a Stewart guard has tested positive.[9] If the virus has not yet reached people detained inside these facilities, it is only a matter of time. *See* Ex. 1 ¶ 10; Ex. 2 ¶ 19.

## C. The Georgia Detention Centers and the Rural Hospital Infrastructure in South Georgia Are Incapable of Safely Handling Detention Center Outbreaks.

The threat posed by COVID-19—a harrowing and highly contagious illness that spreads like wildfire in crowded spaces—is unlike anything ICE has ever managed. The Georgia detention centers are ill-equipped to address medical emergencies and disease outbreaks. *See* Ex. 6 ¶¶ 10, 14, 17 (reporting having witnessed a single holding cell used to contain detained individuals seeking medical care); Ex. 7 ¶ 17 (recounting previous outbreaks at Folkston). At Stewart, Irwin, and Folkston, ICE has long been unable to provide even basic medical care to detained people, resulting in needless deaths and other medical emergencies. Ex. 6 ¶¶ 9, 15,

---

[8]Tanya Lewis, *Map Reveals Hidden U.S. Hotspots of Coronavirus Infection*, Scientific American (Apr. 2, 2020), https://bit.ly/2wZqiNp.**Error! Hyperlink reference not valid.Error! Hyperlink reference not valid.**
[9]Jeremy Redmon, *Georgia Immigration Detention Employee Tests Positive for Coronavirus*, AJC.com (Mar. 31, 2010), https://bit.ly/2UYRYKj.

16, 19; Ex. 7 ¶ 15, 17; Ex. 8 ¶¶ 14-26; Ex. 9 ¶¶ 4-6, 8-10, 20-21; Ex. 10 ¶¶ 8, 10-12; Ex. 11 ¶¶ 6-7, 13; Ex. 12 ¶¶ 6-8, 14-15; Ex. 13 ¶¶ 7, 9-12, 16; Ex. 14 ¶¶ 11-15; Ex. 15 ¶ 8; Ex. 16 ¶¶ 13-15; Ex. 17 ¶¶ 5, 13, 18, 25; Ex. 18 ¶¶ 20, 23-25; Ex. 20 ¶ 7; Compl. ¶¶ 69-78 (collecting sources). When ICE has consistently demonstrated that it is incapable of managing the health and medical care of those in its custody during ordinary times, it is a foregone conclusion that ICE cannot protect the medically vulnerable in the face of a pandemic that has overwhelmed health systems the world over. *See* Ex. 1 ¶ 13, 16; Ex. 3 ¶ 21; Ex. 19 ¶ 6.

The minimal steps ICE has taken to address the pandemic, as well as the limited additional steps—short of release—that they can feasibly take, will necessarily be ineffective in curbing the virus's spread in detention centers. *See* Ex. 1 ¶¶ 18-23; Ex. 3 ¶¶ 22-23. ICE cannot dramatically expand its infrastructure overnight to make space for social distancing. *Cf.* Ex. 1 ¶ 20e; Ex. 19 ¶ 5. DHS has issued guidance to isolate, quarantine, and cohort (segregate as a group from others in the facility) to attempt to mitigate spread, yet these will make matters worse. Ex. 1 ¶ 22 (describing mental health risks and increased physical contact in isolation); Ex. 2 ¶ 20 ("Isolation of symptomatic individuals within detention settings similarly will not stop transmission before symptom onset."); Ex. 3 ¶¶ 8 (describing medical isolation as an "unacceptable and potentially deadly form of quarantine").

Furthermore, Stewart, Folkston, and Irwin are geographically isolated from appropriate levels of medical care to treat COVID-19. Ex. 3 ¶¶ 12-14. The time it will take to transport infected individuals to hospitals could make the difference between life and death. Ex. 3 ¶ 16.

## D. Releasing Petitioners Would Reduce the Devastating Public Health Impact of COVID-19 on Georgia

Petitioners' continued detention not only threatens their own health and wellbeing but also subjects all other detained individuals and staff at Stewart, Irwin, and Folkston to an increased risk of illness or death. *See* Ex. 1 ¶¶ 12, 20a, 25; Ex. 19 ¶ 7; Ex. 3 ¶ 19, 21. The release of vulnerable individuals mitigates the overall risk of a COVID-19 outbreak in any detention facility because it reduces the total number of detained individuals, thereby permitting greater social distancing and reducing the staff's workload. Ex. 19 ¶ 9; Ex. 1 ¶¶ 17, 24-27; Ex. 3 ¶ 22.[10]

An outbreak of COVID-19 at any of Georgia's immigration detention centers would likely overwhelm the local health infrastructure in the surrounding communities. Ex. 3 ¶¶ 14-15 (explaining impact of a detention center outbreak on regional hospitals that serve large swaths of south Georgia). The closest hospitals to

---

[10]Already prisons and detention centers in other countries and many U.S. states have begun releasing people from custody or reducing new arrests. *See, e.g.*, Compl. ¶ 59.

these facilities that are equipped to manage serious cases of COVID-19 serve many counties that are already overwhelmed with COVID-19 cases or will quickly become so if there are outbreaks in these facilities. Ex. 3 ¶ 15 (citing predictions that all Georgia hospital resources will be in use by April 22, 2020). Phoebe Putney Memorial Hospital in Albany—a town only 53 miles from Stewart—has filled three ICUs to capacity with COVID-19 patients. Compl. ¶ 85. If particularly vulnerable detained individuals like Petitioners fall critically ill from COVID-19, their need for intensive medical care would even further strain local hospitals that are already stretched to capacity. Compl. ¶¶ 99-104; Ex. 1 ¶ 25; Ex. 2 ¶ 5 (fatality rates increase as hospitals become overburdened) Ex. 3 ¶¶14-15.

Petitioners filed a habeas petition and complaint for declaratory and injunctive relief on April 3, 2020, alleging that their detention during the pandemic violates the Fifth Amendment Due Process Clause. The emergency nature of this situation cannot be overstated: because they are detained at Stewart, Folkston, and Irwin, Petitioners are at imminent near-certain risk of exposure to an illness from which they have a 20% chance of dying. If they remain detained in southern Georgia, where hospitals are wholly unprepared to treat the impending volume of COVID-19 patients, there is also an unreasonably high risk that Petitioners will be unable to access life-saving medical treatment. Civil detention with such odds of grave harm

cannot be constitutional. Petitioners implore the Court to save their lives and order their immediate release.

## II.    ARGUMENT

Petitioners seek emergency release through a writ of habeas corpus or, alternatively, through injunctive relief under Rule 65. "Habeas is at its core a remedy for unlawful executive detention." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Habeas vests in federal courts broad, equitable authority to "dispose of the matter as law and justice require," 28 U.S.C. § 2243; the "very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice . . . are surfaced and corrected." *Harris v. Nelson*, 394 U.S. 286, 291 (1969). Habeas corpus is, "above all, an adaptable remedy," *Boumediene v. Bush*, 553 U.S. 723, 779 (2008), conferring "broad discretion" on courts to right wrongs, *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). Accordingly, the illegality of custody under the "Constitution or laws . . . of the United States" may stem from the fact of detention and the duration of detention—what is often referred to as the historical core of habeas—or from unlawful placement or conditions of detention. *See Wilwording v. Swenson*, 404 U.S. 249, 249, 251 (1971) (habeas challenging "living conditions and disciplinary measures" is "cognizable in federal habeas corpus"). The Court is fully empowered to remediate through habeas the particular

illegality here—an outbreak of lethal and unavoidable virus that threatens Petitioners and violates their constitutional rights—by ordering Petitioners' release. *See Boumediene*, 553 U.S. at 779.

Courts have similarly broad power under Rule 65 to fashion equitable remedies to address constitutional violations in prisons. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978); *see, e.g.*, *Brown v. Plata*, 563 U.S. 493, 511 (2011) (recognizing authority to "plac[e] limits on a prison's population" when necessary to ensure constitutional compliance); *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (court had authority to direct release of low-bond pretrial detainees as necessary to reach a population cap).

A TRO is warranted when the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury unless the order issues; (3) the threatened injury to the movant outweighs any harm the injunction may cause the opposing party; and (4) the injunction would not undermine the public interest. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995); *accord Friedenberg v. Sch. Bd. of Palm Beach Cty.*, 911 F.3d 1084, 1090 (11th Cir. 2018). "Where, as here, the 'balance of the equities weighs heavily in favor of granting the [injunction]' the Plaintiffs need only show a

'substantial case on the merits.'" *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1298 (11th Cir. 2005). Petitioners easily satisfy all four factors.

**A.    Petitioners are Likely to Succeed on the Merits of Their Due Process Claim.**

All immigration detainees, even those with prior criminal convictions, are civil detainees held pursuant to immigration laws and protected by the Fifth Amendment Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Petitioners are likely to succeed on the merits of their Due Process claim for two independent reasons: continuing to detain Petitioners in Stewart, Folkston, and Irwin during the COVID-19 global pandemic (1) constitutes impermissible punishment, and (2) amounts to deliberate indifference to a substantial risk of harm.

**1.    Petitioners' Continued Detention During the COVID-19 Pandemic Constitutes Impermissible Punishment.**

The Fifth Amendment Due Process Clause, like the Fourteenth Amendment, prohibits punishment of people in civil custody. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004). Civilly detained people "are generally 'entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Marsh v. Fla. Dep't of Corrections*, 330 F. App'x 179 (11th Cir. 2009) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).

To establish that a particular condition or restriction of detention constitutes impermissible punishment, a petitioner must show either (1) an expressed intent to punish; or (2) lack of a reasonable relationship to a legitimate governmental purpose, from which an intent to punish may be inferred. *See Wolfish*, 441 U.S. at 538. Absent explicit intent, courts must ask first "whether any 'legitimate goal' was served by the prison conditions" and second, "whether the conditions are 'reasonably related' to that goal." *Jacoby v. Baldwin County*, 835 F.3d 1338, 1345 (11th Cir. 2016). "[I]f conditions are so extreme that less harsh alternatives are easily available, those conditions constitute 'punishment.'" *Telfair v. Gilberg*, 868 F. Supp. 1396, 1412 (S.D. Ga. 1994) (citing *Wolfish*, 441 U.S. at 538-39 n.20).

The threat of serious illness and death from COVID-19 is not reasonably related to, and vastly outweighs, any purported government interest in Petitioners' civil confinement. As set forth previously, *supra* I.A, Petitioners' underlying health conditions make them especially susceptible to severe illness, life-altering complications, or death if they contract COVID-19. The measures required to prevent Petitioners from contracting COVID-19 are impossible in the Georgia detention centers, and the medical resources needed to treat even a moderate volume of critical care patients are unavailable in south Georgia. *Supra* I.C. Under these circumstances, the government's detention of Petitioners is clearly excessive in

relation to any countervailing government interest. And any government interest in detaining Petitioners can be satisfied with less harsh alternatives. *See supra* n. 4.

**2.** **By Continuing to Detain Petitioners During the COVID-19 Pandemic, Respondents Are Knowingly Subjecting them to a Substantial Risk of Serious Harm**

When Respondents "take[] a person into its custody and hold[] him there against his will, the Constitution imposes . . . a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 199-200 (1989). Failure to provide detained individuals with basic necessities, such as adequate medical care, violates due process. *Hamm v. DeKalb County*, 774 F.2d 1567, at 1573 (11th Cir. 1985); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1115 (11th Cir. 2005). At a minimum, due process prohibits Respondents' deliberate indifference to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation in the post-conviction context.[11] *Revere v. Mass. Gen. Hosp.*,

_____

[11]Civil immigration detainees should not have to satisfy the Eighth Amendment's requirement that a prison official had subjective knowledge of a substantial risk in order to establish a Fifth Amendment violation related to conditions of confinement. The Eleventh Circuit has not yet directly addressed this issue. Other courts have held that an objective deliberate indifference standard should apply to individuals in this context. *See Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 794 (2019); *Darnell v. Pineiro*, 849 F.3d 17, 32-36 (2d Cir.

463 U.S. 239, 244 (1983); *Hale v. Tallapoosa County*, 50 F. 3d 1579, 1582 n.4 (11th Cir. 1995). To show that Respondents are acting with deliberate indifference, Petitioners must show they were exposed to a substantial risk of serious harm, and Respondents knew or should have known of the risk but disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 834, 837–38 (1994); *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019).

The government may violate the Eighth Amendment when it "ignore[s] a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Gates v. Collier*, 501 F.2d 1291, 1300-01 (5th Cir. 1974) (Eighth Amendment violation due to the mingling of "inmates with serious contagious diseases" with other inmates). Courts do not require a plaintiff to "await a tragic event" before seeking relief from unconstitutionally dangerous conditions. *Helling*, 509 U.S. at 33. "It would be odd to deny an injunction to inmates who plainly proved an unsafe,

---

2017). But the court need not address this issue because the evidence is clear that ICE is aware of the substantial risk of serious harm to Petitioners.

life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.*

Thus, the harm Petitioners fear—that their confinement will result in a COVID-19 infection that will seriously injure and possibly kill them—need not become a reality to establish a constitutional violation.

        *a.*     *Substantial Risk of Serious Harm*

By continuing to detain Petitioners, who have medical conditions that render them particularly vulnerable to COVID-19, Respondents are jeopardizing their health and possibly their lives. *See supra* I.A. Petitioners have a 20% risk of death if they contract the disease, and a higher risk of suffering severe complications requiring hospitalization, including intubation and the use of a ventilator, and long-term organ damage.  Yet if Petitioners remain detained in south Georgia, there may not be even one critical care bed available to them in the event of serious infection. *Cf. Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003) (denial or delay in access to needed medical care may amount to deliberate indifference); *accord McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Brown v. Hughes*, 894 F.2d 1533 (11 Cir. 1990); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). These risks constitute the most serious of harms.

        *b.*     *Knowing Disregard of the Substantial Risk*

Respondents have "subjective knowledge of a substantial risk of serious harm" to Petitioners but are "disregard[ing] that known risk by failing to respond to it in an (objectively) reasonable manner." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617, 619 n.15 (11th Cir. 2007); *see also Farmer*, 511 U.S. at 842. Where a risk is obvious, such as the threat posed to medically vulnerable people during a highly contagious and deadly disease outbreak, courts can presume that government officials are aware of the risk. *See, e.g.*, *id.*

There is no question that ICE has actual knowledge of the excessive risk of harm that the coronavirus presents to individuals in ICE custody with underlying medical conditions, including Petitioners. DHS whistleblowers raised the alarm as early as February 25, 2020, recommending release of most detained immigrants due to the specific risks that COVID-19 poses to them.[12] In the last several weeks, ICE has received numerous letters from advocates, medical professionals, and members of Congress emphasizing these same risks, including letters specifically addressing

---

[12] *See, e.g.*, Letter from Dr. Scott Allen and Dr. Josiah Rich, Medical Experts for DHS, to House Comm. on Homeland Sec. (Mar. 19, 2020), https://bit.ly/3dQxP1J.

the Georgia detention centers.[13] There have also been many news articles highlighting the risk of coronavirus outbreaks in ICE facilities.[14]

The federal government itself has issued warnings about the particular risk of COVID-19 for people with high-risk medical conditions.[15] It has also issued guidance to the public that social distancing and proper hand hygiene—measures which Petitioners cannot possibly practice in immigration detention—are effective ways to reduce the risk of exposure to COVID-19. Despite ICE's awareness of the heightened risk faced by Petitioners, the agency continues to detain them under conditions where there is no effective way to protect them from exposure.

Courts across the United States have recognized that urgent release of medically vulnerable individuals from immigration detention is the only appropriate course of action in the face of a highly contagious disease with a death toll that continues to rises daily. *See* Compl. ¶ 5 n.1 (collecting cases).

---

[13]Ex. 6 ¶ 26; *see e.g.*, Letter from 763 non-governmental organizations to Matthew T. Albence, ICE Acting Director (Mar. 19, 2020), https://bit.ly/2UUKtUG.
[14]*See, e.g.*, Abigail Hauslohner, Nick Miroff & Matt Zapotosky, *Coronavirus Could Pose Serious Concern in ICE Jails, Immigration Courts*, The Washington Post (Mar. 12, 2020), https://wapo.st/2X5BxOY.
[15]*Are You at Higher Risk for Severe Illness?*, *Centers for Disease Control and Prevention* (accessed Mar. 23, 2020), https://bit.ly/3bPkxkk.

For the foregoing reasons, Petitioners are likely to succeed on the merits of their claim that their continued detention violates their Fifth Amendment due process right to reasonable safety and freedom from punishment in government custody.

## B. Petitioners Face an Imminent and Substantial Threat of Irreparable Harm from COVID-19

An injury is irreparable when a plaintiff cannot obtain adequate compensatory or corrective relief through the ordinary course of litigation. *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). The injury must be "actual and imminent, not remote or speculative." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013). Absent a TRO, Petitioners face the most fundamental kind of irreparable harm—imminent and substantial risk of serious, lasting illness or death. "There can be no injury more irreparable." Memorandum and Order at 9, *Thakker*, No. 1:20-cv-00480-JEJ; *see also J.M. v. Crittendon*, No. 1:18-CV-568-AT, 2018 WL 7079177, at *7 (N.D. Ga. May 21, 2018).

Petitioners are highly likely to contract COVID-19 if they remain in ICE detention, where their sole defenses against the risk of a coronavirus infection—social distancing and scrupulous hygiene—are simply impossible for the reasons stated above. *See supra* I.B.2, 3. "[I]t is not a matter of *if* COVID-19 will enter . . . prisons, but *when* it is finally detected therein." Memorandum and Order at 8, *Thakker v. Doll*, No. 1:20-cv-00480-JEJ (M.D. Pa. Mar. 31, 2020). Further

exacerbating the risk of injury to Petitioners is their lack of access to adequate medical care in the event of a serious COVID-19 infection. *See supra* I.C. The closest hospitals that can provide critical care services are far away and will quickly become overwhelmed if there are outbreaks in these detention centers.

As the COVID-19 pandemic continues to ravage communities in the United States, courts across the country have begun to acknowledge, in no uncertain terms, the gravity of the danger medically vulnerable individuals like Petitioners face in ICE detention. *See, e.g.*, Temporary Restraining Order and Order to Show Cause at 11, Temporary Restraining Order and Order to Show Cause at 11, *Fraihat v. Wolf*, (M.D. Pa. March 30, 2020) (recognizing the risk of spread from staff ingress and egress); Memorandum and Order at 24, *Thakker*, No. 1:20-cv-00480-JEJ (stating that ICE's facilities were "plainly not equipped" to protect petitioners from a potentially fatal exposure to COVID-19 and that failure to urgently release petitioners would be an "unconscionable and possibly barbaric result"); *Coronel v. Decker*, 2020 WL 1487274 (S.D.N.Y. March 27, 2020); Memorandum and Order at 3-4, *Basank v. Decker*, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm . . . ").

Additionally, continuing to detain Petitioners—when their medical conditions put them at grave risk of severe illness or death if they contract COVID-19—violates due process under the Fifth Amendment. Deprivations of constitutional rights that cannot be compensated monetarily generally amount to irreparable injury as a matter of law. *See Cunningham v. Adams*, 808 F.2d 815, 822 (11th Cir. 1987). As public health experts make clear, Respondents cannot ameliorate the life-threatening risk to Petitioners through any means other than immediate release. Release is the sole remedy that can effectively protect Petitioners against the grave and imminent threat that COVID-19 poses to their health and redress Respondents' violations of their due process rights.

## C. The Balance of Equities and Public Interest Weigh Heavily in Petitioners' Favor.

The final two factors of the TRO inquiry "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In contrast to Petitioners' significant risk of serious illness or death, *see supra* I.A, Respondents will not be injured by an injunction. Indeed, it is in both the Respondents' and the broader public interest to release medically vulnerable individuals from custody, rather than needlessly jeopardizing their health and lives. Moreover, "the public interest is served when constitutional rights are protected." *Jones v. Governor of*

*Fla.*, 950 F.3d 795, 830 (11th Cir. 2020) (citation omitted); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

ICE has an interest in preventing any potential spread of COVID-19 in its detention facilities in order to maintain the health and safety of everyone who has contact with the facilities. The release of people most vulnerable to COVID-19—which would permit greater social distancing and decrease staff workloads—reduces the overall health risk for detained individuals and facility staff alike at Stewart, Irwin, and Folkston, as well as for surrounding communities. Far from harming the government, Petitioners' release would further ICE's interests in maintaining a healthy and orderly environment at Stewart, Irwin, and Folkston.

Releasing Petitioners is unquestionably in the public interest. Ex. 19 ¶6. *See, e.g.*, *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (referring to "public health" as a "significant public interest[]"); *see also* Allen & Rich Ltr., *supra* n. 13 ("*[I]t is essential to consider releasing all detainees who do not pose an immediate risk to public safety*"). In the unprecedented and rapidly evolving circumstances COVID-19 crisis, the continued civil detention of aging or ill individuals does not serve the public's interest. An outbreak of COVID-19 at any of Georgia's immigration detention centers would further strain both local and state health infrastructure and contribute to more massive community spread and more

deaths. The health and safety of the public would thus be best served by rapidly decreasing the number of individuals detained in confined, unsafe conditions. Ex. 19 ¶ 9. By releasing such individuals now, ICE would reduce the spread and severity of infection inside Stewart, Irwin, and Folkston. This, in turn, would reduce the number of people who will become ill enough to require hospitalization and thereby decrease the health and economic burden on local communities. Ex. 1 ¶ 26.

To the extent the equities weigh in favor of some restraint of Petitioners' liberty, that can be achieved through fashioning reasonable release conditions that ICE already uses and that have demonstrated success. *See supra* n. 4; Brief of Amicus Curiae at 36-37, *Jennings v. Rodriguez*, No. 15-1204, 2016 WL 6276890 (Oct. 24, 2016).

## D. The Court Should Not Require Petitioners to Provide Security Prior to Issuing a Temporary Restraining Order.

Courts have discretion to waive the requirement in Federal Rule of Civil Procedure 65(c) that a movant provide a security upon the issuance of a preliminary injunction or TRO. *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). District courts in this Circuit often exercise this discretion to require no security in cases brought by indigent and/or incarcerated people. *See, e.g.*, *Schultz v. Alabama*, 330 F. Supp. 3d 1344, 1376 (N.D.

Ala. 2018) (county prisoners); *Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998) (indigent immigrants). This Court should do the same here.

### III. CONCLUSION

For the foregoing reasons, Petitioners' motion for a temporary restraining order should be granted.

Dated: April 3, 2020                         Respectfully submitted,

SOUTHERN POVERTY LAW CENTER          ASIAN AMERICANS ADVANCING JUSTICE-
                                     ATLANTA

By: /s/ Gracie Willis                By: /s/ Hillary Li
Gracie Willis (GA Bar #851021)       Hillary Li (GA Bar #898375)
Rebecca Cassler (GA Bar #487886)     Phi Nguyen (Ga Bar #578019)
Lorilei Williams*                    5680 Oakbrook Pkwy, Ste. 148
150 E. Ponce de Leon Ave., Ste. 340  Norcross, GA 30093
Decatur, GA 30030                    *Tel:* (404) 585-8466
*Tel:* (404) 521-6700                *Fax:* (404) 890-5690
*Fax:* (404) 221-5857                hli@advancingjustice-atlanta.org
gracie.willis@splcenter.org          pnguyen@advancingjustice-atlanta.org
rebecca.cassler@splcenter.org


Paul Chavez*                         KILPATRICK TOWNSEND & STOCKTON LLP
Victoria Mesa-Estrada*
2 S. Biscayne Blvd., Ste. 3200       By: /s/ Tamara Serwer Caldas
Miami, FL 33101                      Tamara Serwer Caldas (GA Bar #617053)
*Tel:* (786) 347-2056                Kathryn E. Isted (GA Bar #908030)
paul.chavez@splcenter.org            Amanda Brouillette (GA Bar #880528)
victoria.mesa@splcenter.org          1100 Peachtree St., NE, Ste. 2800
                                     Atlanta, GA 30309
Melissa Crow*                        *Tel:* (404) 815-6006
1101 17th Street, NW, Ste. 705       *Fax:* (404) 541-4754
Washington, DC 20036                 tcaldas@kilpatricktownsend.com
*Tel:* (202) 355-4471                kisted@kilpatricktownsend.com

*Fax:* (404) 221-5857          abrouillette@kilpatricktownsend.com
melissa.crow@splcenter.org

*pro hac vice motions forthcoming